UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————

ESTATE OF ESTHER KLIEMAN, et al.,          )
                                           )
          Plaintiffs,                      )
                                           )
     v.                                    )          Civil Action No. 04-1173 (PLF)
                                           )
PALESTINIAN AUTHORITY, et al.,             )
                                           )
          Defendants.                      )

—————————————————————

OPINION

The estate, survivors and heirs of Esther Klieman, a United States citizen, have

brought this action under Section 2333 of the Antiterrorism Act of 1991 ("ATA"), 18 U.S.C.

§§ 2331 et seq., and various tort theories, against the Palestinian Authority (the "PA"), also

known as the Palestinian Interim Self-Government Authority and the Palestinian National

Authority; the Palestine Liberation Organization (the "PLO"); Al Aqsa Martyrs Brigade; Fatah;

Tanzim; Force 17; Yasser Arafat, now deceased; and five other individuals.[1]  Now pending

before the Court are (1) the motion of the Palestinian Authority and the Palestine Liberation

Organization (together referred to herein as "defendants") to dismiss the complaint; (2) plaintiffs'

motion for partial summary judgment; and (3) defendants' motion for the abatement of all

_____

[1]       The ATA claim appears in Count One of the complaint.  The common law tort
theories, pled pursuant to 28 U.S.C. § 1367, are negligence, gross negligence, and intentional and
negligent infliction of emotional distress (Counts Two through Five), as well as similar causes of
action under Israeli law (Counts Six through Eight).  Plaintiffs also assert a claim for punitive
damages (Count Nine).

proceedings in this case for three months, until May 1, 2006.  The Court heard oral argument on

the first two of the three motions on December 15, 2005.

## I. BACKGROUND

As alleged in the complaint, on March 24, 2002, a terrorist attack was carried out

on a public transport bus traveling "on the Abud bypass road, near the village of Umm Safah,

north of Ramallah, in the State of Israel or in territories administered or controlled by the State of

Israel."  Complaint ¶ 23; see also id. ¶¶ 1, 22, 24.  The attack, in which one of the named

individuals is alleged to have opened fire on the bus with a Kalachnikov Automatic rifle, resulted

in the death of Esther Klieman.  Id. ¶¶ 24, 25.  Plaintiffs contend that defendants are responsible

for the attack and, accordingly, have brought this action under the ATA, which establishes a

federal cause of action for damages resulting from terrorist attacks in foreign countries.

The ATA provides in relevant part:

> Any national of the United States injured in his or her person,
> property, or business by reason of an act of international terrorism, or
> his or her estate, survivors, or heirs, may sue therefor in any
> appropriate district court of the United States and shall recover
> threefold the damages he or she sustains and the cost of the suit,
> including attorney's fees.

18 U.S.C. § 2333(a).  The ATA, in turn, defines "international terrorism" as "activities" that:

> (A) involve violent acts or acts dangerous to human life that
> are a violation of the criminal laws of the United States or of any
> State, or that would be a criminal violation if committed within the
> jurisdiction of the United States or of any State;

> (B) appear to be intended – (i) to intimidate or coerce a
> civilian population; (ii) to influence the policy of a government by
> intimidation or coercion; or (iii) to affect the conduct of a government
> by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1).

Defendants, relying on Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, seek dismissal on four grounds. First, they assert sovereign immunity from suit under both Section 1604 of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 et seq., and Section 2337(2) of the ATA. Defendants PA and PLO Supporting Memorandum of Points and Authorities in Support of Their Rule 12(b) Motion ("Def. Mem.") at 2, 13-31.[2] Second, defendants argue that dismissal is warranted because the case presents non-justiciable political questions. Id. at 2, 31-33. Third, they argue that Section 2336(a) of the ATA mandates dismissal because the action is for injury caused by an "act of war." Id. at 2, 33-55. Fourth, and finally, defendants contend that the activities alleged in the complaint fail to satisfy the statutory definition of "international terrorism" in Section 2331 of the ATA. Id. at 2, 38.[3]

---

[2]     On November 16, 2004, the Court entered a Scheduling Order setting forth a briefing schedule for defendants' dispositive motions. Although not expressly provided for in the Scheduling Order, on December 1, 2004, plaintiffs filed a motion for partial summary judgment on the sole issue of whether defendants are entitled to sovereign immunity. Defendants opposed the motion on the ground that the issue of sovereign immunity would be before the Court in connection with defendants' motion to dismiss, as contemplated by the Court's Scheduling Order. See Defendants Opposition to Plaintiffs Motion for Partial Summary Judgment at 1-2. Subsequently, on March 18, 2005, defendants filed their motion to dismiss, which now has been fully briefed and argued by the parties. Accordingly, the Court will render a decision on both defendants' motion to dismiss and plaintiffs' motion for partial summary judgment, treating defendants' submissions in connection with their motion to dismiss as a formal response on the merits to plaintiffs' motion for partial summary judgment.

[3]     Defendants also assert that improper service of process and lack of personal jurisdiction warrant dismissal and request leave to assert these grounds for dismissal if the Court

Defendants also have moved for the abatement of all proceedings in this case, until May 1, 2006, pending receipt by defense counsel of instructions from the new political leadership that has emerged from the Palestinian parliamentary elections that were held on January 25, 2006.  See Defendants' Motion for the Abatement of All Proceedings in This Case for Three Months Pending Receipt by Defense Counsel of Instructions From the New Political Leadership in Palestine.  ("Def. Mot. for Abatement").

## II. DISCUSSION

### A. Applicable Legal Standards

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, plaintiffs bear the burden of establishing by a preponderance of the evidence that the Court has subject matter jurisdiction.  See Rosenboro v. Kim, 994 F.2d 13, 17 (D.C. Cir. 1993); Shekoyan v. Sibley Int'l Corp., 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Although the Court may dispose of a motion to dismiss on the basis of the complaint alone, it may consider materials beyond the pleadings when evaluating a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). Armstrong v. Vance, 328 F. Supp. 2d 50, 53 (D.D.C. 2004); Ass'n of Merger Dealers, LLC v. Tosco Corp., 167 F. Supp. 2d 65, 69 (D.D.C. 2001); Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001); Scolaro v. D.C. Bd. of Elections and Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see Herbert v. National Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992) ("[W]here necessary, the court may consider the complaint supplemented by undisputed facts

_____

denies their pending motion.  See Def. Mem. at 2-3.

evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.").

       A motion to dismiss pursuant to Rule 12(b)(6) challenges the adequacy of the complaint on its face, testing whether the plaintiffs properly have stated a claim.  Materials outside of the four corners of the complaint generally may not be considered in evaluating a Rule 12(b)(6) motion.  See United States ex rel. New v. Rumsfeld, 350 F. Supp. 2d 80, 88-89 (D.D.C. 2004).  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  In evaluating a motion to dismiss, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of plaintiffs.  See Harris v. Ladner, 127 F.3d 1121, 1123 (D.C.Cir.1997).  While the complaint is to be construed liberally, the Court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept the plaintiffs' legal conclusions.  See Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1430 (D.C.Cir.1996); Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C.Cir.1994).

       Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits or declarations, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Material facts are those that "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  When considering a motion for summary judgment, "the evidence of

the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor."

Id. at 255; see Washington Post Co. v. U. S. Dep't of Health and Human Servs., 865 F.2d 320,

325 (D.C. Cir. 1989).

### B. Defendants' Motion to Dismiss

### 1. Sovereign Immunity[4]

Citing Section 2337(2) of the ATA and Section 1604 of the FSIA, defendants

move to dismiss this action on the ground that Palestine is a sovereign entity.  See Def. Mem. at

13-31.  Section 2337(2) prohibits the maintenance of a civil ATA lawsuit against "a foreign state,

an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof

acting within his or her official capacity or under color of legal authority."  18 U.S.C. § 2337(2).

The FSIA similarly directs that, with exceptions not relevant here, "a foreign state shall be

immune from the jurisdiction of the courts of the United States and of the States. . . ."  28 U.S.C.

§ 1604; see also 28 U.S.C. § 1603(a) (indicating that the term "foreign state" under the FSIA

includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign

state").[5]

---

[4]       As noted above in footnote 2, the Court will address plaintiffs' motion for partial
summary judgment in this section of the Opinion, as well as defendants' motion to dismiss on
sovereign immunity grounds.

[5]       Defendants concede that "[n]either the PA nor the PLO are, of themselves, states."
Def. Mem. at 15.  Instead, after acknowledging that "[i]t is the statehood of Palestine that must
be analyzed in this case," defendants contend that they "are essential elements of Palestine
performing core governmental functions" and they therefore are entitled to immunity.  Id.

Although neither the FSIA nor the ATA define the term "foreign state," two things are apparent from the case law.  First, an assertion of sovereign immunity under Section 2337(2) of the ATA is the functional equivalent of an assertion of sovereign immunity under Section 1604 of the FSIA.  Compare Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989) ("[T]he text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts.") with Ungar v. Palestine Liberation Org., 402 F.3d 274, 282-83 (1st Cir. 2005) ("Nothing in either the language or legislative history of the ATA gives any indication that Congress intended the newer statute to supercede, rather than to mirror, the detailed jurisdictional framework described in the FSIA. . . . [W]e regard an assertion of sovereign immunity under the ATA . . . as being functionally equivalent to an assertion of sovereign immunity under the FSIA.").  Second, courts consistently have concluded that the meaning of the term "foreign state," as it relates to a sovereign power, should be derived by application of the standard set forth in the Restatement (Third) of the Foreign Relations Law of the United States (the "Restatement").  See Ungar v. Palestine Liberation Org., 402 F.3d at 283; Kadic v. Karadzic, 70 F.3d 232, 244 (2d Cir. 1995); Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 47-49 (2d Cir. 1991);  Doe v. Islamic Salvation Front, 993 F. Supp. 3, 9 (D.D.C. 1998).[6]

Defendants contend that Palestine meets the standard set forth in the Restatement, which provides in Section 201:  "Under international law, a state is an entity that has a defined

---

[6]    It also may be argued – and not unreasonably – that, for the purposes of the FSIA, a foreign state is an entity that has been recognized as a sovereign by the United States government.  See Ungar v. Palestine Liberation Org., 402 F.3d at 284 n.6.  As of the date of this Opinion, however, the United States has not recognized Palestine as a sovereign nation.

-7-

territory and a permanent population, under the control of its own government, and that engages

in, or has the capacity to engage in, formal relations with other such entities." RESTATEMENT

(THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 201 (1986); see Def. Mem.

at 3, 15-29.[7]  In support of this argument, defendants have submitted an affidavit by Nasser Al-

Kidwa, the Ambassador of Palestine to the United Nations, dated June 13, 2003 – originally

submitted in The Estate of Yaron Ungar v. Palestinian Authority, C.A. No. 00-105L (D.R.I.) –

purporting to show that while "Palestine does not have all the rights, privileges and duties of a

full member of the United Nations," that fact "does not affect its statehood."  Affidavit of

Ambassador Nasser Al-Kidwa ¶ 31.  Attached to the affidavit as exhibits are the United Nations

General Assembly and Security Council Resolutions relating to the issue of Palestinian

statehood.

   In response, plaintiffs argue that defendants' assertion of sovereign immunity is

barred by the doctrine of collateral estoppel.  See Plaintiffs' Memorandum of Points and

Authorities in Opposition to Defendants' Motion to Dismiss ("Pl. Opp'n") at 4-10;

Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment Against

Defendants Palestinian Authority and Palestine Liberation Organization at 3-13.  Under the

doctrine, "a final judgment on the merits in a prior suit precludes subsequent relitigation of issues

actually litigated and determined in the prior suit, regardless of whether the subsequent suit is

based on the same cause of action."  Next Wave Pers. Commc'ns, Inc. v. FCC, 254 F.3d 130,

---

[7]   Defendants also rely on comment d to Section 201 of the Restatement, which
provides: "A state need not have any particular form of government, but there must be some
authority exercising governmental functions and able to represent the entity in international
relations."  Def. Mem. at 24 (quoting RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW
OF THE UNITED STATES § 201 cmt. d (1986)).

147 (D.C. Cir. 2001) (citing I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co., 723 F.2d 944, 947 (D.C. Cir. 1983)).  Collateral estoppel applies when "(i) the issue previously adjudicated is identical with that now presented, (ii) that issue was actually litigated in the prior case, (iii) the previous determination of that issue was necessary to the end-decision then made, and (iv) the party precluded was fully represented in the prior action."  Thomas v. Gen. Servs. Admin., 794 F.2d 661, 664 (Fed. Cir. 1986) (internal quotes and citations omitted).

   The Court agrees with plaintiffs and concludes that the doctrine of collateral estoppel precludes relitigation of the issues surrounding defendants' assertion of sovereign immunity.  This case is one of at least six ATA lawsuits currently pending against defendants; in all six cases the defendants are represented by the same attorneys; and in all six cases they have raised the same issues of fact and law – even relying on the same Al-Kidwa affidavit – with respect to Palestinian statehood.  And in every case that has reached the point of decision, the court either has rejected their sovereign immunity argument on the merits, see Ungar v. Palestine Liberation Org., 402 F.3d at 282-92; Gilmore v. Palestinian Interim Self-Gov't Auth., – F. Supp. 2d –, Civil No. 01-0853, 2006 WL 711264, at *3-5 (D.D.C. Mar. 7, 2006); Estates of Ungar v. Palestinian Auth., 315 F. Supp. 2d 164, 174-87 (D.R.I. 2004); Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 180-81 (D.D.C. 2004) ("Biton I"); Knox v. Palestine Liberation Org., 306 F. Supp. 2d 424, 430-48  (S.D.N.Y. 2004), or has done so under the doctrine of collateral estoppel.  See Biton v. Palestinian Interim Self-Gov't Auth., 412 F. Supp. 2d 1, 4-5 (D.D.C. 2005) ("Biton II").[8]

---

    [8]  On February 7, 2005, in the matter of Shatsky v. Syrian Arab Republic, Civil No. 02-2280 (D.D.C.) – yet another ATA action against defendants currently pending in this District – the court entered a minute order denying a motion to dismiss filed by defendants, which

Although the Court can conceive of circumstances under which it would be reluctant to apply the doctrine of collateral estoppel to bar defendants' assertion of sovereign immunity – for example, if the United States government now recognized Palestine as a sovereign nation – defendants have presented no compelling reason why they should be permitted to re-litigate these already decided issues in this case. Defendants' bald assertion that "the issues of statehood and immunity presented by this case are unique and differ in significant respects from the issues as presented" in prior adjudications is plainly inadequate. Reply Memorandum by Defendants Palestinian Authority and Palestine Liberation Organization in Support of Their Rule 12(b) Motion at 8.[9] Furthermore, nothing in the recent political developments concerning the Palestinian leadership, which is the subject of defendants' motion for the abatement of proceedings, militates against application of the doctrine of collateral estoppel here.[10] Indeed, defendants have presented no meaningful argument otherwise in their

included an assertion of sovereign immunity.

[9]       After tracing the historical background of Palestine from World War I to the modern day, Ungar v. Palestine Liberation Org., 402 F.3d at 284-88, and applying the Restatement's definition of a "state," Judge Selya for the First Circuit in Ungar concluded that none of the evidence, including the same documents appended to the Al-Kidwa affidavit here, proffered by defendants separately or together satisfied the requirements for statehood under applicable principles of international law; thus there is no sovereign immunity. Id. at 292. Judge Lagueux in Estates of Ungar and Judge Marrero in Knox traversed much the same historical ground and legal documents and reached the same conclusions. See Estates of Ungar v. Palestinian Auth., 315 F. Supp. 2d at 174-87; Knox v. Palestine Liberation Org., 306 F. Supp. 2d at 431-39.

[10]       The Court also finds no support for defendants' attempt to revive their assertion of sovereign immunity emanating from the Statement of Interest of the United States of America ("Statement"), filed on September 12, 2005, in Estate of Ungar v. Palestinian Authority, 18 MS 0302 (S.D.N.Y.), in opposition to the Ungar plaintiffs' effort to enforce a total of $116 million in judgments obtained in the United States District Court for the District of Rhode Island against the Palestinian Authority and the Palestine Liberation Organization. The Statement, which is

motion for the abatement of proceedings.

For the reasons stated, the Court not only will deny defendants' motion to dismiss on sovereign immunity grounds but also will grant summary judgment to plaintiffs on their claim that sovereign immunity does not divest the Court of jurisdiction to hear this case.

### 2. Political Question / Non-Justiciability

Defendants next argue that this case should be dismissed because it presents non-justiciable political questions.  See  Def. Mem. at 31-33.  As the parties recognize, in Baker v. Carr , 369 U.S. 186 (1962), the Supreme Court articulated six factors to identify a political question that is non-justiciable:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

---

silent on the issue of Palestinian statehood, expressly is limited to an argument that the Ungar plaintiffs' attempt to enforce the judgments by seeking the sale and eviction of the Palestinian Permanent Observer Mission to the United Nations, located in New York City, directly implicates the foreign policy interests of the United States, as recognized by the Foreign Missions Act, 22 U.S.C. §§ 4301, et seq., which confers on the Secretary of State the authority to regulate all transactions regarding mission property.  See Statement at 2 n.2 ("This Statement does not address the merits of the underlying litigation," which included a rejection of defendants' assertion of sovereign immunity, "but rather only the particular remedies being sought here.").

Id. at 217.  Asserting without elaboration that the instant case touches upon every Baker v. Carr factor, defendants' basic argument is that the prosecution of this lawsuit will burden "the long running Middle East peace process."  Def. Mem. at 31.

    The Court finds defendants' argument unconvincing and the authority on which defendants rely inapposite.  For example, Judge Robb's concurring opinion in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 823 (D.C. Cir. 1984) (Robb, J., concurring), on which defendants primarily rely, while similarly involving an armed attack on a civilian bus in Israel, does not support defendants' position that this case presents non-justiciable political questions because that decision predated the enactment of the ATA, which expressly provides, in Section 2333(a), a civil remedy in federal court for United States nationals injured by acts of international terrorism.  See Tel-Oren v. Libyan Arab Republic, 726 F.2d at 822 (Bork, J., concurring) (although the Alien Tort Claims Act, 28 U.S.C. § 1350, does not authorize the courts "to enter into sensitive areas of foreign policy," only a statute or treaty expressly creating a cause of action "[c]ould direct courts to entertain cases like this one").[11]  Defendants' reliance on Judge Bates' opinion in Doe v. Israel, 400 F. Supp. 2d 86 (D.D.C. 2005), also is misplaced.  In that case, the

_____

   [11]   Although Judge Bork's concurring opinion in Tel-Oren suggests that the enactment of a statute like the ATA – a possibility that he thought "improbable" at the time – would not necessarily foreclose political question doctrine challenges to federal court jurisdiction in lawsuits brought under such a statute, see Tel-Oren v. Libyan Arab Republic, 726 F.2d at 822 (Bork, J., concurring), the proliferation of terrorism-related statutes, the "Executive Branch's repeated condemnations of international terrorism," Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d at 49 n.3, and the numerous judicial decisions that have been rendered in actions brought under the ATA – all since the time of Judge Robb's and Judge Bork's pronouncements – lead the Court to conclude that this ship already has sailed with defendants left standing on the dock clinging to the language of two concurring opinions that have been overtaken by legislative action.

court merely concluded that the political question doctrine constituted an alternative ground to

dismiss claims against the State of Israel, Israeli government entities, and Israeli officials – all of

which (and whom) the court already had determined to be immune from suit under the FSIA.

See id. at 111.  As demonstrated above, defendants here have no such immunity.  Moreover,

unlike defendants in the present case, the defendants in Doe v. Israel were not being sued under

the ATA.

            What is more – similar to their assertion of sovereign immunity – defendants

unsuccessfully have advanced the same political question doctrine argument on numerous prior

occasions in which they have been sued under the ATA.  See Ungar v. Palestine Liberation Org.,

402 F.3d at 279-82;  Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d at 49-50; Gilmore v.

Palestinian Interim Self-Gov't Auth., – F. Supp. 2d –, 2006 WL 711264, at *2-3; Biton II, 412 F.

Supp. 2d at 5-6; Biton I, 310 F. Supp. 2d at 180-81; Knox v. Palestine Liberation Org., 306 F.

Supp. 2d at 448-49.  In Biton II, for example, Judge Collyer rejected defendants' position in an

ATA action brought by the wife of a man who was killed when a roadside device exploded near a

bus that was transporting elementary school children and their teachers in the southern Gaza

Strip.  Judge Collyer stated, in language with which this Court agrees:

> "This is a tort suit brought under a legislative scheme that Congress
> enacted for the express purpose of providing a legal remedy for
> injuries or death occasioned by acts of international terrorism."
> Ungar, 402 F.3d at 280.  There is no flaw in this Court's ability to
> address Plaintiff's claims:  Congress explicitly committed these
> issues to the federal courts under the ATA.  Similarly, the Court has
> access to "judicially manageable standards for resolving the issue[s]
> before it," id., from both existing ATA caselaw and traditional tort
> caselaw. The "initial policy determination" involved here has already
> been made by the U.S. Congress:  Americans injured by terrorist acts
> can sue their attackers in U.S. courts and the Court can manage this

> case to resolution of Defendants' alleged liability without
> "expressing lack of the respect due coordinate branches of
> government." <u>Baker</u>, 369 U.S. at 217. The fifth and sixth factors
> from <u>Baker v. Carr</u> do not apply because a decision in this individual
> case will have no consequences concerning "political decision[s]
> already made" and will raise only the question of Defendants' alleged
> liability regarding this single bombing of a bus. Thus, nothing in
> <u>Baker v. Carr</u> counsels against having this case proceed.

<u>Biton II</u>, 412 F. Supp. 2d at 6. As plaintiffs point out, defendants have made no attempt to

distinguish any of these prior decisions in their moving papers. <u>See</u> Pl. Opp'n at 13-14.[12]

Persuaded by the reasoning and holdings of the courts that have rejected the same

non-justiciability arguments presented by defendants here, the Court concludes that the political

question doctrine does not preclude judicial resolution of this case.

### 3. Act of War

In perhaps their strongest argument, defendants contend that the acts alleged in the

complaint are not subject to litigation in this Court because they constitute "acts of war" over

which the ATA does not extend jurisdiction. <u>See</u> Def. Mem. at 33-55. Section 2336(a) of the

ATA provides that "[n]o action shall be maintained under section 2333 of this title for injury or

loss by reason of an act of war." Section 2331(4), in turn, defines "act of war" as "any act

occurring in the course of – (A) declared war; (B) armed conflict, whether or not war has been

declared, between two or more nations; or (C) armed conflict between military forces of any

origin." Defendants limit their argument to Section 2331(4)(C) by asserting, essentially, that the

---

[12]     The Court is unpersuaded by defendants' efforts to renew their political question
doctrine argument in their motion for the abatement of proceedings and finds no support for
defendants' position in the cases cited in that motion.

alleged attack on the public transport bus was an act of war occurring in the course of armed

conflict between military forces.  See Def. Mem. at 35-37.

According to defendants, "[t]he statutory definition of act of war in [Section]

2331(4)(C) is broad.  It covers 'any act' without limit or qualification and requires only that the

act be one occurring in the course of armed conflict between military forces of any origin."  Def.

Mem. at 35.  "The act itself," their argument continues, "need not consist of or include actual

combat.  An intent to strengthen or advance or to weaken or harm the interests of one side or the

other to the armed conflict by the act is sufficient."  Id.  More to the point, defendants contend

that the "ATA encompasses acts of war against civilians" and that as a "general proposition

violent acts on civilians and their property are readily considered acts of war."  Id. at 37 (noting

that the events of September 11, 2001 have been treated as an act of war by President Bush, the

United Nations and U.S. courts).  Defendants further insist that, even if the alleged attack on a

civilian bus were found to violate the rules of war and armed conflict, the ATA still would bar

this action:

> If illegal the attack may well be a war crime and subject to sanctions
> as such.  However, neither the heinousness nor legality of acts of war
> occurring in the course of armed conflict is germane to the
> application of sec. 2336(a).  Sec. 2336(a) when applicable bars civil
> actions under ATA sec. 2333 for "any act" without regard to its
> nature or seriousness, or whether the act if not barred by sec. 2336(a)
> would constitute international terrorism actionable under the ATA.

Id. at 39.

Regarding Section 2331(4)(C)'s requirement that the act occur "in the course of

. . . armed conflict between military forces of any origin," defendants assert that there was

"ongoing and daily armed conflict between Israeli military and Palestinian military forces

-15-

throughout the West Bank and Gaza" during the relevant period.   Def. Mem. at 35; see also id. at 35-36 (noting that the complaint, in paragraphs 10-13, alleges the existence of active Palestinian military forces).  Defendants also maintain that the Israeli government "consistently [has] characteriz[ed] the fighting as armed conflict."  Id. at 40; see also, e.g., id., Exhibit 13 at 55 ("Israel is engaged in an armed conflict short of war.") (The First Statement of the Government of Israel to the Sharm El-Sheikh Fact-Finding Committee, Dec. 28, 2000).

      Defendants also present policy arguments to explain why the allegations in the complaint should be considered an "act of war."  They argue that, whereas the "ATA is intended to deter international terrorism against U.S. nationals," no such deterrent effect results from applying Section 2333 to an act carried out as "part of the ongoing armed conflict between Israelis and Palestinians."  Def. Mem. at 38.  Specifically, defendants contend that the "violence on which this case is based . . . like all acts in such an ongoing armed conflict, was not directed at persons targeted as Americans."  Id.  Along similar lines, after stating that "[t]housands of innocent civilians on both sides have been killed or wounded in this conflict," defendants assert that "[f]or the American legal system to make multimillion dollar awards under the ATA for individual deaths occurring in the course of such 'daily bloodshed' would be disruptive of efforts to achieve peace and reconciliation and disserve the overall interests of justice."  Id. at 39; see also id. at 38 ("[T]he incongruity of allowing the recovery of damages, as the ATA does, only to American nationals, is readily apparent and has the potential to result in disparities of recovery that are offensive to justice and common sense and complicate or embarrass foreign policy

-16-

interests of the United States.").[13]

Plaintiffs' response is simple:  "[A]s a matter of law, an attack on a civilian bus which results in the murder of one or more innocent civilians cannot be deemed to have occurred 'in the course of' war between nations or armed conflict within the meaning of § 2331."  Pl. Opp'n at 26 (emphasis added).[14]  Although, at the time plaintiffs submitted their opposition to defendants' motion to dismiss, no court yet had interpreted the meaning of Section 2331(4)'s "in the course of" language, plaintiffs argue that, in numerous other contexts, courts consistently have "interpreted the phrase 'in the course of' as a gatekeeper phrase that is intended to exclude as a matter of law a subset of conduct which – because of its nature and substance – deviates from and/or is insufficiently related to the general set of conduct governed by the provision in question."  Id. at 19.

Plaintiffs note, for example, that the Controlled Substances Act, 21 U.S.C. §§ 801, et seq., which generally prohibits the distribution of narcotics, exempts a "practitioner" from its criminal provisions.  See 21 U.S.C. § 829.  The statutory definition of "practitioner"

---

[13]     While the Court of course must construe the statute written by Congress and, if it is ambiguous, determine what Congress meant by the term "act of war," the policy arguments advanced in defendants' memorandum of law properly are matters for Congress, not the judiciary.  See Pigford v. Veneman, 355 F. Supp. 2d 148, 169-70 (D.D.C. 2005).

[14]     Although plaintiffs expressly do not dispute that an "armed conflict" existed in the West Bank at the time of the events alleged in the complaint, they assert that such a determination "would necessitate significant fact-finding."  Pl. Opp'n at 17.  According to plaintiffs, however, disposition of the "act of war" question does not require the Court to determine (1) whether an "armed conflict" existed; or (2) whether defendants constitute "military forces of any origin" within the meaning of Section 2331(4)(C).  See id. at 18. Plaintiffs nevertheless argue that none of the organizations named as defendants in this case qualify as "military forces of any origin."  See Plaintiffs' Sur-Reply in Further Opposition to Defendants' Motion to Dismiss at 5.

includes a physician who dispenses and a pharmacist who prescribes "a controlled substance <u>in the course of</u> professional practice or research."  21 U.S.C. § 802(21) (emphasis added). According to plaintiffs, however, on the basis of the statutory phrase "in the course of," courts "have consistently held that a person who meets the definition of 'practitioner' as a matter of fact . . . will nevertheless be excluded as a matter of law from the criminal immunity granted to a 'practitioner' if that person distributes a narcotic . . . in violation of the rules of legitimate medical practice."  Pl. Opp'n at 20 (citing <u>United States v. Collier</u>, 478 F.2d 268, 272 (5th Cir. 1973); and <u>United States v. Rosenberg</u>, 515 F.2d 190, 197-198 (9th Cir. 1975)).  In other words, a physician or pharmacist is immune from criminal prosecution only when acting as a doctor or druggist "in the course of professional practice," not when he or she "step[s] outside the bounds of professional practice" and, for example, prescribes or dispenses large quantities of drugs to drug addicts according to graduated fee scales depending on the amount of drugs prescribed or dispensed; then he or she acts like any other "large-scale 'pusher,' not as a physician [or pharmacist]" and may be prosecuted criminally.  <u>United States v. Moore</u>, 423 U.S. 122, 132, 143 (1975).

        Plaintiffs offer numerous other examples where courts, in other contexts, have interpreted the phrase "in the course of" in a similar fashion to exclude from the scope of a statutory provision a subset of conduct that, by its nature and substance, deviates from or is not sufficiently related to the general set of conduct otherwise governed by the provision.  Pl. Opp'n at 26, <u>see id</u>. at 22-26; <u>O'Donnell v. Great Lakes Dredge & Dock Co.</u>, 318 U.S. 36, 42-43 (1943) (construing the Jones Act, 46 App. U.S.C.A. § 688); <u>Colon v. Apex Marine Corp.</u>, 832 F. Supp. 508, 513-15 (D.R.I. 1993), <u>aff'd</u>, 35 F.3d 16 (1st Cir. 1994) (same); <u>Vincent v. Harvey Well</u>

Serv., 441 F.2d 146, 147 (5th Cir. 1971) (same); Kalantar v. Luftansa German Airlines, 276 F.

Supp. 2d 5, 10-14 (D.D.C. 2003) (construing Article 17 of the Warsaw Convention, reprinted

following 49 U.S.C. § 40105); Abu Hamdeh v. American Airlines, Inc., 862 F. Supp. 243,

247-48 (E.D. Mo. 1994) (same).

   Perhaps most relevant for present purposes, plaintiffs contend that, in the context

of applying the "political offense" exception to extradition, courts have held "that any act that

violates the rules of warfare and armed conflict – such as a terrorist attack on civilians – is

excluded as a matter law from being deemed to have occurred in the course of or incidental to

war or armed conflict."  Pl. Opp'n at 30; see Matter of Doherty, 599 F. Supp. 270, 274-76

(S.D.N.Y. 1984) (extradition of IRA member alleged to have participated in ambush against

British soldiers); In re Extradition of Atta, 706 F. Supp. 1032, 1042 (E.D.N.Y. 1989) (extradition

of PLO member alleged to have participated in attack against Israeli bus in West Bank); Ahmed

v. Wigen, 726 F. Supp. 389, 405-407 (E.D.N.Y. 1989), aff'd, 910 F.2d 1063 (2d Cir. 1990)

(same); Matter of Extradition of Marzook, 924 F. Supp. 565, 577-78 (S.D.N.Y. 1996)

(extradition of Hamas leader alleged to have participated in numerous terrorist attacks against

civilians); Marzook v. Christopher, 1996 WL 583378, at *2-3 (S.D.N.Y. Oct. 10, 1996) (same).[15]

   Plaintiffs also assert that other federal statutes governing the identical subject

matter – terrorism and violations of international law – support the interpretation of the scope of

Section 2336(a) that they urge.  See Pl. Opp'n at 38-40 (criminal provisions of the ATA, inter

---

   [15] The "political offense" exception is a subject all its own, which this Court need
not discuss at length.  Suffice it say that the Court agrees with the analyses of Judges Korman
and Weinstein, respectively, in In re Extradition of Atta, 706 F. Supp. at 1042-50; and Ahmed v.
Wigen, 726 F. Supp. at 402-09.

alia, Sections 2332, 2339A and 2339B); id. at 40-42 (War Crimes, 18 U.S.C. § 2441); id. at

42-46 (Alien Tort Claims Act, 28 U.S.C. § 1350).  For example, they argue that, with respect to

the war crimes statute, defendants' interpretation of the ATA would create an impermissible

conflict between the provisions of Section 2331 and Section 2441, "because it would single out

and exclude § 2441 from the criminality component of the definition of 'international terrorism'

in § 2331 which applies by its plain terms to any 'violation of the criminal laws of the United

States' – including of course § 2441."  Pl. Opp'n at 41.  Such an interpretation, plaintiffs submit,

"would create an absurd situation wherein persons guilty of War Crimes in which an American is

killed would face the death penalty under § 2441, but would not face civil liability under

§ 2333."  Id.[16]

   The Court is persuaded by plaintiffs' arguments and concludes that the statutory

phrase "in the course of" necessarily imposes limitations on what "acts" constitute "acts of war"

within the meaning of Section 2333(a) – as defined in Section 2331(4).  As a matter of law, an

act that violates established norms of warfare and armed conflict under international law is not an

act occurring in the course of armed conflict.  An armed attack on a civilian bus, such as the one

plaintiffs have alleged in the complaint, violates these established norms.  See Kadic v. Karadzic,

---

[16]  Like defendants, plaintiffs present policy-based arguments as well, asserting that
the rationale behind applying the "political offense" doctrine to exclude terrorist acts that violate
the international law of armed conflict – namely, the vital interest of the United States in
combating terrorism – "applies with equal or even greater force to the interpretation of the 'in the
course of' requirement of § 2331."  Pl. Opp'n at 36.  According to plaintiffs, because Congress
intended the ATA to be construed broadly and because the legislative history of Section 2333
shows an unequivocal congressional intent to deter and punish acts of international terrorism,
"Congress clearly did not intend the limitation on actions for 'acts of war' contained in § 2336(a)
(as defined in § 2331) to exclude from civil liability acts of terrorism that are not legitimate 'acts
of war' under international law."  Id. at 36-37.

70 F.3d 232, 242 (2d Cir. 1995) (violent acts against civilians, committed in the course of open

hostilities, "long have been recognized in international law as violations of the law of war")

(citing In re Yamashita, 327 U.S. 1, 14 (1946)); Ahmad v. Wigen, 726 F. Supp. at 409 (killing

civilian on civilian bus "must be characterized as a random act of murderous terrorism, rather

than a protected political offense").

       Subsequent to the completion of briefing on defendants' motion to dismiss, Judge

Collyer of this Court rejected an "act of war" argument under Section 2331(4)(C), similar to the

one advanced by defendants here.  See Biton II, 412 F. Supp. 2d at 7 (characterizing defendants'

argument as an assertion "that the bombing of a school bus was an act of war occurring in the

course of an armed conflict between military forces of any origin").[17]  Although stating in dicta

that "[i]t is not immediately obvious that an attack on a settler, who intentionally went into

Palestinian territory to claim it for Israel, would automatically and necessarily be a 'terrorist'

attack against a 'civilian,'" id. at 10, Judge Collyer in Biton II concluded that "[t]he

circumstances of the alleged attack – on a recognized school bus full of students and teachers –

---

[17]    It appears that Biton II is the only decision squarely addressing – after full briefing
by opposing parties – the scope of the ATA's prohibition against civil lawsuits for injuries
resulting from an "act of war," and in particular Section 2331(4)'s "in the course of" language.
The only other decision the Court could locate that addresses Section 2336(a)'s "act of war"
exclusion is Judge Cassell's opinion in Morris v. Khadr, – F. Supp. 2d –, Civil No. 04-0723
(PGC), 2006 WL 350175 (D. Utah Feb. 16, 2006), a case involving an attack against United
States armed forces in Afghanistan by alleged members of al Qaeda.  In the course of granting
plaintiffs' motion for default judgment because the defendant had failed to respond to the
complaint, Judge Cassell in Morris v. Khadr analyzed the "act of war" exclusion sua sponte and
concluded that it did not apply to divest the court of jurisdiction.  2006 WL 350175, at *5.
Specifically, he found that al Qaeda could not be considered a "military force[ ] of any origin"
under Section 2331(4)(C).  See id. at *7 ("A conventional dictionary definition of 'military' is
'armed forces' or the persons serving in them.  'Armed forces,' in turn, are 'the combined
military, naval, and air forces of a nation.'") (footnotes omitted).

and the status of those noncombatants lead the Court to conclude that the attack did not occur 'during the course of' an armed conflict as a matter of law," id. at 10-11.  Here, too, the alleged attack was committed on a recognized public transport bus, and it is undisputed that all of the passengers on the bus were non-combatant civilians.  Accordingly, without deciding whether there existed "armed conflict between military forces of any origin" within the meaning of Section 2331(4)(C), the Court concludes that the armed attack alleged in the complaint did not occur "in the course of" an armed conflict.

### 4. International Terrorism

In an argument not unrelated to their "act of war" claim, defendants also assert that dismissal is warranted because "this case fails to satisfy the statutory definition of 'international terrorism' " in Section 2331(1) of the ATA.  See Def. Mem. at 2.  Specifically, defendants contend that "[e]nding an illegal belligerent occupation is an objective that is not within ATA sec. 2331's definition of international terrorism."  Def. Mem. at 38; see also id. (quoting from a news article in which an Israeli settler states that Palestinian acts of violence committed against Israeli settlers are "specifically designed to make people leave").

Plaintiffs have two straightforward responses to this argument.  They first contend that if the attack that killed Ms. Klieman was conducted to "end an illegal belligerent occupation," as defendants have asserted, then the attack plainly meets Section 2331's definition of "international terrorism," as an activity that " 'appear[s] to be intended . . . to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation.' "

Pl. Opp'n at 14 (quoting 18 U.S.C. § 2331(1)).  Plaintiffs also submit that defendants' intent in carrying out the attack is not properly decided on a motion to dismiss.  See id. at 15.

Whether defendants' alleged activities "appear[ed] to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping," within the meaning of Section 2331(B), are disputed questions of material fact.  The Court cannot determine defendants' intent in allegedly committing the attack in the context of a motion to dismiss; that is a question for trial or, at a minimum, for summary judgment.  See Gilmore v. Palestinian Interim Self-Gov't Auth., – F. Supp. 2d –, 2006 WL 711264, at *5; Biton I, 310 F. Supp. 2d at 185.

### C. Defendants' Motion for the Abatement of Proceedings

In their abatement motion, defendants seek an order holding further proceedings in this case in abeyance until May 1, 2006, pending receipt by defense counsel of instructions from the new political leadership that has emerged from the Palestinian parliamentary elections that were held on January 25, 2006.  See Def. Mot. for Abatement at 2 ("In view of the election's outcome, its uncertain consequences, and new officials yet to be determined, it is not clear what the instructions will be with respect to positions to be taken by the defendants [in this case]."). Defendants also attempt to resurrect the sovereign immunity and political question doctrine arguments raised in their motion to dismiss.  See id. at 2 ("There is a real question whether the cases are now nonjusticiable as a threshold matter under the political question doctrine."); Reply Memorandum of Defendants Palestinian Authority and Palestine Liberation Organization in

Support of Their Motion for Abatement of Proceedings at 3 ("Palestine firmly believes that U.S. courts lack jurisdiction to adjudicate the ATA cases.  Palestine is under no obligation to litigate these cases on the merits.").

Having considered defendants' motion, the Court concludes that the requested abatement of proceedings in this case is unnecessary.  For the reasons stated above, defendants' sovereign immunity and political question doctrine arguments are without merit.  Moreover, during the Court's December 15, 2005 hearing on defendants' motion to dismiss, the Court gave defendants sixty days from the entry of an order denying their motion to dismiss – should the Court so rule – in which to raise additional defenses related to jurisdiction.  As a result, defendants are not required to file another pleading in this case until after May 1, 2006.

## III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is denied; defendants' motion for the abatement of proceedings is denied; and plaintiffs' motion for partial summary judgment is granted.  A separate Order to that effect shall issue this same day.  Defendants shall have sixty (60) days from the date of that Order to raise additional jurisdictional defenses by motion.  Plaintiffs shall file any response thirty (30) days thereafter, and defendants shall file any reply twenty (20) days after plaintiffs file their response.


/s/_____
PAUL L. FRIEDMAN
United States District Judge


DATE: March 30, 2006