**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| ESTATE OF ESTHER KLIEMAN, et al., | |
| Plaintiffs, | Civil Action No. 04-1173 (PLF) |
| v. | |
| THE PALESTINIAN AUTHORITY, et al., | |
| Defendants. | |

**DEFENDANTS' BRIEF REGARDING THE CONSTITUTIONALITY**
**OF THE PSJVTA**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................. 4

    A. Defendants Repeatedly Object to the Exercise of Personal Jurisdiction in this Case Because the Attack Lacked Any Connection to the United States. ......... 5

    B. Defendants Renew Their Jurisdictional Challenges After *Daimler*, and this Court Dismisses the Case for Lack of Personal Jurisdiction. ........................... 6

    C. Plaintiffs Unsuccessfully Argue for Personal Jurisdiction under the Anti-Terrorism Clarification Act of 2018. ............................................................ 7

    D. Plaintiffs Assert Jurisdiction Under the PSJVTA, and the Case Returns to this Court. .......................................................................................................... 8

    E. Defendants Provide Jurisdictional Discovery on Remand, and this Court Orders Briefing on the Constitutionality of the PSJVTA. ............................... 9

ARGUMENT ................................................................................................ 11

  I. Exercising Personal Jurisdiction Over Defendants Would Violate Due Process. ........... 11

    A. Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction. ................................................................. 11

    B. Defendants Have Not "Consented" to Personal Jurisdiction in the United States. ....................................................................................................... 16

        1.  Consent to Personal Jurisdiction Must Be Knowing and Voluntary. 16

        2.  Defendants Have Not Knowingly and Voluntarily Consented to Personal Jurisdiction. ................................................................. 25

    C. Permitting Congress to Impose "Deemed Consent" to Personal Jurisdiction Based on Constitutionally-Inadequate Conduct Would Eviscerate Due Process Protections. ................................................................................................ 32

  II. Based on the Plain Language of the PSJVTA, the Alleged Activities of Palestine's UN Mission Cannot Create Personal Jurisdiction. .................................................. 35

    A. Palestine's UN Mission Performs the Same Activities as Other UN Missions—All of Which Constitute Official UN Business. .......................... 36

    B. The Office of Palestine's UN Mission is Specifically Exempted from Jurisdictional Consideration by the PSJVTA. ................................................ 40

    C. Any Other U.S. Activities Claimed by Plaintiffs Fall Under the PSJVTA's "Ancillary" Activities Provision. ................................................................. 41

  III. The PSJVTA Violates Separation of Powers.......................................... 43

CONCLUSION............................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**         **Page(s)**

*Anonymous v. Palestinian Auth.,*
(Isr.), CivA 2362/19 (Jerusalem 2022) ...................................................................15

*Armstrong v. Pomerance,*
423 A.2d 174 (Del. 1980) ......................................................................................23

*AT&T Communs. v. BellSouth Telecom.,*
238 F.3d 636 (5th Cir. 2001) ................................................................................21

*Atchley v. AstraZeneca UK Ltd.,*
22 F.4th 204 (D.C. Cir. 2022) ...............................................................................15

*Bank Markazi v. Peterson,*
578 U.S. 212 (2016) ..............................................................................................43

*Bankamerica Corp. v. United States,*
462 U.S. 122 (1983) ..............................................................................................43

*Boerne v. Flores,*
521 U.S. 507 (1997) .........................................................................................43, 44

*Brewer v. Williams,*
430 U.S. 387 (1977) ..............................................................................................43

*Brown v. Lockheed Martin Corp.,*
814 F.3d 619 (2d Cir. 2016)..................................................................................22

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985).................................................................................11, 12, 17

*Carnival Cruise Lines v. Shute,*
499 U.S. 585 (1991) ..............................................................................................34

*College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
527 U.S. 666 (1999)...................................................................................... *passim*

*Cooper v. Aaron,*
358 U.S. 1 (1958).................................................................................................43

*Daimler AG v. Bauman,*
571 U.S. 117 (2014)...................................................................................... *passim*

*Dickerson v. United States,*
530 U.S. 428 (2000)..............................................................................................44

*Ford Motor v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021) ........................................................................................24

*Fuld v. PLO*,
    578 F. Supp. 3d 577 (S.D.N.Y. 2022) ........................................................ *passim*

*Gilson v. Republic of Ire.*,
    682 F.2d 1022 (D.C. Cir. 1982) ..........................................................................33

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) ............................................................................................11

*Hess v. Pawloski*,
    274 U.S. 352 (1927) ............................................................................... 2, 22, 31

*Hovey v. Elliott*,
    167 U.S. 409 (1897) ............................................................................................19

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) ......................................................................................*passim*

*INS v. Chadha*,
    462 U.S. 919 (1983) ............................................................................................44

*Kirkland v. District of Columbia*,
    70 F.3d 629 (D.C. Cir. 1995) ..............................................................................18

*Klieman v. Palestinian Auth.*,
    467 F. Supp. 2d 107 (D.D.C. 2006) ..............................................................5, 12

*Klieman v. Palestinian Auth.*,
    82 F. Supp. 3d 237 (D.D.C. 2015) ...............................................................*passim*

*Klieman v. Palestinian Auth.*,
    923 F.3d 1115 (D.C. Cir. 2019) ...................................................................*passim*

*Klieman v. Palestinian Auth.*,
    No. 04-1173, 2008 WL 11521974 (D.D.C. Apr. 24, 2008) ..................................5

*Klinghoffer v. SNC Achille Lauro*,
    937 F.2d 44 (2d Cir. 1991) ...........................................................................30, 40

*Laker Airways v. Sabena*,
    731 F.2d 909 (D.C. Cir. 1984) ............................................................................27

*Leonard v. USA Petroleum Corp.*,
    829 F. Supp. 882 (S.D. Tex. 1993) ...............................................................24, 31

*Lewis v. Mutond*,
   62 F.4th 587 (D.C. Cir. 2023) ............................................................. 33

*Licci v. Lebanese Canadian Bank*,
   732 F.3d 161 (2d Cir. 2013) ............................................................... 16

*Litecubes, LLC v. N. Light Prods.*,
   523 F.3d 1353 (Fed. Cir. 2008) .......................................................... 27

*Livnat v. Palestinian Auth.*,
   851 F.3d 45 (D.C. Cir. 2017) ....................................................... *passim*

*Marbury v. Madison*,
   5 U.S. (1 Cranch.) 137 (1803) ............................................................ 44

*Mendelsohn v. Meese*,
   695 F. Supp. 1474 (S.D.N.Y. 1988) ................................................... 30

*In re Mid-Atl. Toyota Antitrust Litig.*,
   525 F. Supp. 1265 (D. Md. 1981) ................................................ 23, 24

*Mwani v. bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) ............................................................... 15

*Nat'l Equip. Rental, Ltd. v. Szukhent*,
   375 U.S. 311 (1964) .......................................................................... 17

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   294 F.3d 82 (D.C. Cir. 2002) ............................................................ 33

*Roell v. Withrow*,
   538 U.S. 580 (2003) .................................................................... 17, 18

*See In re Sealed Case*,
   932 F.3d 915 (D.C. Cir. 2019) .......................................................... 23

*Shatsky v. PLO*,
   955 F.3d 1016 (D.C. Cir. 2020) .................................................. *passim*

*Shatsky v. PLO*,
   No. 18-cv-12355, 2022 WL 826409 (Mar. 18, 2022) ..................... 16, 32

*Siemer v. Learjet Acquisition Corp.*,
   966 F.2d 179 (5th Cir. 1992) ............................................................. 35

*Sokolow v. PLO*,
   590 F. Supp. 3d 589 (S.D.N.Y. 2022) ......................................... *passim*

*Sokolow v. PLO,*
    607 F. Supp. 3d 323 (S.D.N.Y. 2022)................................................................... *passim*

*Sullivan v. A.W. Chesterton, Inc.* (*In re Asbestos Prods. Liab. Litig.*),
    384 F. Supp. 3d 532 (E.D. Pa. 2019) ......................................................................23

*Swenson v. Thibaut,*
    250 S.E.2d 279 (N.C. Ct. App. 1978) ......................................................................23

*Tanzin v. Tanvir,*
    141 S. Ct. 486 (2020)..............................................................................................41

*United States v. Klein,*
    80 U.S. 128 (1871)..................................................................................................43

*United States v. PLO,*
    695 F. Supp. 1456 (S.D.N.Y. 1988).................................................................. *passim*

*Walden v. Fiore,*
    571 U.S. 277 (2014)................................................................................................12

*Waldman v. PLO,*
    835 F.3d 317 (2d Cir. 2016).............................................................................. *passim*

*Waldman v. PLO,*
    925 F.3d 570 (2d Cir. 2019)....................................................................................40

*Wellness Int'l Network, Ltd. v. Sharif,*
    575 U.S. 665 (2015)...........................................................................................17, 18

*Wood v. White,*
    97 F.2d 646 (D.C. Cir. 1938)..................................................................................22

*WorldCare Ltd. Corp. v. World Ins. Co.,*
    767 F. Supp. 2d 341 (D. Conn. 2011).....................................................................35

*Wuchter v. Pizzutti,*
    276 U.S. 13 (1928)..................................................................................................22

**Statutes**

18 U.S.C. § 2331 *et seq.*...........................................................................................4

Promoting Security and Justice for Victims of Terrorism Act of 2019, Pub. L. No.
    116-94, § 903, 18 U.S.C. § 2334 (Dec. 20, 2019) .......................................... *passim*

22 U.S.C. § 2378c-1 ................................................................................................28

22 U.S.C. § 5201(b) ................................................................................................29

22 U.S.C. § 5202 ..................................................................................................29

Anti-terrorism Clarification Act of 2018, Pub. L. No. 115-253, 132 Stat. 3183
    (Oct. 3, 2018) ........................................................................................7, 29, 30

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ...............................................................41

Brookings Institution, *Why the Discourse about Palestinian Payments to
    Prisoners' Families Is Distorted and Misleading* (2020),
    www.brookings.edu/blog/order-from-chaos/2020/12/07/why-the-discourse-
    about-palestinian-payments-to-prisoners-families-is-distorted-and-misleading/ ...................26

Carnegie Endowment for Int'l Peace, *Palestinian Prisoner Payments* (2021),
    https://carnegieendowment.org/specialprojects/breakingtheisraelpalestinestatu
    squo/payments ...............................................................................................26, 27

G.A. Res. No. A/73/L.32 (Nov. 23, 2010) ...........................................................37

G.A. Res. No. A/C.4/73/L.18 (Nov. 14, 2018) ....................................................37

Jerusalem Post, *Terror victims' families to collect NIS 500 m. from Palestinian
    Authority* (Apr. 26, 2020), https://jpost.com/arab-israeli-conflict/court-orders-
    collection-of-nis-500-m-from-pa-for-second-intifada-625930 ...............................15

Programme of Work for 2020, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7,
    2020), at: https://www.un.org/unispal/document/palestinian-rights-committee-
    programme-of-work-for-2020-a-ac-183-2020-1/. .................................................38

Report, CEIRPP, UN Doc. A/75/35 (2020) at:
    https://www.un.org/unispal/document/2020-annual-report-of-committee-on-
    the-exercise-of-the-inalienable-rights-of-the-palestinian-people-to-the-un-
    general-assembly-a-75-35 .......................................................................................38

Statement of Sen. Leahy, Cong. Rec.-Sen., S267, 116th Cong. (Jan. 28, 2020) ....................42

Times of Israel, *High Court: PA liable for terrorism due to money it pays
    attackers; victims can sue* (Apr. 10, 2022),
    https://www.timesofisrael.com/high-court-pa-liable-for-terrorism-due-to-
    stipends-to-attackers-victims-can-sue/ ...................................................................15

Times of Israel, *UN condemned Israel 17 times in 2020, versus 6 times for rest of
    world combined*, (Dec. 23, 2020), at: www.timesofisrael.com/un-condemned-
    israel-17-times-in-2020-versus-6-times-for-rest-of-world-combined/. ...................37

UN Juridical Yearbook (1985) ...............................................................................37

UN Juridical Yearbook (2000).................................................................................................40, 43

United Nations, UNISPAL, Civil Society and the Question of Palestine:
    Overview, at: https://www.un.org/unispal/data-collection/civil-society/ ...............................39

Webster's Third New International Dictionary, Unabridged (2002)............................................41

## INTRODUCTION

The PSJVTA[1] is the latest legislative attempt to undo an unbroken line of cases—including the prior decisions of this Court and the D.C. Circuit in this very case—holding that Defendants are not subject to personal jurisdiction in the United States for their alleged involvement in terrorist attacks in Israel and Palestine.  Time and again, courts have held that exercising personal jurisdiction over Defendants would violate due process because the attacks did not target Americans, and Defendants' suit-related conduct lacks any constitutionally-sufficient connection to the United States.  Because jurisdictional due process protections are rooted in the Constitution, these decisions cannot be undone by legislation.

In enacting the PSJVTA, Congress attempted an end-run around this Court's settled constitutional analysis through the long-discarded fiction of "deemed consent."  The PSJVTA purports to impose personal jurisdiction where it is otherwise lacking by declaring that Defendants always shall be "deemed" to "consent" to personal jurisdiction when they engage in the same conduct previously held insufficient to support jurisdiction under the Due Process Clause.

As every district court evaluating the PSJVTA has held, the PSJVTA's "deemed consent" provisions violate due process because they fail to satisfy the "knowing and voluntary" test for consent to jurisdiction.  To establish valid "consent" to personal jurisdiction, Plaintiffs must identify facts and circumstances that provide a reasonable proxy for express consent to jurisdiction. The PSJVTA unconstitutionally instructs courts to find such a reasonable proxy based on conduct that both the D.C. and Second Circuits have held is insufficient to support jurisdiction.  As a matter of law and logic, Defendants' decision to continue conduct that was already judged insufficient to

---

[1] Promoting Security and Justice for Victims of Terrorism Act of 2019 (PSJVTA), Pub. L. No. 116-94, § 903, 18 U.S.C. § 2334 (Dec. 20, 2019).

support jurisdiction under the Due Process Clause cannot signify Defendants' knowing and voluntary consent to jurisdiction.

Legislatures may direct courts to draw an inference that a defendant's conduct signifies consent to jurisdiction, but only if that inference satisfies due process. Due process case law identifies two common scenarios that illustrate when such a reasonable proxy for consent to jurisdiction may arise. The contrast between those two common scenarios and the PSJVTA's "deemed consent" framework demonstrates why the PSJVTA violates due process, as every district court evaluating the PSJVTA has held.

One scenario, recognized by the Supreme Court in *Bauxites*, is based on the so-called "*Hammond Packing* presumption." *See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee* ("*Bauxites*"), 456 U.S. 694, 705-06 (1982) (discussing *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 351 (1909)). In that scenario, jurisdiction may be based on a "presumption of fact" that a defendant's failure to produce evidence supporting a challenge to personal jurisdiction amounts to a concession that personal jurisdiction exists.

The second scenario, recognized in *Hess* and *College Savings Bank*, is based on a defendant's acceptance of a benefit or "gratuity" provided by the forum, which is conditioned on consent to jurisdiction. *See Hess v. Pawloski*, 274 U.S. 352, 356-57 (1927); *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999). In that reciprocal benefits scenario, the defendant's acceptance of the benefit is taken as implicit submission to the forum's jurisdiction.

Based on the same central set of facts regarding Defendants' post-PSJVTA activities, all three district judges to consider the issue have concluded that the PSJVTA does not give rise to valid "consent" to jurisdiction because the specified conduct does not serve as a reasonable proxy

for consent.  The conduct relied upon by Plaintiffs in this case does not support a *Hammond Packing* presumption, does not involve a reciprocal exchange of benefits, and does not otherwise serve as a reasonable proxy for submission to jurisdiction.  Accordingly, the PSJVTA is an unconstitutional legislative imposition of jurisdiction as a penalty or sanction, which is prohibited by *Bauxites* and *College Savings Bank*.

Allowing Congress to impose "consent" on Defendants in these circumstances would swallow the traditional due process test.  If due process required nothing more than "fair warning" of legislatively-imposed jurisdictional consequences, then nothing would stop Congress from decreeing that a foreign defendant shall be "deemed" to have "consented" to personal jurisdiction by engaging in any activity anywhere in the world.  Personal jurisdiction could be legislatively imposed even in the absence of "minimum contacts" or "knowing and voluntary" consent, despite this Court's prior ruling rejecting the same conduct as a constitutionally-insufficient basis for jurisdiction.  These are not merely theoretical concerns.  That is precisely what the PSJVTA purports to do here.

Because imposing personal jurisdiction on Defendants in this case would violate due process, this Court need not determine whether the PSJVTA's factual predicate regarding U.S. activities has been met.  But if it reaches the issue, the Court should apply the PSJVTA's express exclusion of jurisdiction based on Defendants' UN-related activities, and reject Plaintiffs' claim that the social media and civil society activities of Palestine's Permanent Observer Mission to the United Nations are not UN-related.  To the contrary, the UN itself has stated that such activities constitute part of the official business of Palestine's UN Mission.  Accordingly, these UN-related activities cannot give rise to consent to jurisdiction under the PSJVTA.

Finally, allowing Congress to dictate when courts must find "consent" to personal jurisdiction would also violate separation of powers.  Determining whether a party has waived its constitutional defenses requires the application of constitutional principles to the facts as found— a quintessential judicial function.  Personal jurisdiction requires individualized adjudication that is reserved for the judiciary—particularly as the courts have already provided the applicable "knowing and voluntary" standard for valid consent.  The PSJVTA attempts to usurp the judicial function by dictating that certain activities must be "deemed" to be valid "consent" to personal jurisdiction, regardless of whether they satisfy that standard.  In such circumstances, this Court's constitutional precedent, not the statute, must control.

## **BACKGROUND**

This case arises from the March 24, 2002 shooting death of Esther Klieman on an Israeli bus in an Israeli-controlled portion of the West Bank.  *Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1118 (D.C. Cir. 2019).  There is no evidence the attack targeted American citizens.  The attackers claimed they intended to target a bus of Israeli soldiers, but hit a bus carrying civilians instead.  *See* Halabi Depo. at 68:18-23 (DE 260-5) ("The agreement was to open fire on a military garrison .... The idea of attacking civilians is crossing all red lines."); Rimawi Depo. at 66:1-3, 22-24; 89:21-25 (DE 260-4) (attackers assumed "it is a bus for soldiers" based on its security profile); Rimawi Decl. ¶ 12 (DE 260-2) (same).  And Plaintiffs affirmatively allege that the attack was part of a conspiracy to "commit acts of violence and terrorism upon Israel, Israelis, and the Jewish people."  Compl. ¶ 31 (DE 1); *see also id.* at ¶¶ 10-14, 20, 36, 40, 44-45, 55 (same).  Following the attack, Plaintiffs brought this suit under the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*, claiming that the PA and PLO provided financial support to third-party organizations to "terrorize the people of Israel and the Jewish people."  Compl. ¶ 55 (DE 1).

**A.      Defendants Repeatedly Object to the Exercise of Personal Jurisdiction in this Case Because the Attack Lacked Any Connection to the United States.**

Since the inception of this case nearly two decades ago, the PA and PLO have steadfastly objected to personal jurisdiction.  Defendants timely moved to dismiss the complaint and preserved their personal jurisdiction defense in 2005.  *See* Defs. Mem. at 2 (DE 36-1); Defs. Mem. at 3 (DE 55-1).  The Court denied Defendants' motion, holding the PA and PLO had sufficient contacts with the United States to satisfy the standard for general personal jurisdiction.  *Klieman v. Palestinian Auth.,* 467 F. Supp. 2d 107, 113-15 (D.D.C. 2006).   Defendants moved for reconsideration, which was also denied.  *Klieman v. Palestinian Auth.*, No. 04-1173, 2008 WL 11521974 (D.D.C. Apr. 24, 2008).  The parties engaged in discovery for five years, with Plaintiffs receiving nine extensions of the discovery period.[2]  During those five years, Plaintiffs served 96 document requests, 22 interrogatories, 96 requests for admission, and deposed 12 witnesses.

Discovery confirmed that the attack targeted Israeli soldiers—not Americans and not the United States.  Plaintiffs "alleged no facts indicating that the attack on an Israeli bus in the West Bank was directed at locales with a strong presence of U.S. nationals—either in the form of high-level planning or the individual attackers' motives."  *Klieman*, 923 F.3d at 1124.   Rather, "unbeknownst to them," the attackers had simply "chosen as their target a bus traveling through such a locale."  *Id.*; *see also Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237, 248 (D.D.C. 2015) ("Plaintiffs have not made any *prima facie* showing that defendants' alleged conduct—providing support for terrorist organizations in Israel—focused on the United States ….").

---

[2] The various motions for extensions of the discovery period are at DE 95, 98, 102, 105, 112, 131, 133, 148, and 186.

**B.** **Defendants Renew Their Jurisdictional Challenges After *Daimler*, and this Court Dismisses the Case for Lack of Personal Jurisdiction.**

Following the Supreme Court's 2014 decision in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), the PA and PLO again moved to dismiss for lack of personal jurisdiction. *See* Defs. Mot. (DE 233). Defendants argued that under *Daimler*, the Court lacked general jurisdiction because the PA and PLO were not "at home" in the United States. *See id.* at 8-13. This Court agreed and dismissed the case for lack of personal jurisdiction, holding that the PA and PLO were entities "based in the West Bank" and thus were not "essentially at home" in the United States.[3] *Klieman*, 82 F. Supp. 3d at 245, 250.

This Court further held that Defendants were not subject to specific jurisdiction "because the suit does not arise out of or relate to defendants' contacts with the United States." *Id.* at 250. This Court rejected Plaintiffs' speculation that the attack was part of some broader "publicity campaign in the United States intended to pressure the United States government to persuade Israel to withdraw from Gaza and the West Bank," and that jurisdiction was proper because injuries to Americans were a "foreseeable result" of Defendants' alleged conduct abroad. *Id.* at 247-50.[4] Although the Court "recognize[d] plaintiffs' concern that this holding may appear inconsistent with" the remedial goals of the ATA, it emphasized that, "as the D.C. Circuit has pointed out, 'a statute cannot grant personal jurisdiction where the Constitution forbids it.'" *Id.* at 249 n.8 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002)).

---

[3] In so holding, this Court also rejected Plaintiffs' arguments that Defendants were not entitled to due process, and that Fourteenth Amendment jurisdictional due process standards do not guide the application of Fifth Amendment due process. *Klieman*, 82 F. Supp. 3d at 245 n.4.

[4] Both the Second and D.C. Circuits rejected the same theories of specific jurisdiction in three prior ATA cases against these same Defendants. *See Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-58 (D.C. Cir. 2017); *Shatsky v. PLO*, 955 F.3d 1016, 1037 (D.C. Cir. 2020); *Waldman v. PLO*, 835 F.3d 317, 337-44 (2d Cir. 2016).

The D.C. Circuit affirmed in full, holding that "[b]ecause the PA's headquarters, officials, and primary activities are all in the West Bank, it is not subject to general jurisdiction in the United States" under *Daimler*. *Klieman*, 923 F.3d at 1123 (cleaned up). The court also rejected Plaintiffs' theory of specific jurisdiction, explaining that Plaintiffs "have not alleged tangible facts as to how *this* attack was intended (or even used *ex post*) to further defendants' political aims in the United States." *Id.* at 1124. "[I]n a 'jurisdictional inquiry focuse[d] on the relationship among the defendant, the forum, and the litigation,' the 'litigation' element requires tangible allegations relating the attack that cost Esther Kleiman's life to defendants' contacts with the forum." *Id.* (citation omitted). The D.C. Circuit concluded that requisite connection between Defendants' conduct, the claims at issue, and the United States was lacking in this case. *Id.*

## C.   Plaintiffs Unsuccessfully Argue for Personal Jurisdiction under the Anti-Terrorism Clarification Act of 2018.

During the pendency of Plaintiffs' appeal to the D.C. Circuit, Congress passed the Anti-terrorism Clarification Act of 2018, Pub. L. No. 115-253, 132 Stat. 3183 (Oct. 3, 2018) (ATCA). The ATCA purported to "deem" that Defendants consented to personal jurisdiction if, following a statutory grace period, they either (1) accepted certain types of foreign aid from the United States, or (2) had a physical office "within the jurisdiction of the United States" that was "benefiting from a waiver or suspension of section 1003 of the Anti-Terrorism Act of 1987 (22 U.S.C. 5202)," which broadly prohibits Defendants from operating in the United States.

Defendants argued, and the United States filed two amicus briefs in the D.C. Circuit stating, that the factual prerequisites for jurisdiction under the ATCA had not been met. Defendants declined to accept the foreign assistance specified in the ATCA, and did not (and currently do not) benefit from a waiver of section 1003. U.S. Brief, *Klieman v. Palestinian Auth.*, No. 15-7034 (Doc. 1773566) (D.C. Cir. Feb. 15, 2019); U.S. Brief, *Klieman v. Palestinian Auth.*, No. 15-7034

(Doc. 1777372) (D.C. Cir. Mar. 13, 2019).  The D.C. Circuit agreed, holding that "in keeping with the view of the United States," Plaintiffs "failed to offer plausible allegations that any of the factual predicates of ATCA § 4 has been met."  *Klieman*, 923 F.3d at 1128.

**D.  Plaintiffs Assert Jurisdiction Under the PSJVTA, and the Case Returns to this Court.**

Two weeks after Plaintiffs petitioned for *certiorari* from the D.C. Circuit's decision, Congress enacted the PSJVTA.  The PSJVTA provides that Defendants "shall be deemed to have consented to personal jurisdiction" in ATA actions if they engage in either of two types of predicate conduct:  (1) making payments after April 18, 2020, to persons imprisoned for (or to families of those who died while committing) "any act of terrorism" resulting in the death or injury of a U.S. national (§ 2334(e)(1)(A) (the "Payments Predicate")); or (2) maintaining "any office" or other physical facility in the United States, or engaging in "any activity" while "physically present in the United States," after January 4, 2020 (§ 2334(e)(1)(B) & (e)(3) (the "U.S. Activity Predicate")).[5]  In determining whether these predicates are satisfied, the PSJVTA exempts from consideration (1) "any office, headquarters, premises, or other facility or establishment used exclusively for the purpose of conducting official business of the United Nations"; (2) "any activity undertaken exclusively for the purpose of conducting official business of the United Nations"; (3) activities undertaken "exclusively for the purpose of meetings with officials of the United States or other foreign governments," or other activities approved by the Secretary of State; and (4) activities related to legal representations.  *See* 18 U.S.C. § 2334(e)(3)(A)-(E).  The PSJVTA also exempts "any personal or official activities conducted ancillary to" those enumerated activities.  *Id.* § 2334(e)(3)(F).

---

[5] The PSJVTA also amended the definition of "defendant" to specify that it applied only to the PA, the PLO, and their successors.  18 U.S.C. § 2334(e)(5).

The Supreme Court remanded the case to the D.C. Circuit for consideration of the PSJVTA. The D.C. Circuit, in turn, "reinstated" that "portion of this court's judgment affirming the District Court's judgment relating to general jurisdiction, specific jurisdiction, and discovery," and remanded the case to this Court "for further proceedings in light of the [PSJVTA]."  Judgment, *Klieman v. Palestinian Auth.*, No. 15-7034 (Doc. 1857056) (D.C. Cir. Aug. 18, 2020).

### E.   Defendants Provide Jurisdictional Discovery on Remand, and this Court Orders Briefing on the Constitutionality of the PSJVTA.

The PSJVTA is now the sole basis asserted by Plaintiffs for personal jurisdiction over Defendants.  On remand, this Court allowed jurisdictional discovery "so long as it is narrowly tailored" to "the narrow issues encapsulated in the predicates established by the PSJVTA."  Order at 2 (Dec. 2, 2020) (DE 298).  Consistent with this Court's order, Defendants produced substantial discovery regarding both the Payments and U.S. Activity Predicates.  Defendants produced the entirety of the jurisdictional discovery record generated in a similar case (*Shatsky v. PLO*, No. 18-cv-12355-MKV-DCF (S.D.N.Y.) ("*Shatsky*")) where identical PSJVTA jurisdictional issues were being litigated.  The *Shatsky* record included seven depositions (five 30(b)(1) depositions on the U.S. Activity Predicate, and four days of 30(b)(6) testimony on the Payments Predicate) and thousands of pages of documents concerning both Predicates.  *See* Defs. Mem. at 2 (Oct. 14, 2021) (DE 321).  Defendants also provided sworn answers to interrogatories and responses to requests for admission, relating to both PSJVTA Predicates.  *Id.*

Notwithstanding the limited jurisdictional discovery permitted by the Court and Defendants' voluminous productions, Plaintiffs moved to compel additional information primarily related to activities undertaken by Palestine's UN Mission (such as social media posts and teleconferences with university students) and Palestinian President Mahmoud Abbas's visit to New York City to speak at the Security Council as a UN invitee.  Pls. Mot. at 2-3 (Sept. 30, 2021) (DE

315); *see also* Pls. Mem. at 6-8, 14-15 (DE 315-1).  Plaintiffs argued that those activities were

neither "official UN business" nor "ancillary" to UN business under the PSJVTA.  *Id*. at 12-14.

Defendants opposed the motion, arguing, among other things, that Plaintiffs failed to explain why

the jurisdictional discovery already produced—which was sufficient to litigate the PSJVTA issues

in *Shatsky*—was not equally sufficient to litigate the identical issues in this case.[6]  Defs. Mem. at

2 (Oct. 14, 2021) (DE 321).

Defendants also filed several notices of supplemental authority drawing the Court's

attention to three Southern District of New York decisions concluding that the PSJVTA cannot

constitutionally provide jurisdiction over Defendants.  Order at 1-2 (Jan. 25, 2023) (DE 340).  In

all three cases, the court held that the PSJVTA does not create valid "consent" to personal

jurisdiction because "Congress simply took conduct in which the PLO and PA had previously

engaged—conduct that the Second and D.C. Circuits had held was insufficient to support personal

jurisdiction in *Waldman I*, *Livnat*, *Shatsky*, and *Klieman*—and declared that such conduct 'shall

be deemed' to be consent."  *Fuld v. PLO*, 578 F. Supp. 3d 577, 587 (S.D.N.Y. 2022).  Such

conduct, the courts explained, does not evidence knowing and voluntary consent to personal

jurisdiction in the United States.  *Sokolow v. PLO*, 590 F. Supp. 3d 589, 595-97 (S.D.N.Y. 2022);

*see also Fuld*, 578 F. Supp. 3d at 587 (payments in Palestine and UN-related activities do not "even

remotely signal[] approval or acceptance of the Court's jurisdiction").  Exercising jurisdiction

---

[6] Defendants also noted that certain requests were duplicative of those in *Shatsky*, and thus responsive information was transmitted to Plaintiffs as part of the *Shatsky* production. Defs. Mem. at 8-10 (Oct. 14, 2021) (DE 321).  Other requests (i) replicated discovery requests that the *Shatsky* plaintiffs abandoned following that court's admonition that the requests were "grossly overbroad and abusive" for purposes of jurisdictional discovery (*id.* at 12-13), or (ii) related to activities which are protected from discovery under UN functional immunity (*id.* at 14-23).

based on "deemed consent" under the PSJVTA therefore would "breach the limits prescribed by the Due Process Clause." *Sokolow v. PLO*, 607 F. Supp. 3d 323, 324 (S.D.N.Y. 2022).[7]

In light of those decisions, this Court concluded "[i]t would be a waste of judicial resources to decide plaintiffs' motion to compel before addressing the issue of constitutionality of the PSJVTA because plaintiffs' motion to compel is premised on this very law.  In fact, plaintiffs concede that 'ordered briefing [on this issue] would assist the Court in making the best decision.'" Order at 3 (Jan. 25, 2023) (DE 340).  Accordingly, the Court directed the parties to submit supplemental briefs on the constitutionality of the PSJVTA.

## ARGUMENT

## I.   Exercising Personal Jurisdiction Over Defendants Would Violate Due Process.

### A.   Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction.

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  Because a court's "assertion of jurisdiction exposes [a foreign defendant] to the State's coercive power," it is subject to review in federal court for "compatibility" with due process.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011) (holding assertion of personal jurisdiction over foreign corporations violated due process).  The personal jurisdiction requirement "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Bauxites*, 456 U.S. at 702; *see also*

---

[7] The Second Circuit will hear argument in *Sokolow* and *Fuld* on May 3, 2023.  *See* Nos. 15-3151, 22-1060, 22-76, 22-496 (2d Cir. 2022).  The *Shatsky* appeal has been held in abeyance.  *See* Nos. 22-791, 22-1138 (2d Cir. 2022).

*Klieman*, 467 F. Supp. 2d at 112 (due process requirements "are a restriction on judicial power as a matter of individual liberty").

"Due process requires that a defendant be haled into court … based on <u>his own affiliation</u> with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (emphasis added). Accordingly, the Supreme Court has "consistently" rejected the argument that the "foreseeability of causing <u>injury</u>" to residents of the forum is sufficient to establish personal jurisdiction whenever "policy considerations so require." *Burger King*, 471 U.S. at 474. Rather, jurisdiction is "proper" only when some "actions by the defendant <u>himself</u>" create a "substantial connection" with the forum. *Id.* at 475-76; *see also Walden*, 571 U.S. at 289-90 (emphasizing "analytical focus" must remain on <u>the defendant's</u> connection to the forum and holding "mere injury to a forum resident is not a sufficient connection" to satisfy due process).

Applying these principles, both this Court and the D.C. Circuit previously held that subjecting Defendants to personal jurisdiction in the United States for the claims alleged by Plaintiffs <u>in this very case</u> would violate due process, because Defendants lack sufficient contacts with the forum. *See Klieman*, 82 F. Supp. 3d at 243-249; *Klieman*, 923 F.3d at 1123-26. Defendants are not subject to general jurisdiction in the United States because they lack the type of "continuous and systematic" contacts with the forum that would render them "essentially at home" here. *See Daimler*, 571 U.S. at 137-39 (holding general jurisdiction requires contacts with the forum "so 'continuous and systematic' as to render [the defendant] essentially at home in the forum"); *Klieman*, 923 F.3d at 1123 (holding Defendants are not subject to general jurisdiction in the United States because their "headquarters, officials, and primary activities are all in the West Bank").

Defendants are not subject to <u>specific</u> jurisdiction in the United States for the claims asserted by Plaintiffs in this case because their "suit-related conduct"—namely, their alleged involvement in an attack on an Israeli bus in the West Bank (which Defendants dispute)—is not substantially connected to the United States. *Klieman*, 923 F.3d at 1120, 1123-26. "Specific jurisdiction permits a court only to hear disputes that 'arise out of or relate to the defendant's contacts with the forum.'" *Id.* at 1119. In this case, the "planning, carrying out, and occurrence of" the alleged attack "all took place in the West Bank," and thus fail to "connect[]" Defendants to the forum "in a meaningful way." *Id.* at 1125. Moreover, Plaintiffs failed to allege any "basis for inferring that the terrorists who attacked an Israeli bus were instructed, or endeavored, to injure American nationals." *Id.* at 1126. "[A]bsent intentional targeting, the fact that an American died in a terrorist incident abroad" is exactly the type of "'random, fortuitous, or attenuated' contact 'made by interacting with persons affiliated with the United States'" that is insufficient to support the exercise of personal jurisdiction under the Due Process Clause. *Id.* (quoting *Walden*, 571 U.S. at 286) (cleaned up).

Every other court to consider the issue has reached the same conclusion, holding Defendants lack sufficient contacts with the United States to be subject to either general or specific jurisdiction for the types of claims at issue here. *See Waldman*, 835 F.3d at 344 (holding court "could not constitutionally exercise either general or specific personal jurisdiction" over Defendants for alleged attacks in Israel); *Shatsky*, 955 F.3d at 1036-38 (directing dismissal of ATA claims against Defendants for lack of personal jurisdiction); *Livnat*, 851 F.3d at 56-58 (holding court could not exercise specific jurisdiction because plaintiffs failed to allege sufficient "link" between attack in the West Bank and Defendants' alleged activities in the United States). Put simply, the courts have repeatedly held—consistent with this Court's analysis—that Defendants

are not subject to personal jurisdiction in the United States for claims based on their alleged involvement in indiscriminate third-party attacks in Israel or Palestine.

This unbroken line of decisions specifically holds that the <u>same activities</u> upon which Plaintiffs now rely to impose personal jurisdiction under the PSJVTA are <u>insufficient</u> to support the exercise of jurisdiction under the Due Process Clause.  As noted above, Plaintiffs here assert that Defendants consented to jurisdiction by (1) making "posts and tweets" for "the purpose of raising or magnifying public awareness of the Observer Mission's views"; (2) holding "meetings" with civil society organizations and individuals with "no formal connection to the United Nations"; and (3) conducting those activities from Palestine's UN Mission in New York City, which Plaintiffs assert is located "within the United States."  Pls. Mem. at 11-15 (DE 315-1).

Courts confronted with virtually identical (if not more extensive) allegations have consistently held the same types of activities do <u>not</u> establish a sufficient connection between Defendants, the claims at issue, and the United States to support the exercise of personal jurisdiction.  In its prior decision in this case, for example, the D.C. Circuit specifically held that Plaintiffs' allegations regarding Defendants' purported "campaign" to "influence" U.S. foreign policy "through the use of U.S. offices, fundraising, lobbying, [and] speaking engagements" were insufficient to establish personal jurisdiction.  *Klieman*, 923 F.3d at 1118, 1123-26.  Both the Second and D.C. Circuits have repeatedly reached the same conclusion, holding that alleged "martyr payments," "speaking engagements," and public relations activities failed to establish the requisite connection to the United States to satisfy the Due Process Clause.[8]  *See Waldman*, 835

---

[8] At the time of these earlier decisions, Defendants' presence in the United States was more extensive than it is now.  At that time, Defendants maintained an office in Washington, D.C. (in addition to Palestine's UN Mission in New York).  As discussed below, Defendants closed their D.C. office in 2018 after the U.S. Government declined to extend the ATA waiver necessary to

F.3d at 323, 326, 333-37, 341-42 (holding allegations that Defendants maintained a "substantial" diplomatic and commercial presence in the United States, retained a lobby firm, "promoted the Palestinian cause in speeches and media appearances," and engaged in "extensive public relations activities" designed to "influence United States policy" failed to establish a "substantial connection" between Defendants, the alleged attack, and the United States); *Shatsky*, 955 F.3d at 1022-23, 1037 (holding alleged "martyr payments" and "public relations campaign" insufficient to support personal jurisdiction); *Livnat*, 851 F.3d at 56-57 (holding plaintiffs failed to establish requisite link between alleged attack and "lobbying" activities).

As this Court previously explained, these holdings do not place ATA defendants beyond the jurisdictional reach of U.S. courts, nor do they prevent victims of terrorist attacks from obtaining an adequate remedy in a proper forum.  *See* Klieman, 82 F. Supp. 3d at 249 n.8.  When a defendant targets American citizens or engages in conduct in the United States substantially connected to terrorist attacks overseas, U.S. courts can (and do) exercise personal jurisdiction over the defendant.[9]  *See, e.g.*, *Mwani v. bin Laden*, 417 F.3d 1, 11-14 (D.C. Cir. 2005) (holding foreign defendants who "orchestrated the bombing of the American embassy in Nairobi" subject to personal jurisdiction because they "purposefully direct[ed] their terror at the United States"); *Atchley v. AstraZeneca UK Ltd.,* 22 F.4th 204, 209-10, 231-38 (D.C. Cir. 2022) (holding court had

---

continue operations.  *See Klieman*, 923 F.3d at 1130.  Aside from the UN Mission, Defendants do not currently maintain any office or physical location in the United States.

[9] Victims of terrorist attacks overseas also may file suit in foreign jurisdictions.  Plaintiffs in Israeli courts, for example, have secured several large awards against Defendants for attacks during the Second Intifada.  *See, e.g.*, *Anonymous v. Palestinian Auth.* (Isr.), CivA 2362/19 (Jerusalem 2022); *Mentin v. Palestinian Auth.* (Isr.), CivC 3361/09 (Jerusalem 2017); *see also* Jerusalem Post, *Terror victims' families to collect NIS 500 m. from Palestinian Authority* (Apr. 26, 2020), https://jpost.com/arab-israeli-conflict/court-orders-collection-of-nis-500-m-from-pa-for-second-intifada-625930; Times of Israel, *High Court: PA liable for terrorism due to money it pays attackers; victims can sue* (Apr. 10, 2022), https://www.timesofisrael.com/high-court-pa-liable-for-terrorism-due-to-stipends-to-attackers-victims-can-sue/.

specific jurisdiction over foreign companies that provided substantial support to a terrorist group that "injured or killed hundreds of United States service members" during a "years-long campaign to harm Americans and drive the United States' military … out of Iraq"); *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 169-74 (2d Cir. 2013) (holding foreign bank that used U.S. correspondent accounts to transfer funds for Hezbollah was subject to personal jurisdiction for claims arising from rocket attacks in Israel).  The Due Process Clause precludes the exercise of personal jurisdiction only when plaintiffs cannot establish the requisite connection between the defendant, the attack allegedly giving rise to plaintiffs' claims, and the forum.  *See Klieman*, 923 F.3d at 1126 (distinguishing Plaintiffs' claims in this case from *Mwani*, in which the defendants "indisputably aimed to kill Americans").

In this case, Plaintiffs cannot satisfy the traditional due process requirements for exercising personal jurisdiction over a foreign defendant—as both this Court and the D.C. Circuit have already held.  The sole question before this Court is whether Plaintiffs can rely upon those same, jurisdictionally-insufficient activities to establish "deemed consent" to personal jurisdiction under the PSJVTA.  Over the past year, three federal judges have considered that question.  All three correctly concluded that the constitutional protections afforded to defendants under the Due Process Clause are not so easily evaded.  *See Fuld*, 578 F. Supp. 3d 577; *Sokolow v. PLO*, 590 F. Supp. 3d 589, *recon. denied*, 607 F. Supp. 3d 323; *Shatsky v. PLO*, No. 18-cv-12355, 2022 WL 826409 (Mar. 18, 2022).

### B. Defendants Have Not "Consented" to Personal Jurisdiction in the United States.

#### 1. Consent to Personal Jurisdiction Must Be Knowing and Voluntary.

"Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."  *Bauxites*, 456 U.S. at 703.  A party may expressly

consent to the court's jurisdiction, or impliedly consent by "signal[ing]" its agreement "through actions rather than words." *Roell v. Withrow*, 538 U.S. 580, 589-91 (2003). In *Bauxites*, the Supreme Court cataloged a "variety of legal arrangements [that] have been taken to represent express or implied consent to the personal jurisdiction of the court," including submission "by appearance," forum-selection clauses, arbitration agreements, stipulations, "constructive consent" through "the voluntary use of certain state procedures," and failure to assert a jurisdictional defense in a responsive pleading. 456 U.S. at 703-04. Each of these "legal arrangements," the Court explained, reflects some "actions of the defendant" that "amount to a legal submission to the jurisdiction of the court." *Id.* at 704-05.

"[W]hether express or implied," however, the Supreme Court has "emphasiz[ed]" that a party's consent to jurisdiction must be "knowing and voluntary." *Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665, 685 (2015). An "effective waiver of a constitutional right" generally requires proof of "the 'intentional relinquishment or abandonment of a known right or privilege.'" *College Savings Bank*, 527 U.S. at 682. Because implied or "constructive" consent "is not a doctrine commonly associated with the surrender of constitutional rights," federal courts "indulge every reasonable presumption against waiver." *Id.* at 681-82.

In some cases, determining whether a defendant knowingly and voluntarily consented to personal jurisdiction is straightforward. A party may expressly agree—through a forum-selection clause, for example—to litigate in a particular forum. *See Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-16 (1964) ("[I]t is settled … that parties to a contract may agree in advance to submit to the jurisdiction of a given court…."); *Burger King*, 471 U.S. at 472 n.14 ("Where such forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process."). Courts may also infer

- 17 -

consent to jurisdiction based on <u>actions in the litigation itself</u>, which demonstrate the defendant's intent to submit to jurisdiction.  *See, e.g.*, *Roell*, 538 U.S. at 584 (holding parties who "voluntarily participated in the entire course of proceedings" through trial without objecting to jurisdiction "clearly implied their consent" "by their actions"); *Kirkland v. District of Columbia*, 70 F.3d 629, 633-35 (D.C. Cir. 1995) (holding failure to object may constitute "implied consent" to trial of issues omitted from pleadings or pretrial order).

These canonical forms of consent are not at issue in this case, however, because Plaintiffs cannot claim that Defendants expressly consented to jurisdiction or took any action in the litigation itself evincing their intent to submit to the court's jurisdiction.  To the contrary, as this Court previously noted, Defendants "persistently have objected to personal jurisdiction throughout this case," arguing they lacked sufficient contacts with the United States to justify the exercise of personal jurisdiction.  *Klieman*, 82 F. Supp. 3d at 243; *see also Klieman*, 923 F.3d at 1119 (noting that Defendants repeatedly moved to dismiss for lack of personal jurisdiction).

In the absence of express consent or litigation conduct evincing submission to jurisdiction, determining whether the defendant knowingly and voluntarily consented to personal jurisdiction is more difficult.  To establish implied consent, Plaintiffs must demonstrate some "actions of the defendant" that "amount to a legal submission to the jurisdiction of the court."  *Bauxites*, 456 U.S. at 704-05.  This is "a deeply factbound analysis" that requires the court to determine "whether [defendant's] actions evinced the requisite knowing and voluntary consent."  *Wellness Int'l*, 575 U.S. at 685-86.

In making this determination, the Supreme Court expressly distinguishes between inferring a defendant's knowing and voluntary choice to submit to jurisdiction by its own conduct, and "mere assertions of power" by the forum to impose jurisdiction on nonconsenting defendants.  *See*

*Bauxites*, 456 U.S. at 705.  In *Bauxites*, for example, the Court examined whether the defendant's failure to comply with court-ordered jurisdictional discovery could be treated as constructive waiver of its objection to personal jurisdiction.  The Court held that it could, but only because "[t]he preservation of due process was secured by the presumption" that the defendant's specific conduct—its "failure to supply the requested information as to its contacts with [the forum]"— "was but an admission of the want of merit in the asserted defense."  *Id.* at 705, 709 (quoting *Hammond Packing*, 212 U.S. at 351).  By refusing to produce the requested materials, the defendant implicitly acknowledged that it did have sufficient contacts with the forum to support the exercise of personal jurisdiction.  *Id.* at 705-06.  The defendant's conduct thus served as a constructive waiver of any objection to jurisdiction.  *See id.* ("[T]he sanction is nothing more than the invocation of a legal presumption, or what is the same thing, the finding of a constructive waiver.").

To illustrate the "due process limits" that apply to constructive consent, *Bauxites* distinguished an earlier case, *Hovey v. Elliott*, 167 U.S. 409 (1897), in which the Court held "it did violate due process for [a court] to take similar action as 'punishment' for failure to obey a court order" unrelated to the asserted defense.  *Bauxites*, 456 U.S. at 705-06 (emphasis added).  The defendant's conduct in that case—failure "to pay into the registry of the court a certain sum of money"—did not support the presumption of a "want of merit" in its asserted defense.  *Id*. Subjecting the defendant to the court's jurisdiction, the Court explained, therefore constituted an improper penalty, rather than a valid presumption of constructive waiver drawn from the

defendant's own conduct.  *See id.* at 706 ("Due process is violated only if the behavior of the defendant will not support the *Hammond Packing* presumption.").[10]

The Supreme Court similarly distinguished between valid, implied consent to jurisdiction and the improper imposition of jurisdiction in *College Savings Bank*.  In that case, plaintiffs argued that a state agency waived its immunity and "impliedly" consented to jurisdiction in federal court by knowingly and voluntarily engaging in interstate marketing, after a federal statute made clear that such activity would subject it to jurisdiction for Lanham Act claims.  527 U.S. at 671, 676.  The Court emphatically rejected this "constructive-waiver" theory, explaining:

> There is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity.  In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals.  That is very far from concluding that the State made an "altogether voluntary" decision to waive its immunity.

*Id.* at 680-81.  The constitutional requirement of knowing and voluntary consent would mean little, the Court noted, if Congress had "[the] power to exact constructive waivers" of jurisdictional defenses "through the exercise of Article I powers."  *Id.* at 683.  Accordingly, the Court held that merely providing <u>notice</u> of Congress's intent to subject a defendant to jurisdiction if it "voluntarily" engages in "federally regulated conduct" is insufficient to establish a constructive waiver.  *Id.* at 679-82.  In other words, knowledge of the law (congressional intent to impose

---

[10] In one recent case addressing the constitutionality of the PSJVTA, the district court expressly relied on *Bauxites*' discussion of the "*Hammond Packing* presumption" to hold that the PSJVTA fails to provide valid consent to personal jurisdiction.  *See Sokolow*, 590 F. Supp. 3d at 595-97.  As the court explained, the PSJVTA's "deemed consent" provisions violate due process because engaging in the specified conduct—making payments in Palestine or conducting activities in the United States unrelated to Plaintiffs' claims—does not support an inference that Defendants intended to submit to jurisdiction.  *Id.*

jurisdiction) alone cannot be the basis for inferring "consent" to jurisdiction. *See id.* at 681. Otherwise, legislative fiat coupled with presumed knowledge of the law always would suffice to establish jurisdiction.

In describing the circumstances in which plaintiffs <u>could</u> demonstrate implied consent to jurisdiction, *College Savings Bank* located valid "consent" in the same place as many other implied consent statutes: the defendant's knowing and voluntary acceptance of a government benefit or privilege conditioned upon consent. Congress, the Court explained, may "condition its grant of [federal] funds to the States" upon their willingness to consent to jurisdiction in a federal forum. 527 U.S. at 686. By "accept[ing] of "the funds," the State signals its "agreement" or consent to the condition attached. *Id.* The Court noted, however, that accepting this type of "gift" or "gratuity" conditioned on consent to jurisdiction presents a "fundamentally different" case than the imposition of jurisdiction by legislative fiat. *Id.* at 686-87. In the latter case, "what Congress threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction." *Id.*; *see also AT&T Communs. v. BellSouth Telecom.*, 238 F.3d 636, 646 (5th Cir. 2001) (contrasting "forced waiver" with "[a] state's voluntary waiver of immunity, inferred from the state's acceptance of a Congressional gratuity that it was free to decline without loss").[11]

Courts have used the same barometer to evaluate other implied consent statutes, examining whether the defendant signaled its agreement to personal jurisdiction by accepting a government

---

[11] Although *College Savings Bank* addressed state sovereign immunity rather than personal jurisdiction, the Court's reasoning was not limited to the sovereign immunity context. Relying on the "classic description of an effective waiver of a constitutional right," the Court explained that "constructive consent is not a doctrine commonly associated with the surrender of <u>constitutional rights</u>." 527 U.S. at 681-82 (emphasis added). Because "[s]tate sovereign immunity, no less than the right to trial by jury in criminal cases, is constitutionally protected," courts should "indulge every reasonable presumption against waiver." *Id.* at 682. Accordingly, "the principles underlying *College Savings Bank* are not specific to the Eleventh Amendment, but rather apply to constitutional rights broadly." *Fuld*, 578 F. Supp. 3d at 588.

benefit or privilege conditioned on consent.  Many states, for example, have enacted statutes conditioning the "privilege" of driving on public roads on a non-resident's consent to personal jurisdiction in the state for any suits arising from such conduct.  Because the state has the antecedent authority "to regulate the use of its highways" and to "exclude" non-residents from such use, the Supreme Court has held that the state may also require non-residents to consent to jurisdiction "in advance of the operation of a motor vehicle on its highway."  *Hess*, 274 U.S. at 354, 356-57.  By "accept[ing]" the "privilege" of driving on public roads, a non-resident defendant implicitly signals its agreement, through its actions, to consent to personal jurisdiction in the forum.  *Id.*; *see also Wuchter v. Pizzutti*, 276 U.S. 13, 19 (1928) ("[T]he act of a non resident in using the highways of another state may be properly declared to be an agreement to accept service of summons in a suit growing out of the use of the highway…"); *Wood v. White*, 97 F.2d 646, 647-48 & n.1 (D.C. Cir. 1938) (analyzing D.C. statute under which nonresident motorist "signifies his agreement" to personal jurisdiction "by the act of operating a motor vehicle" on public highways in the District).

Courts apply the same framework to a host of other implied consent statutes as well.  Business registration statutes, for example, condition the privilege of doing business in the state on consent to personal jurisdiction.  By registering to do business in the state, a foreign corporation impliedly agrees to submit to personal jurisdiction in the forum.[12]  *See, e.g.*, *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 631-33 (2d Cir. 2016) (tracing the history of business registration

---

[12] The Supreme Court recently heard a case addressing the continued vitality of business registration statutes following *Daimler*, which sharply curtailed the exercise of general jurisdiction over foreign corporations on due process grounds.  *See Mallory v. Norfolk Southern Ry. Co.*, No. 21-1168 (argued Nov. 8, 2022).  In addition to challenging whether the "consent" extracted under such statutes is truly "knowing and voluntary," the Respondents in *Mallory* also challenge whether the ability to do business in a state is a "privilege" the State may deny if the corporation refuses to consent, or an antecedent "right" protected by the Constitution.  *See* Resp't Br. 11-13, 25, 34-38.

statutes and describing the "fiction" of corporate consent through registration as "a promise, fairly extracted, to appear in state court" in exchange for the privilege of doing business in the state); *Sullivan v. A.W. Chesterton, Inc.* (*In re Asbestos Prods. Liab. Litig.*), 384 F. Supp. 3d 532, 540-41 (E.D. Pa. 2019) (explaining that business registration statutes "purport[] to confer consent to general jurisdiction in exchange for the ability to legally do business in a state"); *In re Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1278 (D. Md. 1981) (describing corporate "consent" to jurisdiction as "part of a bargain, by which the corporation agrees to accept certain obligations in return for the right to do business in the state").[13]

Several states have also adopted corporate director statutes, which "deem" that non-resident defendants "consent" to jurisdiction by accepting appointment to a corporation's board of directors. *See, e.g.*, *Armstrong v. Pomerance*, 423 A.2d 174, 176 & n.4 (Del. 1980) (analyzing Delaware corporate director statute). By accepting the benefits afforded to directors under state law (e.g., eligibility for interest-free, unsecured loans from the corporation, indemnification rights, and managerial powers), non-resident directors impliedly consent to personal jurisdiction in the state for any claims related to the corporation. *Id.*; *see also Swenson v. Thibaut*, 250 S.E.2d 279, 289-91 (N.C. Ct. App. 1978) (same).

In each of these cases, the defendant's acceptance of a benefit or privilege conditioned by the forum on consent to jurisdiction signals the defendant's implied agreement to submit to jurisdiction in the forum—just as a state's acceptance of a conditional "gift" or "gratuity" from the

---

[13] The same rule applies to foreign banks seeking to operate in the United States: in exchange for permission to open a branch office or agency in the United States, the Federal Reserve may require "consent" to jurisdiction for any claim arising under U.S. banking law. *See In re Sealed Case*, 932 F.3d 915, 922-24 (D.C. Cir. 2019) (explaining the Federal Reserve has the "authority to 'impose such conditions on its approval' of a foreign bank's application" to open a U.S. branch or agency "'as it deems necessary'").

federal government signals its implied waiver of sovereign immunity under *College Savings Bank*. By accepting the benefit provided by the forum, the defendant enters into a "'bargain' with the state" whereby it consents to personal jurisdiction in exchange for permission to engage in conduct the state could otherwise prohibit. *Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993); *see also Mid-Atl. Toyota*, 525 F. Supp. at 1278 (describing implied "consent" as "part of a bargain"). Indeed, the exchange of "reciprocal obligations" is exactly what makes the exercise of personal jurisdiction "fair" to a defendant under the Due Process Clause. *Ford Motor v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1029-30 (2021) (explaining that "allowing jurisdiction in these cases treats Ford fairly" because Ford enjoyed "the benefits and protection" of state law when doing business in the forum).

As *College Savings Bank* recognized, however, implied consent becomes a disguised form of legislatively-imposed jurisdiction when the forum does not offer any corresponding benefit for the defendant to accept or reject, in exchange for its consent to jurisdiction. *College Savings Bank*, 527 U.S. at 679-86. If the activity purportedly giving rise to "consent" does not require authorization from the forum, the defendant's choice to engage in the activity does not reflect any implied agreement to submit to jurisdiction because the defendant's ability to engage in the activity did not depend on any benefit (or "gratuity") conferred by the forum in the first instance. *Id*. at 680-81 (holding Congress's bare "intention" to subject defendant to jurisdiction failed to establish implied consent because "there is little reason to assume actual consent based upon the [defendant's] mere presence in a field subject to congressional regulation"). "Without a received benefit," in other words, "there is no bargain, and without a bargain, there is no due process." *Leonard*, 829 F. Supp. at 889.

This does not mean that reciprocity or an exchange of benefits is necessary to establish knowing and voluntary consent in <u>every</u> case.  As noted above, a defendant may expressly consent to personal jurisdiction via a forum-selection clause, obviating any need to determine whether the defendant consented "through actions rather than words."  Submission to jurisdiction also may be presumed, consistent with *Hammond Packing*, from a defendant's failure to comply with "certain procedural rules" in litigation in which the defendant has appeared.  For example, a defendant who enters an appearance and then fails to object to personal jurisdiction may impliedly submit to the court's jurisdiction, "whether voluntary or not."  *See Bauxites*, 456 U.S. at 704-05 (discussing waiver under Fed. R. Civ. P. 12(h)); *id.* at 705 ("The expression of legal rights is often subject to certain procedural rules: The failure to follow those rules may well result in a curtailment of the rights.").

But Defendants are not aware of a single case finding implied consent or submission to jurisdiction based on a defendant's choice to engage in non-litigation-related activities in the <u>absence</u> of some benefit or privilege conferred upon the defendant in exchange for its consent.  Reciprocity, or an exchange of benefits, thus provides a useful means of distinguishing between knowing and voluntary consent under an implied consent statute, and improper attempts to legislatively impose jurisdiction on a nonconsenting defendant.

## 2. Defendants Have Not Knowingly and Voluntarily Consented to Personal Jurisdiction.

Measured against these standards, the PSJVTA fails to provide valid, "knowing and voluntary" consent to personal jurisdiction in this case.  Rather than identifying conduct that might actually demonstrate implied consent (such as the acceptance of U.S. foreign aid or some other government benefit), Congress "simply took conduct in which the PLO and PA had previously engaged—conduct that the Second and D.C. Circuits had held was insufficient to support personal

jurisdiction in *Waldman I*, *Livnat*, *Shatsky*, and *Klieman*—and declared that such conduct 'shall be deemed' to be consent." *Fuld*, 578 F. Supp. 3d at 587. Because such conduct is not "of such a nature as to justify the fiction" that Defendants knowingly and voluntarily consented to suit in the United States, it cannot give rise to valid "consent" to personal jurisdiction. *Id.*; *see also Sokolow*, 607 F. Supp. 3d at 326 (holding that neither form of conduct specified by the PSJVTA "infer[s] any intention on the part of Defendants to legally submit to suit in the United States"). Accordingly, the PSJVTA cannot salvage Plaintiffs' claims from the previously adjudicated dismissal for lack of personal jurisdiction.

### a. Social Welfare Payments Made Outside the United States Do Not Evince Agreement to Personal Jurisdiction in the United States.

The first type of conduct specified by the PSJVTA—payments made in Palestine to families of Palestinians imprisoned for, or killed in, alleged terrorist attacks—has "no direct connection to the United States, let alone to litigation in a United States court." *Fuld*, 578 F. Supp. 3d at 587. The payments at issue occur entirely outside the United States, under Palestinian law, and do not require authorization from the U.S. government or the involvement of any U.S. entity.[14]

---

[14] The payments at issue are part of a broader program designed to provide a "social safety net in the face of brutal and oppressive living conditions under Israeli military occupation." Carnegie Endowment for Int'l Peace, *Palestinian Prisoner Payments* (2021), https://carnegieendowment.org/specialprojects/breakingtheisraelpalestinestatusquo/payments. As part of the program, the PA provides monthly welfare payments to families of Palestinians imprisoned in Israel for political crimes and security offenses or killed during political violence. *Id.*; *see also* Brookings Institution, *Why the Discourse about Palestinian Payments to Prisoners' Families Is Distorted and Misleading* (2020), https://www.brookings.edu/blog/order-from-chaos/2020/12/07/why-the-discourse-about-palestinian-payments-to-prisoners-families-is-distorted-and-misleading/. Israel broadly defines what constitutes a security offense in the occupied territories, and Palestinians can be imprisoned for participating in political demonstrations without a permit, waving the Palestinian flag without approval, or posting social media messages critical of Israeli forces and the occupation. *Id.* According to the Carnegie Endowment, 70% of Palestinian families have at least one relative detained by Israel. *Id.* As of

Any decision to continue making such payments reflects Defendants' own domestic laws and policy choices, rather than some implicit agreement to knowingly and voluntarily consent to jurisdiction in a forum (the United States) completely unconnected to those payments.  Inferring consent to personal jurisdiction based on such payments therefore would "strain the idea of consent beyond its breaking point," allowing Congress to unilaterally impose jurisdiction on nonconsenting foreign defendants. *Id.*

Although the United States may maintain a <u>policy</u> interest in discouraging such payments, that interest does not allow Congress to override the constitutional protections afforded to foreign defendants under the Due Process Clause.   "The personal jurisdiction requirement—which prevents federal courts from exercising authority over defendants without sufficient contacts with the United States—is an important limitation on the jurisdiction of the federal courts over purely extraterritorial activity that is <u>independent of the extraterritorial reach of a federal statute</u> or the court's subject matter jurisdiction." *Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1363 & n.10 (Fed. Cir. 2008) (emphasis added).  Although Congress can "extend[] a cause of action to reach extraterritorial activity," a federal court can only adjudicate such claims "providing [it] has personal jurisdiction over the defendants." *Id.* at 1363.  In other words, Congress's "prescriptive jurisdiction," its authority to make federal law applicable to foreign conduct, "is activated only when there is personal jurisdiction, often referred to as 'jurisdiction to adjudicate.'" *Laker Airways v. Sabena*, 731 F.2d 909, 923 (D.C. Cir. 1984).

---

2017, an estimated 13,000 prisoners and 33,700 families received monthly payments under the program. *Id.*

Even if Congress can legislate that such payments may subject a party to potential <u>liability</u> in the United States,[15] that prescriptive authority therefore does not answer the separate question whether Defendants can be forced to <u>adjudicate</u> such claims in U.S. court.  *See, e.g., Waldman*, 835 F.3d at 343 (holding federal statute providing for jurisdiction through service of process in ATA cases "does not answer the constitutional question of whether due process is satisfied").  As noted above, courts have already held that such payments, standing alone, fail to establish the requisite "connection" between Defendants, Plaintiffs' claims, and the United States to support the exercise of personal jurisdiction.  *See, e.g., Shatsky*, 955 F.3d at 1022-23, 1037 (holding alleged "martyr payments" did not confer specific jurisdiction).  Accordingly, Defendants' decision to continue making such payments in Palestine, without the involvement of any U.S. entity, does not evidence any knowing and voluntary agreement to submit to jurisdiction in the United States.

> **b.    Plaintiffs' Allegations Regarding Defendants' U.S. Activities Fail to Demonstrate Knowing and Voluntary Consent to Jurisdiction.**

The second type of conduct relied upon by Plaintiffs in this case—maintaining an office (Palestine's UN Mission) in New York and furthering the Mission's work by advocating the Palestinian cause through press conferences, civil society engagement, and social media posts—similarly fails to establish a valid basis for knowing and voluntary consent to personal jurisdiction.  "[F]or conduct to imply consent, the conduct must be 'of such nature as to justify the fiction' that the party actually consented to submit itself to the jurisdiction of the court."  *Fuld*, 578 F. Supp. 3d at 586-87 (quoting *Int'l Shoe*, 326 U.S. at 318).  The conduct relied upon by Plaintiffs in this

---

[15] Congress also has legislated that continuation of such payments forecloses Defendants from receiving a government benefit: U.S. foreign aid to Palestine.  *See* Taylor Force Act, 22 U.S.C. § 2378c-1.  But a legislative decision to <u>withhold</u> a gratuity—foreign aid—is the opposite of the *Hess* scenario of conditioning <u>acceptance</u> of a gratuity on submission to personal jurisdiction in the United States.

case does not satisfy that standard, given the courts' repeated holdings that engaging in precisely the same activities was <u>insufficient</u> to establish any meaningful connection between Defendants, the claims at issue, and the United States.  *Id.* at 587 (holding that Defendants' limited U.S. activities do not support a "meaningful inference … that Defendants intended to submit to the laws of the United States or to the jurisdiction of an American court"); *see also Sokolow*, 607 F. Supp. 3d at 326 (holding that engaging in the same conduct previously held "insufficient to support personal jurisdiction" fails "to support any meaningful consent to jurisdiction by Defendants"). "To pass muster, … the predicate conduct would have to be a much closer proxy for actual consent than the predicate conduct at issue is here." *Fuld*, 578 F. Supp. 3d at 587.

The PSJVTA's failure to establish valid, implied consent to jurisdiction is perhaps best illustrated by contrasting the PSJVTA with its predecessor statute, the Anti-Terrorism Clarification Act of 2018 ("ATCA").  Since long before passage of the ATCA, Congress had blocked Defendants from conducting any activities in the United States.  More than three decades ago, Congress enacted the Anti-Terrorism Act of 1987 for the express purpose of denying Defendants the "benefit" of "operating in the United States." *See* 22 U.S.C. § 5201(b).  The 1987 Act prohibits Defendants from operating in the United States by making it unlawful to (1) "receive anything of value except informational material" from the PLO; (2) "expend funds from the PLO"; or (3) "establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by," the PLO.  22 U.S.C. § 5202.  The Act has been interpreted as a "wide gauged restriction of PLO activity within the United States," *United States v. PLO*, 695 F. Supp. 1456,  1471 (S.D.N.Y. 1988), that deprives Defendants of the "many <u>benefits</u> which accrue to organizations operating in the United States, including political stability, access to our press and capital infrastructure, and

- 29 -

… the patina of legitimacy." *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1484 (S.D.N.Y. 1988) (emphasis added); *see also id.* ("The avowed interest asserted by Congress in favor of the ATA is a tactical one—to deny the PLO the benefits of operating in the United States.").[16]

Like many of the other implied consent statutes described above, the ATCA offered Defendants a government "benefit" in exchange for their implied agreement to submit to jurisdiction in the United States. The ATCA specifically provided that Defendants "shall be deemed to have consented to personal jurisdiction" if they accepted either of two government benefits: (1) U.S. foreign aid, or (2) the "<u>benefit</u>" of a formal "waiver or suspension" of the 1987 Anti-Terrorism Act's prohibitions on Defendants' U.S. activities, which would have allowed them to maintain an embassy in Washington. *See* 18 U.S.C. § 2334(e)(1) (2018) (emphasis added) (superseded by PSJVTA).

In defending the constitutionality of the ATCA, the Government specifically argued the statute was "reasonable and consistent with the Fifth Amendment" because "[t]he political branches have long imposed <u>conditions on these benefits</u>." U.S. Brief 12-13, *Klieman v. Palestinian Auth.*, No. 15-7034 (D.C. Cir. Mar. 13, 2019) (emphasis added). The ATCA satisfied

---

[16] Case law has long established that the 1987 Act cannot be enforced to prohibit Defendants' activities in furtherance of Palestine's role as a Permanent Observer at the United Nations. *United States v. PLO*, 695 F. Supp. at 1465-68. The UN Headquarters Agreement ("UNHQA") guarantees "invitees" of the UN, including Palestine, basic rights of "entry, access, and residence" in the UN Headquarters District in New York. *Id.* Under the UNHQA, the United States is "obligat[ed] … to refrain from impairing the function of the PLO Observer Mission to the United States," which falls outside U.S. "jurisdiction." *Id.* at 1465-68, 1471. Courts have thus long held that UN-related activities cannot serve as a basis for exercising personal jurisdiction. *See Klinghoffer v. SNC Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991) (holding activities of Palestine's UN Mission cannot "properly be considered as a basis of jurisdiction"). As discussed further below, the PSJVTA mirrors but does not alter this longstanding interpretation of the UNHQA, providing that "[i]n determining whether a defendant shall be deemed to have consented to personal jurisdiction," "no court may consider" Defendants' UN Mission, their UN-related activities, meetings with government officials, or "any personal or official activities conducted ancillary" thereto. *See* 18 U.S.C. § 2334(e)(3).

due process, in other words, because it grounded "deemed consent" on Defendants' choice to accept or reject either of two distinct government benefits conditioned upon consent.   This interpretation is consistent with *Hess*, *College Savings Bank*, and the other authorities described above, which similarly hold that acceptance of a government benefit or "gratuity" conditioned on consent may constitute a knowing and voluntary waiver of jurisdictional defenses.  *See Hess*, 274 U.S. at 354-57; *College Savings Bank*, 527 U.S. at 686.[17]

The PSJVTA, by contrast, does not confer any benefit for Defendants to "accept" in exchange for their purported "consent."  The PSJVTA does not waive the prohibitions imposed by the 1987 Act, nor does it purport to permit Defendants to conduct any previously-unauthorized activities in the United States.  The PSJVTA also does not extend any government benefit (*e.g.*, foreign aid) conditioned upon consent to personal jurisdiction.  Accordingly, "there is no bargain— no social compact" between the parties that could evince Defendants' implied agreement to submit to jurisdiction in the United States.  *Leonard*, 829 F. Supp. at 889.

Rather than grounding "deemed consent" to jurisdiction on Defendants' voluntary choice to accept or reject a government benefit, the PSJVTA instead attempts to impose "consent" if Defendants engage in <u>any</u> activity in the United States—no matter how unrelated or tangential to the claims at issue.  *See* 18 U.S.C. § 2334(e)(1)(B)(iii).  Plaintiffs in parallel PSJVTA cases have asserted, for example, that Defendants "consented" to jurisdiction by maintaining and "regularly updat[ing]" their website and social media accounts, and by tweeting a message promoting a film

---

[17] The D.C. Circuit subsequently held that the ATCA did not establish personal jurisdiction in this case, because Defendants had not accepted either of the benefits specified by the Act.  *See Klieman*, 923 F.3d at 1128-31.

about "surfing in Gaza" on the United Nations International Day of Sport for Development and Peace. *See Sokolow v. PLO*, No. 04-cv-397 (S.D.N.Y.), DE 1015 at 18; DE 1027 at 2-3.

As every court to consider the issue has concluded, imposing "deemed consent" to jurisdiction based on such activities would violate due process. "Congress cannot, consistent with the Constitution, simply decree that any conduct, without regard for its connections to the United States generally or to litigation in the United States specifically, signals a party's intent to submit to the jurisdiction of a United States court." *Fuld*, 578 F. Supp. 3d at 580. Rather, inferring a defendant's intent to submit to jurisdiction in a forum "is reasonable … only where the defendant's statements or conduct actually signal approval or acceptance" of the Court's jurisdiction. *Fuld*, 578 F. Supp. 3d at 586-87.

Defendants' limited activities in the United States are "too thin to support a meaningful inference of consent to jurisdiction in this country," as they are unrelated to the claims at issue and do not "even remotely signal[] approval or acceptance of the Court's jurisdiction." *Id.* at 587; *see also Sokolow*, 607 F. Supp. 3d at 326 (holding Defendants' limited U.S. activities "do not infer any intention on the part of Defendants to legally submit to suit in the United States"). For that reason, courts have uniformly held that—even if Defendants' alleged post-PSJVTA activities in the United States were not expressly exempted as UN-related activities (*see* section II, *infra*)— such activities do not give rise to valid "consent" to personal jurisdiction in the United States. *See Fuld*, 578 F. Supp. 3d at 578, 595; *Sokolow*, 607 F. Supp. 3d at 326; *Shatsky*, 2022 WL 826409 at *4-5.

### C. Permitting Congress to Impose "Deemed Consent" to Personal Jurisdiction Based on Constitutionally-Inadequate Conduct Would Eviscerate Due Process Protections.

The PSJVTA's attempt to impose "deemed consent" to jurisdiction by legislative fiat also violates the "well-settled" principle that "'a statute cannot grant personal jurisdiction where the

Constitution forbids it.'" *Price*, 294 F.3d at 95 (quoting *Gilson v. Republic of Ire.*, 682 F.2d 1022, 1028 (D.C. Cir. 1982)); *Lewis v. Mutond*, 62 F.4th 587, 595 (D.C. Cir. 2023) (same).  Even when a statute purports to create jurisdiction for claims against certain defendants, the court nonetheless must ensure that exercising jurisdiction would satisfy the Due Process Clause.  *See Gilson*, 682 F.2d at 1028 (examining whether foreign defendants had "sufficient minimum contacts" to exercise jurisdiction under the FSIA); *Waldman*, 835 F.3d at 343 (holding compliance with ATA provision governing service of process "does not answer the constitutional question of whether due process is satisfied").  The D.C. Circuit made precisely this point in *Livnat*, another case involving ATA claims brought against the same Defendants.  Plaintiffs urged the court to depart from "ordinary due-process requirements" (and to exercise personal jurisdiction over Defendants) because the ATA reflected "Congress's intent to provide redress in U.S. courts for terrorism abroad."  851 F.3d at 53.  The D.C. Circuit flatly rejected that request, explaining that "Congress cannot wish away a constitutional provision."  *Id.*

If Congress were permitted to dispense with traditional due process protections merely by providing notice of its intent to subject defendants to suit in federal court via the fiction of "deemed consent," there would be no limit to the types of conduct that could give rise to jurisdiction.  Congress and state legislatures could circumvent modern due-process doctrine simply by enacting statutes declaring that the same activities already held insufficient to satisfy the Due Process Clause "shall be deemed consent" to personal jurisdiction.  In *Daimler*, for example, the Supreme Court held it would violate due process to allow a California court to exercise personal jurisdiction over a foreign car manufacturer and its U.S. subsidiary, which distributed vehicles to California dealerships but were incorporated and maintained their principal places of business elsewhere.  *See* 571 U.S. at 139.  Despite achieving "sizable" sales in the state, the Court held that defendants'

activities were insufficient to confer general jurisdiction because they were not "essentially at home" in the forum. *Id.*

Under the PSJVTA's novel approach to personal jurisdiction, California could circumvent *Daimler*'s holding simply by enacting a statute declaring that any foreign corporation that distributed vehicles to California dealerships "shall be deemed to have consented to personal jurisdiction" in the state. The same would be true of virtually any decision dismissing federal claims for lack of personal jurisdiction: the legislature could simply repackage the same contacts with the forum held insufficient to satisfy due process as grounds for "deemed consent" to jurisdiction. Accepting this interpretation "would effectively mean that there are no due process limitations on the exercise of personal jurisdiction. Congress or a state legislature could provide for jurisdiction over any defendant for any conduct so long as the conduct post-dated enactment of the law at issue." *Fuld*, 578 F. Supp. 3d at 590. The only limit would be the "reach of the legislative imagination—which is to say, that there are no constitutional limits at all." *Id.* at 591.

Finally, even if this Court were to endorse the PSJVTA's novel "deemed consent" framework (and it should not), exercising personal jurisdiction over Defendants in this case would "offend 'traditional notions of fair play and substantial justice.'" *Bauxites*, 456 U.S. at 702-03 (quoting *Int'l Shoe Co.*, 326 U.S. at 316). Even when a party expressly consents to jurisdiction, the Supreme Court has emphasized the agreement is still "subject to judicial scrutiny for fundamental fairness." *Carnival Cruise Lines v. Shute*, 499 U.S. 585, 595 (1991). In this case, Defendants have consistently objected to the exercise of personal jurisdiction for more than a decade. Despite their long-standing objection, the PSJVTA directs courts to "deem" that Defendants "consented" to jurisdiction by continuing to engage in the same activities the courts previously held insufficient to satisfy the Due Process Clause.

Adhering to that directive "would let fiction get the better of fact and make a mockery of the Due Process Clause." *Fuld*, 578 F. Supp. 3d at 595. "Consent is not a legal fiction devoid of content and neither the courts nor Congress may engage in circular reasoning that premises consent on the presumption that defendants know the law and then define the law so that anyone engaging in the defined conduct is deemed to have consented to personal jurisdiction." *Sokolow,* 607 F. Supp. 3d at 326 (cleaned up). "[G]iven this country's longstanding legal tradition of applying due process principles to evaluate personal jurisdiction over non-resident defendants, it seems unjust to expand consent to deem it binding where it would clearly violate due process." *WorldCare Ltd. Corp. v. World Ins. Co.*, 767 F. Supp. 2d 341, 354 (D. Conn. 2011).

Deeming that Defendants knowingly and voluntarily "consented" to personal jurisdiction in this case, despite their long-standing objection to personal jurisdiction and the lack of any substantial connection between Defendants, the claims at issue, and the forum, would violate traditional notions of fair play and substantial justice. *See Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183-84 (5th Cir. 1992) (holding defendant can impliedly "consent" to jurisdiction only "where such jurisdiction is constitutionally permissible"); *WorldCare*, 767 F. Supp. 2d at 361, 363 (D. Conn. 2011) (holding foreign defendant's "paltry" forum contacts failed the "reasonableness test"). Accordingly, this Court should reject Plaintiffs' attempts to impose jurisdiction on Defendants through the fiction of "deemed consent" in this case.

## II.     Based on the Plain Language of the PSJVTA, the Alleged Activities of Palestine's UN Mission Cannot Create Personal Jurisdiction.

Because applying the PSJVTA to impose personal jurisdiction on Defendants in this case would violate due process, and because Defendants do not contest the applicability of the Payments Predicate, this Court need not determine whether Defendants' limited conduct and presence in the United States satisfies the PSJVTA's U.S. Activities Predicate. If the Court were to reach that

issue, however, it should reject Plaintiffs' argument that the social media and civil society activities of Defendants' UN Mission are sufficient to create jurisdiction under the PSJVTA.  *See* Pls. Mot. at 6-8 (Sept. 30, 2021) (DE 315); Pls. Mem. at 11-15 (DE 315-1).

The PSJVTA does not provide for jurisdiction based on Defendants' UN activities.  The statute instead provides that "[i]n determining whether a defendant shall be deemed to have consented to personal jurisdiction," "no court may consider" Defendants' UN Mission "office," "official business of the United Nations," meetings with government officials, or "any personal or official activities conducted ancillary" to such activities.  18 U.S.C. § 2334(e)(3).  The U.S. activities claimed by Plaintiffs in this case fall within these exclusions.  The activities of Palestine's UN Mission are the same as the activities of other UN Missions—and constitute official UN business as defined by the relevant UN committee.  Palestine's UN Mission office is not "in the United States" for jurisdictional purposes, as other courts have recognized.  And the PSJVTA expressly provides that jurisdiction cannot be based on activities "ancillary" to Defendants' UN-related activities.  Accordingly, none of the U.S. activities relied upon by Plaintiffs in this case give rise to jurisdiction under the plain language of the PSJVTA.

## A.   Palestine's UN Mission Performs the Same Activities as Other UN Missions—All of Which Constitute Official UN Business.

Just like every other mission to the United Nations, Palestine's UN Mission maintains a website and social media accounts, and routinely engages with civil society organizations. Plaintiffs interpret the PSJVTA as if drawing attention to Israel's human rights abuses and discussing the Israel-Palestine question cannot constitute official UN business.  *See* Pls. Mem. at 12-14 (DE 315-1) (claiming that "raising or magnifying public awareness" on social media or discussing the Palestinian situation with educational or civic organizations cannot be UN business).  Yet those very issues are omnipresent topics at the UN, with formal resolutions and

speeches condemning Israel's violence against Palestinian civilians[18] and UN Missions tweeting about Israel's appalling record in Palestine.[19]  In fact, Israel frequently complains about the UN's criticism.[20]   Plaintiffs' arguments ignore the modern reality that the UN and UN Missions frequently communicate through social media and civil society engagement about the Israel-Palestinian conflict.[21]

Defendants' public discussion of these topics constitutes official UN business in light of the role that Palestine's UN Mission is expected to play at the UN.  According to the UN Juridical Yearbook, "official UN business" means activities "directly related" to a "mission or project."  UN Juridical Yearbook at 154-55 (1985).  Critically, the UN has also defined the official business of Palestine's UN Mission.  As explained by the UN Committee on the Exercise of the Inalienable Rights of the Palestinian People ("CEIRPP"), Palestine's Mission is expected to "participate[] in

---

[18] *See*, *e.g.,* Meetings Coverage, GA/12325 (António Guterres: "If there is a hell on earth, it is the lives of children in Gaza") (May 20, 2021); G.A. Res. No. A/C.4/73/L.18 (Nov. 14, 2018) (condemning "the excessive use of force by the Israeli occupying forces against Palestinian civilians, resulting in the death and injury of civilians"); G.A. Res. No. A/73/L.32 (Nov. 23, 2010) (condemning "acts of violence, intimidation and provocation by Israeli settlers against Palestinian civilians … settlement construction and expansion, home demolitions, evictions ...").

[19] *See, e.g.,* Twitter: @UKUN_NewYork ("What hope is there for 2-state solution when communities are simply removed from the map?") (Oct 14, 2016); @FranceONU (Feb. 24, 2020) ("No further settlements. No colonization."); @Turkiye_UN (Apr. 23, 2020) ("All illegal settlement and demolition activities must stop.").

[20] *UN condemned Israel 17 times in 2020, versus 6 times for rest of world combined*, Times of Israel (Dec. 23, 2020), at: www.timesofisrael.com/un-condemned-israel-17-times-in-2020-versus-6-times-for-rest-of-world-combined/.

[21] *See, e.g.,* Twitter: @Turkiye_UN (discussing UN meeting about Palestine and supporting "an independent, sovereign & contiguous State of #Palestine") (Feb. 8, 2022); @MYNewYorkUN1 (Malaysian UN Mission expressing "Malaysia's unwavering commitment towards the Palestinian cause").

the work of [the CEIRPP]" as part of its UN-invitee status.[22]  The CEIRPP's work is to "mobilize the international community to stay steadfast in its support for the inalienable rights of the Palestinian people," to support the "two-State solution," to highlight "the illegality of Israeli settlement activities in the West Bank," and to raise "awareness of the political, human rights and humanitarian developments on the ground … to mobilize the broadest possible international support."[23]  As the *Sokolow* court recognized, official UN business encompasses more than merely closed-door meetings between diplomats:

> [T]here are a lot of things that you do to engage in UN business …. You may have to persuade other members of the UN of your position that's going to be addressed at the UN.  You may need public support for that position.  You may need to communicate to your constituents, and even those who disagree with you, why you're taking that position at the UN and why that's a legitimate position to take.

*Sokolow*, No. 04-0397, DE 1029 at 41 (S.D.N.Y. May 19, 2021).

As such, the CEIRPP's <u>official</u> UN business includes exactly the type of public outreach activities that Plaintiffs attempt to rely on to impose jurisdiction in this case.  *See* Pls. Mem. at 12-14 (DE 315-1) (arguing that any discussions with "organizations and individuals that have no formal connection to the United Nations" cannot be UN business).  The CEIRPP "has a mandate from the United Nations General Assembly" to network with "more than 1,000 civil society

---

[22]  Report, CEIRPP, UN Doc. A/75/35, ¶ 31 (2020), at: https://www.un.org/unispal/document/2020-annual-report-of-committee-on-the-exercise-of-the-inalienable-rights-of-the-palestinian-people-to-the-un-general-assembly-a-75-35.

[23] Programme of Work for 2020, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7, 2020), at: https://www.un.org/unispal/document/palestinian-rights-committee-programme-of-work-for-2020-a-ac-183-2020-1/.

organizations from all regions of the world, active on the question of Palestine."[24]  Together with Palestine's UN Mission, the CEIRPP and other UN bodies and missions use social media to communicate with each other and with the international community.  Those activities are the official UN business at the heart of one of the longest-standing and most important of official UN issues: the Question of Palestine.  *See* UN G.A. Res. 3236, A/RES/3236 (XXIX) (Nov. 22, 1974).

This conclusion is further supported by the fact that other UN organs, missions, and observers engage in exactly the same kinds of official activities as Palestine's UN Mission. American news media regularly interview UN Ambassadors regarding issues important to the United Nations.  CNN interviewed the UN Ambassadors from Morocco and Myanmar.[25]  NBC interviewed Iran's UN Ambassador, and Reuters interviewed Ethiopia's UN representative.[26]  The Saudi Arabian UN Ambassador spoke with an English-language Chinese news service about the Israeli-Palestinian issue.[27]  UN missions are encouraged to communicate frequently with civil society organizations and university and student groups.[28]  Moreover, the United States has long

---

[24] United Nations, UNISPAL, Civil Society and the Question of Palestine:  Overview, at: https://www.un.org/unispal/data-collection/civil-society/.

[25] CNN News (Mar. 9, 2021), at: https://www.cnn.com/2021/03/09/world/meanwhile-in-america-march-9-intl/index.html (interview with Myanmar's UN ambassador); CNN News (Nov. 23, 2020), at https://www.cnn.com/videos/world/2020/11/23/connect-the-world-omar-hilale-western-sahara.cnn (interview with Morocco's UN ambassador).

[26] NBC News Interview (Jan. 26, 2021), at https://www.nbcnews.com/politics/national-security/iran-s-un-ambassador-says-iran-waiting-president-biden-make-n1255608 (interview with Iran's UN ambassador); Reuters News (Mar. 29, 2021), at https://www.youtube.com/watch?v=qIbZIpzUoXk (interview with Ethiopia's UN ambassador).

[27] CGTN America (Sept. 10, 2020), at https://america.cgtn.com/2020/09/10/un-general-assembly-interview-with-saudi-ambassador-to-un (interview with Saudi Arabia's UN ambassador); *see also* MSNBC (May 30, 2019), at https://www.msnbc.com/ali-velshi/watch/israeli-amb-to-un-on-new-vote-political-chaos-in-israel-60583493582 (interview with Israel's UN ambassador).

[28] *See Francophone panel discussion marked the launch of the festival*, Princeton University, at https://fit.princeton.edu/node/4156 (discussion panel with UN representatives from Mali, Ivory Coast, and Romania); *Liechtensteinian Ambassador Christian Wenaweser critiques current state of the UN*, Daily Princetonian (Feb. 28, 2020), at

been aware of the media activities of Palestine's UN Mission, and has never claimed that the Mission has gone beyond the parameters of official UN business or has broken any law prohibiting Palestinian government activities in the United States.

Nothing about the PSJVTA changes the pre-existing protections accorded Palestine's UN Mission as a UN invitee under the UNHQA and otherwise, including "immunity from legal process in respect of words spoken and written or any act performed in the exercise of the observer functions."  UN Juridical Yearbook, Chapter VI, § A(13) (2000).  As such, "[a]ny measure which might impede … its ability to discharge its official functions" would "contravene" the UN Charter, the UN Headquarters Agreement, and "General Assembly resolutions."  *Id.*  In prior cases, the United States Government has warned that ignoring these pre-existing protections would lead courts into a "political and legal quagmire".  U.S. Statement of Interest, *Ungar v. Palestinian Auth.*, No. 18-302, at 25-27 (S.D.N.Y. Sept. 12, 2005).

**B.     The Office of Palestine's UN Mission is Specifically Exempted from Jurisdictional Consideration by the PSJVTA.**

Many of Plaintiffs' claimed U.S. activities are also insufficient to satisfy the PSJVTA's U.S. Activities Predicate because the Mission premises are not considered "in the United States" for jurisdictional purposes.  *See Waldman v. PLO*, 925 F.3d 570, 575 (2d Cir. 2019) (holding Palestine's UN Mission "is not considered to be within the jurisdiction of the United States"); *Klinghoffer*, 937 F.2d at 51 (same).  As the leading case on Palestine's UN Mission, *United States v. PLO*, explains:  "the United Nations has, from its incipiency, welcomed various non-member observers to participate in its proceedings," including the Palestinian Mission, which "is present

---

https://www.dailyprincetonian.com/article/2020/02/princeton-christian-wenaweser-un-liechtenstein-ambassador-trump-indifferent;  Oxford  Union  Society  (Mar  7,  2021),  at https://www.youtube.com/watch?v=iWDv-mfdNmA (event featuring the European Union's UN ambassador).

at the United Nations as its invitee." 695 F. Supp. at 1458-59. When the UN's right to invite Palestine to open a mission was challenged nearly five decades ago, the "court upheld the presence of a PLO representative in New York." *Id.* Since that time, Palestine "has maintained its Mission to the United Nations without trammel, largely because of the Headquarters Agreement," and the U.S. has "acted in a manner consistent with a recognition of the PLO's rights in the Headquarters Agreement." *Id.* at 1459, 1466. Those rights come "not only from the language of the Headquarters Agreement but also from forty years of practice under it." *Id.* at 1465.

This consistent practice is unchanged in the PSJVTA, which expressly accepts that Palestine's UN Mission and activities cannot be a basis for jurisdiction. The PSJVTA provides that Palestinian offices are considered "in the United States" under the statute only if they are not "exempted by paragraph (3)(A)." 18 U.S.C. § 2334(e)(4). In turn, paragraph 3(A) precludes jurisdiction based on any office "used exclusively for the purpose" of conducting UN business or meeting with foreign officials. *Id.* § 2334(e)(3)(A). Defendants' maintenance of their UN Mission in New York therefore cannot give rise to "deemed consent" to jurisdiction under the PSJVTA.

### C.   Any Other U.S. Activities Claimed by Plaintiffs Fall Under the PSJVTA's "Ancillary" Activities Provision.

The PSJVTA further provides that "deemed consent" to jurisdiction cannot arise from activities in the United States that are "ancillary" to Defendants' UN activities. *See* 18 U.S.C. § 2334(e)(3)(F). When considering Plaintiffs' claims about Defendants' U.S. activities, this Court should adopt a common-sense interpretation of the term "ancillary." Because the PSJVTA does not define what activities are "ancillary" to Defendants' UN activities, courts "turn to the phrase's plain meaning at the time of enactment." *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020). Dictionaries define "ancillary" to mean "supplementary," "additional," or "auxiliary." *See, e.g.,* Black's Law Dictionary (11th ed. 2019) ("Supplementary"); Webster's Third New International

Dictionary, Unabridged (2002) ("auxiliary, supplementary").  Thus, the ordinary meaning of the PSJVTA's "ancillary" activities provision is that jurisdiction may not be based on activities that are supplemental or additional to Defendants' UN activities.

The text of the statute further supports that interpretation.  Subparagraphs (A) through (E) of section 2334 exclude activities undertaken "exclusively" for "official" business.  *See* 18 U.S.C. § 2334(e)(3).  The ancillary provision, subparagraph (F), then excludes "<u>any personal or official</u> activities conducted <u>ancillary </u> to activities listed under this paragraph." *Id.* (emphases added).  The word "any" suggests that the exception should be read broadly, as does the word "personal"— personal activities, by definition, are not official business of the Mission.  Similarly, the inclusion of "<u>any … official activities</u>" in subparagraph (F) must exempt official activities that are not exclusively <u>UN</u> activities, so long as they are "supplementary" or "additional" to official UN activities.

This common-sense interpretation draws further support from legislative history.  Senator Leahy explained that not including the "ancillary" activities provision might undermine Defendants' UN activities: "ancillary activities are those which may not be essential for the minimal functioning of the mission but which support the mission's primary operations." Statement of Sen. Leahy, Cong. Rec.—Sen., S267, 116th Cong. (Jan. 28, 2020).  This includes "meet[ing] with advocates regarding relevant issues, mak[ing] public statements, and otherwise engag[ing] in public advocacy and civil society[.]" *Id*.  As Senator Leahy stated, the addition of the "ancillary" activities provision ensures that the statute does not interfere with the workings of the UN, as required under the UNHQA.  *Id.*; *see United States v. PLO*, 695 F. Supp. at 1466 ("course of conduct under the Headquarters Agreement is important evidence of its meaning").  Senator Leahy's understanding of the PSJVTA's "ancillary activities" clause is entitled to "greater

weight" because he negotiated the addition of the clause and ultimately voted for the bill. *Bankamerica Corp. v. United States*, 462 U.S. 122, 139 (1983).

This Court need not rely on the "ancillary" activities provision because the activities of Palestine's UN Mission fall well within the ambit of the CEIRPP's official mandate and thus constitute official UN business. But the "ancillary" provision can act as a relief-valve if there are any questions about the scope of the Mission's UN business, ensuring that the PSVJTA is not interpreted to "impede" the "words spoken and written" by the Mission "or any act performed in the exercise of the observer functions." UN Juridical Yearbook, Chapter VI, § A(13) (2000).

## III.   THE PSJVTA VIOLATES SEPARATION OF POWERS.

The PSJVTA's deemed consent provisions also violate separation of powers. Congress oversteps its constitutional authority when it attempts to "usurp a court's power to interpret and apply the law to the circumstances before it." *Bank Markazi v. Peterson*, 578 U.S. 212, 224-28 (2016); *see also Boerne v. Flores*, 521 U.S. 507, 536 (1997) (holding Congress cannot override the judiciary's responsibility to "say what the law is"); *United States v. Klein,* 80 U.S. 128, 147 (1871) (holding statute requiring courts to treat pardons of Confederate sympathizers as conclusive evidence of disloyalty "passed the limit which separates the legislative from the judicial power").

The PSJVTA usurps the judicial function by directing courts to <u>always</u> find consent if its factual predicates are met—regardless of whether those activities satisfy the standard for consent under the Due Process Clause. Determining whether a party has waived constitutional rights is a quintessentially judicial question, requiring "application of constitutional principles to the facts as found." *Brewer v. Williams*, 430 U.S. 387, 403 (1977) (cleaned up). While Congress may legislate standards for liability and many other issues, it cannot dictate constitutional due-process standards. *Cooper v. Aaron,* 358 U.S. 1, 18 (1958) (the "judiciary is supreme in the exposition of the law of the Constitution") (cleaned up); *see also Bank Markazi*, 136 S. Ct. at 1324 n.19 (explaining *Klein*

held that "Congress 'may not exercise [its authority, including its power to regulate federal jurisdiction,] in a way that requires a federal court to act unconstitutionally'" (cleaned up)).

The PSJVTA also violates the well-established principle that Congress cannot "legislatively supersede" decisions "interpreting and applying the Constitution." *Dickerson v. United States*, 530 U.S. 428, 437 (2000). As noted above, *Waldman*, *Shatsky*, *Livnat*, and this Court uniformly held that subjecting Defendants to personal jurisdiction in the United States based on the same type of conduct alleged in this case would violate the Due Process Clause. *See supra* at 10. Permitting Congress to supersede those constitutional holdings by legislative fiat would make the Constitution, "like other acts … alterable when the legislature shall please to alter it," in violation of fundamental principles of separation of powers. *Marbury v. Madison*, 5 U.S. (1 Cranch.) 137, 177 (1803); *see, e.g.*, *Boerne*, 521 U.S. at 523-24 (rejecting Congressional effort to overturn Supreme Court precedent by creating a different constitutional standard).

The Government and plaintiffs in similar cases have asserted that the PSJVTA should be excused from scrutiny because it applies only to a narrow set of defendants. But this only exacerbates the constitutional violation. The "Framers vested the executive, legislative, and judicial powers in separate branches" precisely to protect "the rights of one person" from the "tyranny of shifting majorities." *INS v. Chadha*, 462 U.S. 919, 961-62 (1983) (Powell, J., concurring). A statute aimed at the constitutional rights of just two entities should result in more scrutiny, not less. *See Boerne*, 521 U.S. at 529 (explaining that if Congress were permitted to define the scope of constitutional protections for individual groups, "it is difficult to conceive of a principle that would limit congressional power"). A statute like the PSJVTA, which singles out disfavored groups for disparate treatment, is therefore more—not less—constitutionally suspect.

## **<u>CONCLUSION</u>**

This Court should join the district courts in *Sokolow*, *Fuld*, and *Shatsky*, and hold that the

PSJVTA is unconstitutional as applied to the PA and PLO in this case.


April 7, 2023                                                    Respectfully submitted,

                                                                */s/ Gassan A. Baloul*
                                                                Gassan A. Baloul (DC Bar 1034245)
                                                                gassan.baloul@squirepb.com
                                                                Mitchell R. Berger (DC Bar 385467)
                                                                mitchell.berger@squirepb.com
                                                                SQUIRE PATTON BOGGS (US) LLP
                                                                2550 M Street, N.W.
                                                                Washington, D.C. 20037
                                                                Telephone: (202) 457-6000
                                                                Facsimile:  (202) 457-6315

                                                                *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2023, I caused a true and correct copy of the foregoing

Defendants' Brief Regarding the Constitutionality of the PSJVTA to be served through the Court's

CM/ECF System on all counsel of record in this action.


/s/ *Gassan A. Baloul*
Gassan A. Baloul