**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Estate of Esther Klieman, *et al.*,       ) | |
| ) | |
| Plaintiffs,   ) | |
| v.                          ) | Civil Action No. 04-1173 (PLF) |
| ) | |
| The Palestinian Authority, *et al.*,   ) | |
| ) | |
| Defendants.   ) | |
| ) | |

**PLAINTIFFS' MEMORANDUM OF LAW WITH POINTS AND AUTHORITIES IN RESPONSE TO DEFENDANTS' BRIEF REGARDING THE CONSTITUTIONALITY OF THE PSJVTA**

Dated:  June 6, 2023

Respectfully Submitted,

HEIDEMAN NUDELMAN & KALIK P.C.

By:    */s/ Richard D. Heideman*_____
*/s/ Noel. J. Nudelman*_____
Richard D. Heideman (No. 377462)
Noel J. Nudelman   (No. 449969)
Tracy Reichman Kalik (No. 462055)
Joseph H. Tipograph (No.997533)
HEIDEMAN NUDELMAN & KALIK, PC
5335 Wisconsin Avenue, NW; Suite 440
Washington, DC  20015
Telephone: 202.463.1818
Facsimile: 202.463.2999

PERLES LAW FIRM, P.C
Steven R. Perles (No. 326975)
Edward MacAllister (No. 494558)
816 Connecticut Ave., NW
12th Floor
Washington, DC 20006
Telephone: 202-955-9055
Telefax: 202-955-3806
*Counsel to the Plaintiffs*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ....................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND .................................................. 3

   I.   Congress's long history of attempted regulation of PA terrorism ....................... 3

   II.   *Klieman* lawsuit in the context of Congressional attempts to deter PA terrorism ............... 6

SUMMARY OF ARGUMENT ................................................................................... 12

ARGUMENT ............................................................................................................. 16

   I.   The PSJVTA satisfies Due Process Requirements ........................................... 16

      A.   The Applicable Due Process Clause Test .................................................. 16

      B.   "Deemed Consent" does not violate the Due Process Clause in these Limited Circumstances ......................................................................................... 36

   II.   Separation of Powers .................................................................................... 38

CONCLUSION .......................................................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

Cases

*AFC Franchising, LLC v. Purugganan*,
    43 F.4th 1285 (11th Cir. 2022) ....................................................................... 17, 18

*Alexander Proudfoot Co. World Headquarters L.P. v. Thayer*,
    877 F.2d 912 (11th Cir. 1989) .................................................................................. 17

*Armstrong v. Exec. Office of the President*,
    90 F.3d 553 (D.C. Cir. 1996) .................................................................................... 10

*Baltimore & Carolina Line v. Redman*,
    295 U.S. 654 (1935) ................................................................................................. 24

*Baltimore & Ohio R.R. Co. v. Harris*,
    79 U.S. (12 Wall.) 65 (1870) .............................................................................. 25, 26

*Bank Markazi v. Peterson*,
    578 U.S. 212 (2016) ...................................................................................... 37, 38, 39

*Bank of Columbia v. Okely*,
    17 U.S. (4 Wheat.) 235 (1819) ................................................................................. 24

*Bendix Autolite Corp. v. Midwesco Enters., Inc.*,
    486 U.S. 888 (1988) ................................................................................................. 27

*Birchfield v. North Dakota*,
    579 U.S. 438 (2016) ................................................................................................. 24

*Biton v. Palestinian Auth.*,
    310 F. Supp. 2d 172 (D.D.C. 2004) ............................................................................ 7

*Blackburn v. Alabama*,
    361 U.S. 199 (1960) ................................................................................................. 21

*Boim v. Quranic Literacy Inst.*,
    291 F.3d 1000 (7th Cir. 2002) ................................................................................... 4

*Brady v. United States*,
    397 U.S. 742 (1970) ........................................................................................... 20, 21

*Bremen v. Zapata Off-Shore Co.*,
    407 U.S. 1 (1972) ..................................................................................................... 29

*Brown v. Lockheed Martin Corp.*,
    814 F.3d 619 (2d Cir. 2016) ........................................................................ 17, 32, 37

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) .......................................................................................... passim

*Carnival Cruise Lines, Inc. v. Shute*,
    499 U.S. 585 (1991) ................................................................................................. 25

*College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*,
    527 U.S. 666 (1999) ................................................................................................. 23

*Colorado v. Connelly*,
    479 U.S. 157 (1986) ................................................................................................. 21

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014) ................................................................................................. 7

ii

*Donahue v. Far E. Air Transp. Corp.*,
652 F.2d 1032 (D.C. Cir. 1981) .................................................................................................. 27

*E.E.O.C. v. Arabian Am. Oil Co.*,
499 U.S. 244 (1991) ................................................................................................................... 36

*Edelman v. Jordan*,
415 U.S. 651 (1974) ................................................................................................................... 23

*Estate of Klieman v. Palestinian Auth.*,
82 F. Supp. 3d 237 (D.D.C. 2015) ....................................................................................... 7, 8, 9

*Estate of Klieman v. Palestinian Auth.*,
467 F. Supp. 2d 107 (D.D.C. 2006) ............................................................................................ 7

*Estate of Klieman v. Palestinian Auth.*,
923 F.3d 1115 (D.C. Cir. 2019) ........................................................................................... 10, 16

*Estate of Ungar v. Palestinian Auth.*,
153 F. Supp. 2d 76 (D.R.I. 2001) ............................................................................................... 7

*Estate of Ungar v. Palestinian Auth.*,
325 F. Supp. 2d 15 (D.R.I. 2004) ............................................................................................... 7

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
141 S. Ct. 1017 (2021) ...................................................................................................... passim

*Fuld v. PLO*,
578 F. Supp. 3d 577 (S.D.N.Y. 2022) ............................................................................... passim

*Gamble v. United States*,
139 S. Ct. 1960 (2019) ............................................................................................................... 30

*Gilmore v. Palestinian Auth.*,
843 F.3d 958 (D.C. Cir. 2016) ..................................................................................................... 8

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
8 F. Supp. 3d 9 (D.D.C. 2014) ................................................................................................... 22

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011), which overruled ................................................................................. 7, 27

*Hammond Packing Co. v. Arkansas*,
212 U.S. 322 (1909) ................................................................................................................... 20

*Hampton v. Mow Sun Wong*,
426 U.S. 88 (1976) ..................................................................................................................... 29

*Hawkins v. i-TV Digitalis Tavkozlesi zrt.*,
935 F.3d 211 (4th Cir. 2019) ..................................................................................................... 17

*Hess v. Pawloski*,
274 U.S. 352 (1927) ................................................................................................................... 26

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ....................................................................................................................... 30

*Husayn v. Austin*,
No. 08-cv-1360 (EGS), 2022 U.S. Dist. LEXIS 104435 (D.D.C. June 10, 2022) .................... 10

*In re Sealed Case*,
932 F.3d 915 (D.C. Cir. 2019) ................................................................................................... 30

*Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*,
456 U.S. 694 (1982) ....................................................................................................... 16, 18, 20

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ....................................................................................................... 16, 17, 26, 29

*J. McIntyre Mach., Ltd. V. Nicastro*,
  564 U.S. 873 (2011) ............................................................................ 28, 29
*Jesner v. Arab Bank, PLC*,
  138 S. Ct. 1386 (2018) ................................................................................ 30
*Kiobel v. Royal Dutch Petro. Co.*,
  569 U.S. 108 (2013) ................................................................................... 30
*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ................................................................................... 30
*Klinghoffer v. Palestine Liberation Org.*,
  937 F.2d 44 (2d Cir. 1991) .......................................................................... 4
*Klinghoffer v. S.N.C. Achille Lauro*,
  795 F. Supp. 112 (S.D.N.Y. 1992) .............................................................. 7
*Knowlton v. Allied Van Lines, Inc.*,
  900 F.2d 1196 (8th Cir. 1990) ................................................................... 17
*Knox v. Palestine Liberation Org.*,
  229 F.R.D. 65 (S.D.N.Y. 2005) .................................................................. 7
*Knox v. Palestine Liberation Org.*,
  248 F.R.D. 420 (S.D.N.Y. 2008) ............................................................... 7
*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013) ................................................................................... 30
*Landgraf v. USI Film Products*,
  511 U.S. 244 (1994) ................................................................................... 37
*Leonard v. USA Petroleum Corp.*,
  829 F. Supp. 882 (S.D. Tex. 1993) ...................................................... 23, 32
*Linde v. Arab Bank, PLC*,
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) ...................................................... 34
*Livnat v. Palestinian Auth.*,
  851 F.3d 45 (D.C. Cir. 2017) ............................................................... 8, 17
*Mallory v. Norfolk Southern Ry. Co.*,
  142 S. Ct. 2646 (2022) ............................................................................... 27
*McMann v. Richardson*,
  397 U.S. 759 (1970) ................................................................................... 20
*Miss. Publ'g Corp. v. Murphree*,
  326 U.S. 438 (1946) ................................................................................... 27
*North Carolina v. Alford*,
  400 U.S. 25 (1970) ..................................................................................... 20
*Palestine Info. Office v. Shultz*,
  853 F.2d 932 (D.C. Cir. 1988) .................................................................. 30
*Parke v. Raley*,
  506 U.S. 20 (1992) ..................................................................................... 20
*Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining & Milling Co.*,
  243 U.S. 93 (1917) ............................................................................... 25, 26
*Roell v. Withrow*,
  538 U.S. 580 (2003) ............................................................................. 17, 24
*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973) ................................................................................... 24

*Shatsky v. Palestine Liberation Org.*,
  955 F.3d 1016 (D.C. Cir. 2020)........................................................ 19, 24, 27, 34
*Sickle v. Torres Advanced Enter. Sols., LLC*,
  884 F.3d 338 (D.C. Cir. 2018)....................................................................... 16
*Sokolow v. Palestine Liberation Org.*,
  No. 04 Civ. 397 (GBD), 2011 WL 1345086 n.10 (S.D.N.Y. Mar. 30, 2011) ............................ 7
*Sokolow v. PLO*,
  607 F. Supp. 3d 323 (S.D.N.Y. 2022)............................................................. 25, 27
*South Dakota v. Neville*,
  459 U.S. 553 (1983) ............................................................................... 24
*St. Clair v. Cox*,
  106 U.S. 350 (1882) ........................................................................... 25, 26
*Sun Forest Corp. v. Shvili*,
  152 F. Supp. 2d 367 (S.D.N.Y. 2001) .............................................................. 24
*Tamosiunas v. NLRB*,
  892 F.3d 422 (D.C. Cir. 2018)..................................................................... 21
*United States* v. *Schooner Peggy*,
  5 U.S. 103, 1 Cranch 103 (1801) .................................................................. 37
United States,
  59 Fed. Reg. 4777 (1994).......................................................................... 31
*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016) ....................................................................... 7
*Washington v. Superior Ct. of Wash.*,
  289 U.S. 361 (1933) ........................................................................... 25, 26
*Water & Sand Int'l Capital, Ltd. v. Capacitive Deionization Tech. Sys.*,
  563 F. Supp. 2d 278 (D.D.C. 2008)................................................................. 18
*Wellness Int'l Network*,
  575 U.S.......................................................................................... 24
*World-Wide Volkswagen Corp.* v. *Woodson*,
  444 U.S. 286 (1980) .............................................................................. 18

Statutes

18 U.S.C. § 2331(1)(C)............................................................................. 4
18 U.S.C. § 2333 .................................................................................. 1
18 U.S.C. § 2333 (ATA)............................................................................. 4
18 U.S.C. § 2334(e) ........................................................................... 1, 2, 8
18 U.S.C. § 2334(e)(1)(A) ......................................................................... 19
18 U.S.C. § 2334(e)(1)(B) ......................................................................... 19
22 U.S.C. § 2378c-1............................................................................. 9, 28
22 U.S.C. § 5201 .................................................................................. 3
Pub. L. 100-204 § 1002, 101 Stat. 1407 ............................................................ 3
Pub. L. 101-246................................................................................... 3
Pub. L. 101-246 § 803(a), 104 Stat. 76-80......................................................... 28
Pub. L. 103-125, 107 Stat. 1309 .................................................................. 31
Pub. L. 103-236 § 583, 108 Stat. 382 (1994)........................................................ 5
Pub. L. 103-87, §§ 516(c), 578, 107 Stat. 960, 973-74 (1993)....................................... 5

Pub. L. 107-228 ................................................................................................................ 6
Pub. L. 109-446, 120 Stat. 3318 ..................................................................................... 6
Pub. L. 115-31, §§ 7036-40, 7041(l)(3), 131 Stat. 135, 655-59, 668 ......................... 5
Pub. L. No. 115-253, § 4 ................................................................................................. 8
Pub. L. No. 115-141, 132 Stat. 348, 1143 ............................................................... 9, 28

Rules

Fed. R. Civ. P. 12(b) ................................................................................................ 22, 23

Other Authorities

2 Ronald D. Rotunda & John E. Nowak, *Treatise on Const. L.* § 15.7 (5th ed. 2012 & Supp. 2022) ............................................................................................................................. 35
137 Cong. Rec. S4511-04 ............................................................................................... 4
164 Cong. Rec. S5103 .................................................................................................... 9
165 Cong. Rec. S7182 .................................................................................................. 10
H.R. Rep. No. 102-1040 ................................................................................................. 4
H.R. Rep. No. 115-858 ........................................................................................ 8, 9, 30
S. 1569 ............................................................................................................................. 5
S. Rep. No. 102-342 ........................................................................................................ 4

**INTRODUCTION**

For over three decades, Congress has legislated extensively to give American citizens the ability to bring a lawsuit in U.S. courts against the Defendants, Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") (or "Defendants"), for their responsibility for acts of terrorism that kill or injure Americans overseas—including their program of making regular, periodic "martyr payments" to imprisoned terrorists or to the family members of deceased terrorists. The goal of hold sponsors of terrorism accountable for Americans killed or injured in terror attacks led to the passing of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, et seq., after which Americans were able to bring suit against the PA and PLO for such acts until 2014. The PA and PLO vigorously defended these lawsuits, and routinely lost on their procedural defenses such as personal jurisdiction as the several lawsuits slowly progressed through the court system. This changed in 2011 and 2014 when the Supreme Court in the seminal decisions of *Daimler* and *Goodyear* altered the analysis for general personal jurisdiction, and several district courts in their wake, ruled invalid the general jurisdiction basis for those lawsuits.

Congress immediately sprang into action passing first the Anti-Terrorism Clarification Act ("ATCA"), creating 18 U.S.C. § 2334(e), and then passing the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), which amended 18 U.S.C. § 2334(e) and solidified the personal jurisdiction bases for these lawsuits. Based upon its power to impose conditions on the PA and PLO's presence in or availing of the United States, Congress sought to restore the pre-*Daimler* status quo.

The PSJVTA satisfies the Due Process Clause because the Defendants had fair notice that engaging in certain conduct that is clearly detrimental to American citizens and interests could

1

result in their submission to the jurisdiction of this Court and there is a reasonable relationship between the statute and the legitimate government objectives that it seeks to further. The PA and PLO have no right to any presence in the United States outside of its diplomatic presence, both at the UN and in Washington, but the PSJVTA implicitly allows activities outside that range of diplomatic activities, based upon the deemed consent of the PA and PLO to the personal jurisdiction of US courts over the PA for supporting acts of international terrorism committed against Americans abroad. The Supreme Court has many times found constitutional statutes wherein a sovereign imposes reasonable conditions as the price of entry into its territory. Given the history of the PA[1] and the PLO, formerly designated a Foreign Terrorist Organization during the Second Intifada, when Plaintiffs' injuries arose from the murder of Esther Klieman, there is a strong relationship between the PSJVTA statute and the legitimate government objective of deterring PA-supported-terrorism against Americans.

---

[1] On September 13, 1993, by the agreement commonly referred to as the "Oslo Accord", the State of Israel and the PLO agreed to the establishment of the then-interim Palestinian Authority ("PA") to provide quasi-governmental services to the Arab Palestinians located in the West Bank of the Jordan River, and in Gaza, and "and the PLO renounced terrorism and recognized Israel's right to exist in peace." Department of State, Office of the Historian, https://history.state.gov/milestones/1993-2000/oslo (last accessed June 6, 2023). The Oslo Accord resulted from an intensive peace process between the PLO and Israel, led by the United States government:

> While President Bill Clinton's administration played a limited role in bringing the Oslo Accord into being, it would invest vast amounts of time and resources in order to help Israel and the Palestinians implement the agreement.

*Id.*

2

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     Congress's long history of attempted regulation of PA terrorism**

Over a period of decades, Congress has walked a tightrope in drawing a balance between two critically important national security goals: 1) giving the PA and PLO access to the United States as part of the U.S. support of the Arab-Israeli peace process in prior years when the PA and PLO participated actively as well as 2) protecting U.S. citizens from acts of PA and PLO terrorism abroad. These goals have been a top priority for both the Executive and Legislative Branches of the United States government for many years.

While Congress aided the efforts of the Executive Branch's negotiations with the PA and PLO in support of this top priority, it also legislated extensively and explicitly to protect American citizens from PA-PLO terrorism by passing laws with extra-territorial reach. In 1987, Congress determined that "the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law and should not benefit from operating in the United States." Pub. L. 100-204 § 1002, 101 Stat. 1407 (Dec. 22, 1987) (codified at 22 U.S.C. § 5201). Congress forbade the PLO and its agents from spending money in the United States or operating an office on U.S. soil. *Id.*

In 1990, Congress enacted the PLO Commitments Compliance Act. Pub. L. 101-246 Title VIII, 104 Stat. 76-80 (Feb. 16, 1990). That law reiterated "long-standing United States policy" that "any dialogue with the PLO be contingent upon the PLO's…renunciation of all acts of terrorism." *Id.* § 803(a). Congress required the Secretary of State to report periodically on, among other things, the PLO's actions and statements "regarding cessation of terrorism" and

whether the PLO would provide "compensation to the American victims or the families of American victims of PLO terrorism." *Id.* § 803(a).

Congress enacted the Anti-Terrorism Act of 1992, 18 U.S.C. § 2333 (ATA), which established federal court jurisdiction for civil claims by U.S. nationals arising out of terrorist attacks that occur "outside the territorial jurisdiction of the United States." 18 U.S.C. § 2331(1)(C).  The ATA was precipitated in part by jurisdictional defenses raised by the PLO in an attempt to avoid paying compensation to the family of U.S. citizen Leon Klinghoffer, who was murdered by PLO-affiliated terrorists who hijacked an Italian cruise ship. H.R. Rep. No. 102-1040, at 5 (1992). Recognizing that existing law was inadequate to "provid[e] victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories," S. Rep. No. 102-342, at 22 (1992), Congress determined that the "extension of civil jurisdiction" to terrorism cases was necessary to fill a damaging "gap in our efforts to develop a comprehensive legal response to international terrorism," H.R. Rep. No. 102-1040, at 5.

Congress passed the ATA, to "codify" and "extend" the Second Circuit's holding in *Klinghoffer v. Palestine Liberation Org.*, 937 F.2d 44 (2d Cir. 1991), by providing for federal-court jurisdiction over terror attacks occurring outside the United States if such attacks injured or killed nationals of the United States. *See Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1010-11 (7th Cir. 2002). Congress was concerned that "[a] similar attack occurring on an airplane or in some other [foreign] locale might not have been subject to civil action in the U.S.," and therefore passed the ATA to "codify" the *Klinghoffer* ruling and "make[] the rights of American victims definitive," 137 Cong. Rec. S4511-04 (1991) (statement of Sen. Grassley). President George H.W. Bush signed the law, explaining that it provides a remedy "for Americans injured abroad by

senseless acts of terrorism." Statement by President George H.W. Bush Upon Signing S. 1569, 28 Weekly Comp. Pres. Docs. 2212 (Oct. 29, 1992).

Coincident with the Madrid Process and the signing of the Oslo Accord, and starting in 1993, after the PLO publicly renounced the use of terrorism, Congress allowed the PLO and PA to establish a U.S. office and receive foreign assistance. However, Congress conditioned these benefits on certification by the President that the PLO was complying with its commitment to renounce "the use of terrorism." Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1994, Pub. L. 103-87, §§ 516(c), 578, 107 Stat. 960, 973-74 (1993). Congress repeatedly imposed this condition on the maintenance of a U.S. office, *see e.g.*, Middle East Peace Facilitation Act of 1994, Pub. L. 103-236 § 583, 108 Stat. 382 (1994), and on the provision of foreign assistance to the PLO and PA. *See e.g.*, Consolidated Appropriations Act, 2017, Pub. L. 115-31, §§ 7036-40, 7041(l)(3), 131 Stat. 135, 655-59, 668 (May 5, 2017).

In 2000, President Clinton met at Camp David with Israeli Prime Minister Ehud Barak and Yasser Arafat, the Chairman of the PLO who also served as the President of the PA and led extensive peace negotiations to build upon the Oslo Accord.  However, no peace accord was achieved and subsequently, the Second Intifada was launched with Arafat's encouragement. The Second Intifada transpired from September 2000 until 2004-, during which time countless Americans became victims of PA or PLO supported-terrorism, including the attack that is the subject of this suit. In 2002, Congress made permanent its requirement that the Secretary of State report to it on the PLO's and PA's compliance with their anti-terrorism commitments, provide detailed information about their connections to terror attacks and the effects of such attacks on American citizens, and sanction them for failure to comply. Middle East Peace Commitments

Act of 2002, Pub. L. 107-228, Title VI, 116 Stat. 1350, 1394-96 (Sept. 30, 2002). These requirements remain in place.

In view of the Second Intifada and documented links between the PA-PLO and the murder and injury of many Americans, Congress continued to legislate to protect Americans against PA-PLO terrorism. In 2006, Congress enacted the Palestinian Anti-Terrorism Act of 2006, imposing additional terrorism-related conditions on the PA during certain periods. First, the PA must "declare an unequivocal end to violence and terrorism and undertake visible efforts on the ground to arrest, disrupt, and restrain individuals and groups conducting and planning violent attacks on Israelis anywhere." Palestinian Anti-Terrorism Act of 2006, Pub. L. 109-446, 120 Stat. 3318 (Dec. 21, 2006). Second, the PA must have made "demonstrable progress" toward "dismantling all terrorist infrastructure within its jurisdiction, confiscating unauthorized weapons, arresting and bringing terrorists to justice, destroying unauthorized arms factories, thwarting and preempting terrorist attacks, and fully cooperating with Israel's security services." *Id.* at § 620K(b)(2)(B).

To impose such conditions upon the PA and PLO was indeed, and remains, furthers the national security interests of the United States in seeking to stamp out terrorism against its citizens. As the evidence in this case shows, those conditions remain unsatisfied.

## II.    *Klieman* lawsuit in the context of Congressional attempts to deter PA terrorism

In 2004, Petitioners filed their lawsuit against the PA-PLO for its support of the murder of Esther Klieman, which occurred on March 24, 2002. The PA and PLO filed a motion to dismiss the lawsuit in part based upon a personal jurisdiction defense. For nearly 25 years, "every federal court to have considered the issue [agreed] that the totality of activities in the United States by the PLO

and the PA justifies the exercise of general personal jurisdiction" over them. *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), 2011 WL 1345086, at *3 n.10 (S.D.N.Y. Mar. 30, 2011) (citing *Knox v. Palestine Liberation Org.*, 248 F.R.D. 420, 427 (S.D.N.Y. 2008)); *Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 113 (D.D.C. 2006); *Knox v. Palestine Liberation Org.*, 229 F.R.D. 65, 67 (S.D.N.Y. 2005); *Estate of Ungar v. Palestinian Auth.*, 325 F. Supp. 2d 15, 59 (D.R.I. 2004); *Biton v. Palestinian Auth.*, 310 F. Supp. 2d 172, 179 (D.D.C. 2004); *Estate of Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001); *Klinghoffer v. S.N.C. Achille Lauro*, 795 F. Supp. 112, 114 (S.D.N.Y. 1992), *rev'd sub. nom. Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016).

In 2006, the District Court in this case followed earlier cases to hold that "the PA and the PLO have sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause." *Estate of Klieman*, 467 F. Supp. 2d at 113. Several years of intensive discovery and active trial preparation ensued. Then, the Supreme Court announced a new "essentially at home" standard for general personal jurisdiction in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011), which overruled the prior test for general jurisdiction of "continuous and systematic" contacts.

On February 5, 2014, almost a year after the close of fact discovery and three years after *Goodyear*, the PA-PLO moved for reconsideration of the District Court's orders on personal jurisdiction based upon the Supreme Court decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). In 2015, the District Court reconsidered its earlier ruling on personal jurisdiction, and dismissed the case based upon a lack of personal jurisdiction. *Estate of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237, 245 (D.D.C. 2015).

In granting the PA-PLO's motion for reconsideration, the District Court rejecting the following arguments by Plaintiffs, among others:

1) that the PA-PLO's conspiracy to attack and murder Americans abroad, such as Esther Kleiman, to support their simultaneous publicity campaign inside the United States, designed to pressure U.S. foreign policy vis-à-vis Palestinian goals subjected them to the court's specific personal jurisdiction under the Fifth Amendment;

2) that the PA-PLO are not entities capable of raising a Due Process defense against the assertion of personal jurisdiction by a U.S. court under the Fifth Amendment;

3) that caselaw issued under the Fourteenth Amendment should not be applied to this case, which hangs on the Fifth Amendment; and

4) that the PA-PLO forfeited the *Goodyear* defense by failing to raise it for three years, which prevented Petitioners from obtaining evidence that tied the PA-PLO to the murder plot.

*Id.* Plaintiffs took an appeal, which the D.C. Circuit stayed pending its decision in two earlier cases raising similar issues. *See Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017); *Gilmore v. Palestinian Auth.*, 843 F.3d 958 (D.C. Cir. 2016). In *Livnat*, the D.C. Circuit held that the Fifth Amendment's Due Process Clause forbade the exercise of jurisdiction over the PA for its employee's murder of a U.S. national outside the United States. 851 F.3d at 56-58.

In response to numerous court decisions which had implemented *Goodyear/Daimler* and rejected personal jurisdiction over the PA and PLO, Congress passed the Anti-Terrorism Clarification Act ("ATCA"), Pub. L. No. 115-253, § 4 (adding 18 U.S.C. § 2334(e)). The ATCA amended the ATA to provide that respondents are deemed to have consented to jurisdiction in civil ATA cases if, after a specified date, they continued to maintain any facility within the jurisdiction of the United States or accepted foreign assistance from the United States. *See* H.R. Rep. No. 115-858 at 7 & n.23.

The ATCA became law on October 3, 2018, while the *Klieman* case remained pending at the D.C. Circuit. The House Report on the ATCA explains that "[n]o defendant should be able to accept U.S. foreign assistance while simultaneously dodging responsibility in U.S. courts for aiding or carrying out terrorist attacks that harm Americans." H.R. Rep. No. 115-858, at 6-7. (2018). "If they continue to accept the covered benefits, they will subject themselves to personal jurisdiction in U.S. courts in ATA cases that are already pending or that may be filed in the future." *Id*; *accord* 164 Cong. Rec. S5103 (daily ed. July 19, 2018) (statement of Sen. Grassley) ("[T]he bill also restores jurisdiction in cases pending at the time of the bill's enactment. No defendant, after all, should be able to enjoy privileges under U.S. law, while simultaneously dodging responsibility for supporting terrorists that injure or kill Americans.").

Also in 2018 Congress passed the Taylor Force Act, Pub. L. No. 115-141, 132 Stat. 348, 1143 (22 U.S.C. § 2378c-1 note) (Mar. 23, 2018), named for a U.S. army veteran murdered in an act of terrorism in Israel in 2016, which condemned Palestinian payment-rewards to "martyrs" who were convicted of participation in acts of terrorism against innocent civilians, and cut foreign aid to the PA until such payments ceased.[2] Congress found that:

---

[2]   The Congressional Research Service ("CRS") "serves as nonpartisan shared staff to congressional committees and Members of Congress" and commission reports on timely topics for use by Congress in its lawmaking function. In 2008, the CRS published a report entitled U.S. Foreign Aid to the Palestinians (updated in December, 2018), which briefly explained the Palestinian martyr payment system:

> Palestinian payments on behalf of prisoners or decedents in their current form apparently "became standardized during the second intifada [uprising] of 2000 to 2005."[23] Various PA laws and decrees since 2004 have established parameters for payments.[24] U.S. lawmakers and executive branch officials have condemned the practice to the extent it might incentivize violence, focusing particular criticism on an apparent tiered structure that provides higher levels of compensation for prisoners who receive longer sentences.[25]

Congress makes the following findings: (1) The Palestinian Authority's practice of paying salaries to terrorists serving in Israeli prisons, as well as to the families of deceased terrorists, is an incentive to commit acts of terror.

*Id.* at § 1002 (Findings). And it was the "Sense of Congress" that:

Congress (1) calls on the Palestinian Authority, the Palestine Liberation Organization, and any successor or affiliated organizations to stop payments for acts of terrorism by individuals who are imprisoned after being fairly tried and convicted for acts of terrorism and by individuals who died committing acts of terrorism and to repeal the laws authorizing such payments;

*Id.* at § 1003 (Sense of Congress).

The D.C. Circuit accepted supplementary briefing on the ATCA but largely affirmed the District Court, ruling that the factual predicates of the ATCA had not been met without allowing any jurisdictional discovery, *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1130 (D.C. Cir. 2019), and Plaintiffs filed a petition for *writ of certiorari* on December 5, 2019. Congress quickly responded to the series of decisions which ignored the intent of the ATCA. Congress enacted the PSJVTA to provide personal jurisdiction over the PA and PLO for certain specific conduct— again—in direct response to the D.C. Circuit's decision in this case and the Second Circuit's similar decision in *Sokolow*. *See* 165 Cong. Rec. S7182–7183 (daily ed. Dec. 19, 2019).

On April 27, 2020, the Supreme Court returned the matter to the D.C. Circuit by order of grant, vacate, and remand "for further consideration in light of the Promoting Security and Justice for Victims of Terrorism Act of 2019." On August 18, 2020, the D.C. Circuit reinstated the judgment below "relating to general jurisdiction, specific jurisdiction, and discovery, as discussed at Estate of

---

https://crsreports.congress.gov/product/pdf/RS/RS22967/59#:~:text=U.S.%20aid%20to%20the%20Palestinians%20remains%20subject%20to%20several%20legislative,totaled%20more%20than%20%20%246%20billion. CRS reports are widely respected as authoritative sources and frequently used by courts in this judicial circuit. *See e.g.*, *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 576 (D.C. Cir. 1996); *Husayn v. Austin*, No. 08-cv-1360 (EGS), 2022 U.S. Dist. LEXIS 104435, at *17 (D.D.C. June 10, 2022) ("According to the June 2021 CRS Report. . . .").

Esther Klieman v. Palestinian Authority, 923 F.3d 1115, 1115-27 (D.C. Cir. 2019)," and remanded to this Court for further proceedings "in light of the Promoting Security and Justice for Victims of Terrorism Act of 2019. . . ." and issued the mandate accordingly.

On December 2, 2020, this Court ordered that Plaintiffs may proceed with jurisdictional discovery limited to the predicates in the PSJVTA. Memorandum Opinion and Order, *Est. of Klieman et al v. Palestinian Authority et al*, 1:04-cv-01173 (D.D.C. Dec. 2, 2020) [D.E. 298]. On January 4, 2021, this Court set forth a discovery schedule: Plaintiffs would issue initial discovery on or before January 25, 2021; Defendants would provide written responses on or before February 24, 2021; and the parties would complete jurisdictional discovery by October 4, 2021. Order, *Klieman v. PA*, 1:04-cv-01173, D.E. 301 (D.D.C. filed Jan. 4, 2021). The PA and PLO produced limited discovery but ignored most of Plaintiffs' requests, interrogatories, and requests for admissions which sought information regarding conduct relevant to both prongs of the PSJVTA. Defendants' main objection to producing any information beyond a very thin scope was that plaintiffs' counsel in other cases had accepted that jurisdictional discovery as sufficient. "Plaintiffs failed to explain why the jurisdictional discovery already produced—which was sufficient to litigate the PSJVTA issues in *Shatsky*—was not equally sufficient to litigate the identical issues in this case." Defendants' Opposition to Plaintiffs' Motion to Compel Jurisdictional Discovery, DE 321, at 2 (D.D.C. filed Oct. 14, 2021). Plaintiffs filed a Motion to Compel Discovery on September 30, 2021, which remains pending before this Court.

In response to a series of five Notices of Supplemental Authority filed by the Defendants,, on January 25, 2023 the Court ordered the parties to submit supplemental briefs on

the issue of the constitutionality of the PSJVTA. Memorandum Opinion and Order, DE 340 (D.D.C. Jan. 25, 2023).

## SUMMARY OF ARGUMENT

A party through its conduct can expressly or implicitly consent to a court's exercise of personal jurisdiction over it, even if there is an otherwise insufficient constitutional basis. Once a party consents to the jurisdiction of a court, this consent can override the minimum contacts component of the due process analysis. The assertion of jurisdiction must still meet the test focused on "traditional notions of fair play and substantial justice," which in the context of consent means that defendants must receive fair warning that their conduct may subject them to the jurisdiction of a foreign sovereign. Knowing and voluntary conduct by a defendant may create consent to the assertion of personal jurisdiction, as long as the consent was not "unreasonable and unjust", such as through the enforcement of a forum-selection clause.

The PSJVTA is constitutional because it provided fair warning to the Defendants that their conduct would result in their consent to personal jurisdiction and it reasonably advances legitimate government interests.

The PSJVTA established two alternate predicates for consent to the jurisdiction of the court—the Payments Prong and the Activities Prong—both of which provided the requisite fair warning. The Payments Prong refers to making payments to individuals who committed acts of terrorism or their families, while the Activities Prong pertains to maintaining offices or conducting activities in the United States with a limited exception.  Both prongs articulated specific future dates, by which the Defendants could reasonably cease engaging in the identified predicate acts._Should they continue to engage in predicate acts under either prong, the PSJVTA

notified them that such acts would be construed as consent to this Court's exercise of personal jurisdiction.

The PA and PLO claim that their intent is merely to engage in the conduct, e.g., making payments to terrorists or their families for having successfully killed or injured American citizens and others, so their continued acts do not indicate an intention to submit to this Court's jurisdiction. That is not the standard, nor is it the "stringent" standard imposed by the Supreme Court in the case of *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, which deals specifically with federalism concerns invoked by states' waivers of Eleventh Amendment rights that are not at issue here. Indeed, constructive consent has been recognized in various contexts, including the waiver of other constitutional right and personal jurisdiction is not a fundamental constitutional right, as to warrant the special treatment for which the Defendants advocate.   In fact, the Supreme Court has upheld personal jurisdiction based on deemed consent due to entities' activities within a sovereign territory. There is no case that forecloses this Court from extending that caselaw to entities' activities which target the citizens of that sovereign.  Congress has the authority to enforce its laws beyond the territorial boundaries of the United States and to apply new rules to pending cases retroactively, as recognized by the Supreme Court in previous cases.

The exercise of personal jurisdiction under the PSJVTA is more than reasonable and justifiable in the federal system of government in the context of preventing PA and PLO terrorism from harming Americans. The U.S. government has a significant interest in protecting its citizens from terrorism and advancing national security, which are central themes in the U.S. government's foreign policy as it concerns the Israeli-Palestinian Peace Process.

Consent to jurisdiction should generally be enforced unless the defendant can clearly demonstrate that enforcement would be unreasonable and unjust. Congress has the power to regulate and condition the PA and PLO's privilege of conducting business in the United States, and the authority to exclude them entirely if deemed necessary. By enacting the PSJVTA, Congress has allowed the PA and PLO to operate in the U.S. with the condition of submitting to personal jurisdiction in a limited scope of cases, no different than a statute requiring consent to general jurisdiction as a condition for foreign corporations doing business in the state or an out of state driver entering its roadways.

Some courts have expressed concerns about the statute infringing upon their authority to decide cases based on the existing law with the *Goodyear/Daimler* line of cases. Congress carefully crafted the PSJVTA to align with the concerns raised in the *Daimler* case, which neither falls within nor contemplates the narrow class of cases related to the national security interests of the United States. In the wake of *Goodyear/Daimler*, Congress with the support of the President, passed legislation that tied specified conduct to the exercise of personal jurisdiction in a limited class of cases involving ATA suits brought by U.S. nationals or their families, and it does not encroach on the sovereignty of other sovereign bodies. The Constitution does not prohibit Congress from enacting a statute that provides for implied consent jurisdiction in connection with a specific federal claim based on relevant conduct directed at the citizens or territory of the United States.

Indeed, the PA and PLO continued to engage in conduct that satisfied both prongs of the PSJVTA and, therefore, have consented to the court's jurisdiction. Evidence acquired through jurisdictional discovery in this case shows that the PA and PLO are directly making martyr

payments to the convicted murderers of Esther Klieman, a U.S. citizen, which qualifies as conduct triggering the PSJVTA as it establishes a direct connection between the PA and PLO's conduct in the ongoing case and the U.S. government's interest in protecting its citizens from terrorism. At the same time that the Defendants reward terrorists who murder Americans, they leverage the privilege they are afforded by virtue of the non-member observer status at the U.N. in New York, to send diplomats to American college campuses where they deliver speeches that rewrite history and engender sympathy among younger generations for the very terrorists that are being compensated for killing and injuring Americans. Such actions clearly go beyond the scope of the limited UN activities and therefore trigger the activities prong of the PSJVTA as well.

Furthermore, the PA and PLO ignored most of the jurisdictional discovery in this case, including requests for production of documents that would reveal whether the martyr payments are transiting the U.S. financial system. The PA and PLO argues that there is no connection between the PSJVTA and this case but refuses to allow jurisdictional discovery aimed at those connections.

The recent decisions in similar cases regarding the constitutionality of the PSJVTA that the Defendants wish to see this Court follow failed to appreciate the national security interests that are at stake.  Indeed, if the PA/PLO were a state, they would be liable for their acts incentivizing terrorism under the FSIA terrorism exception.  If they were a private entity, like the Arab Bank or numerous other banks sued for aiding and abetting acts of terrorism, they would be liable under the ATA.

Their status as a non-state, quasi-governmental entity cannot render them free from judicial scrutiny as they go about incentivizing the murdering of innocent Americans while

convincing the next generation of Americans on American soil that they are justified in doing so. But that is precisely what would be achieved with a decision by this Court that finds the PSJVTA unconstitutional and dismisses this case.

## ARGUMENT

## I.     THE PSJVTA SATISFIES DUE PROCESS REQUIREMENTS

### A.  The Applicable Due Process Clause Test

The PSJVTA must satisfy the Due Process Clause to allow the Court to assert personal jurisdiction over the PA and PLO in this case. "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). However, "unlike subject matter jurisdiction, personal jurisdiction is a personal defense that can be waived or forfeited." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344 (D.C. Cir. 2018).

The defendant must have "minimum contacts" with the forum to satisfy the Due Process Clause. *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1119-1120 (D.C. Cir. 2019). The analysis differs when a party consents to the assertion of personal jurisdiction. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1036 (2021) ("[A] court's competency normally depended on the defendant's presence in, *or consent to*, the sovereign's jurisdiction.") (emphasis added). The conduct of a party can permit a court to assert personal jurisdiction over it, despite an insufficient constitutional basis otherwise. "A variety of legal arrangements have been taken to represent express or implied consent to the personal jurisdiction of the court." *Ins.*

*Corp. of Ir. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 694, 703 (1982). "[A]ctions rather than words" may constitute implied consent in the context of the waiver of a fundamental right. *See Roell v. Withrow*, 538 U.S. 580, 589 (2003).

Once a party has consented to the jurisdiction of a court, that conduct changes the due process inquiry "because of its nature as a personal right, a defendant may consent to personal jurisdiction without regard to what a due process analysis of its contacts would yield." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 641 (2d Cir. 2016) (citing *Knowlton v. Allied Van Lines, Inc.*, 900 F.2d 1196, 1199-1200 (8th Cir. 1990)). "[T]he normal 'due process analysis is unnecessary where a nonresident defendant has consented to suit in a forum . . . .'" *AFC Franchising, LLC v. Purugganan*, 43 F.4th 1285, 1291 (11th Cir. 2022) (quoting *Alexander Proudfoot Co. World Headquarters L.P. v. Thayer*, 877 F.2d 912, 921 (11th Cir. 1989)); *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 228 (4th Cir. 2019) ("unless the party consents to jurisdiction, there must be … minimum contacts") (citation omitted).

In addition to the minimum contacts analysis, an analysis under the Fifth Amendment Due Process Clause[3] also requires that the assertion of jurisdiction meet the "test focused on 'traditional notions of fair play and substantial justice'", *Ford Motor Co.*, 141 S. Ct. at 1024 (quoting *Int'l Shoe Co.*, 326 U.S. at 316-17). Thus, due process requires that defendants receive "fair warning" that "a particular activity may subject them to the jurisdiction of a foreign sovereign." *Ford Motor Co.*, 141 S. Ct. at 1024-25 (quoting *Burger King Corp.*, 471 U.S. at

---

[3] At this stage, Plaintiffs are bound to follow the holding of *Livnat v. Palestinian Auth.*, 851 F.3d 45, 55 (D.C. Cir. 2017) which ruled that "[b]ecause strong justifications for personal-jurisdiction limits apply equally in Fifth Amendment cases, we decline to devise new standards for those cases that are less stringent than those under the Fourteenth Amendment." Plaintiffs reserve their right to challenge this ruling at an appropriate time and in the appropriate court.

472). This way the Due Process Clause "'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit,'" *Burger King Corp.*, 471 U.S. at 472 (quoting *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 297 (1980)).

Knowing and voluntary conduct may create consent to the assertion of personal jurisdiction by a court. *Ins. Corp. of Ir.*, 456 U.S. at 703-04. The "actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not." *Id.* at 704-05. Personal jurisdiction based on consent "does not offend due process" as long as the consent was not "unreasonable and unjust," *Burger King*, 471 U.S. at 472 n.14, 477 (quotation marks omitted); *AFC Franchising, LLC v. Purugganan*, 43 F.4th 1285, 1291 (11th Cir. 2022) ("[S]o long as a forum-selection clause is applicable and not unreasonable and unjust, [its] enforcement does not offend due process.") (quotation marks omitted); *Water & Sand Int'l Capital, Ltd. v. Capacitive Deionization Tech. Sys.*, 563 F. Supp. 2d 278, 283 (D.D.C. 2008) (consent jurisdiction applied unless the defendant could show that the assertion of jurisdiction is "unreasonable and unjust").

The PSJVTA is constitutional if it provides defendants fair warning that the consequences of their knowing and voluntary conduct will result in their consent to personal jurisdiction; and it reasonably advances legitimate government interests in the context of our federal system.

### 1. The PA and PLO's Knowing and Voluntary Conduct

The PSJVTA provides that the PA and PLO consent to the jurisdiction of this Court by engaging in conduct that satisfies one of two alternate predicates, which are:

(a) after April 18, 2020, "making any payment, directly or indirectly (i) to any payee designated by any individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or (ii) to any family member of any individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual  to individual payments made by the Defendants to prisoners and other individuals;"

18 U.S.C. § 2334(e)(1)(A) (hereinafter identified as the "Payments Prong").

(b) after January 4, 2020, either (i) continuing "to maintain any office, headquarters, premises, or other facilities or establishments in the United States;" (ii) establishing or procuring "any office, headquarters, premises, or other facilities or establishments in the United States;" or (iii) conducting "any activity while physically present in the United States on behalf of the [PLO] or the [PA]".

18 U.S.C. § 2334(e)(1)(B) (the "Activities Prong").

The PSJVTA precisely describes what actions would cause a defendant to be deemed to have consented to personal jurisdiction in civil cases under the ATA. The PA and PLO received written notice of the PSJVTA within days of its passage; before it even took effect counsel for the PA and PLO represented to the D.C. Circuit that they "might never make covered payments" (*i.e.*, payments sufficient to trigger the pay-for-slay prong). *See Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1038 (D.C. Cir. 2020). Despite this notice and knowledge, the PA and PLO continue to engage in conduct that satisfies both prongs of the PSJVTA. *See* Exhibit 1; PA Mem. at 26, 28 (admitting continuing conduct which would trigger both prongs of the PSJVTA).

The PA and PLO respond by arguing that Plaintiffs cannot show "knowing and voluntary choice to submit to jurisdiction by [PA and PLO] conduct . . . ." PA Mem. at 18. A knowing and voluntary submission to the court's jurisdiction does not require an express statement, as the PA and PLO concede. PA Mem. at 19. Nonetheless the PA and PLO attempt to draw a distinction

from the *Ins. Corp. of Ir.* case which collapses after further inspection. The PA and PLO insist that their decision to continue to engage in activity known to be proscribed by both prongs of the PSJVTA is not a submission to the court's jurisdiction, and attempt to draw a distinction with the conduct of a defendant who refuses to produce discoverable information which would prove jurisdictional facts, which "was but an admission of the want of merit in the asserted defense." *Ins. Corp. of Ir.*, 456 U.S. at 705, 709 (quoting *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 351 (1909)).

Yet in *Ins. Corp. of Ir.*, a failure to "enter a timely objection to personal jurisdiction" also constitutes a submission to the court's personal jurisdiction. 456 U.S. 694, 705. Numerous parties that fail to properly assert their personal jurisdictional defense did not intend to waive the defense, nonetheless the conduct is construed as a submission to jurisdiction. Similarly here, the PA and PLO knew that continuing to engage in the proscribed conduct would expose them to the jurisdiction of U.S. courts, thereby restoring the pre-*Daimler* jurisdictional landscape.

A knowing and voluntary consent to the waiver of constitutional rights means a path pursued after "a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Parke v. Raley*, 506 U.S. 20, 29 (1992) (quoting *North Carolina* v. *Alford*, 400 U.S. 25, 31 (1970)); *McMann v. Richardson*, 397 U.S. 759, 766 (1970) ("a waiver of the right to contest the admissibility of any evidence . . . must be an intelligent act 'done with sufficient awareness of the relevant circumstances and likely consequences.'") (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). The PA and PLO have been represented by large international law firms since Plaintiffs filed this lawsuit in 2004 and have never lacked for advice regarding

the evolving jurisdictional landscape in the United States—the relevant conduct is the product of an intelligent choice.

The relevant conduct is also voluntary. The PA and PLO could have paused their "martyr payments" or closed down all of their non-U.N. related activities and offices in the United States but chose not to do so. In other words, the PA and PLO had "'fair warning'—knowledge that 'a particular activity may subject [it] to the jurisdiction of a foreign sovereign.'" *Ford Motor Co*, 141 S. Ct. at 1025 (quoting *Burger King Corp.*, 471 U.S. at 472). Nor does the PSJVTA coerce the PA and PLO into submission under the relevant caselaw. Coercion is activity that "wrings a confession out of an accused against his will." *Colorado v. Connelly*, 479 U.S. 157, 165 (1986) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960)). "We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167; *Brady v. United States*, 397 U.S. 742, 750 (1970) ("actual or threatened physical harm or by mental coercion overbearing the will of the defendant"); *Tamosiunas v. NLRB*, 892 F.3d 422, 430 (D.C. Cir. 2018).

The PSJVTA imposes no new punishment on the PA and PLO, no matter whether they chose to maintain non-U.N. activities in the United States or cease martyr payments, or not. If the scale of activities in the U.S. is as narrow as the Defendant aver, PA Mem. at 28-29,[4] then it

---

[4] Considering the Defendants' refusal to engage in good faith jurisdictional discovery, it is difficult to say anything with certainty regarding their conduct which would be relevant under the PSJVTA Activities Prong: "Defendants' responses remain deficient to Initial RQPD Nos. 19-24, 32-35, 39-42, and 45-49, Initial ROG Nos. 9-11, Initial RFAs Nos. 21-25, and 46-50. Defendants have also yet to respond to any of Plaintiffs' supplemental discovery requests." Plaintiffs' Motion to Compel, *Klieman v. PA*, 1:04-cv-01173, DE 315-1, at 6 (D.D.C. filed Sept. 30, 2021).

is hardly a punishment to withdraw their presence. And Congress has already punished the PA policy of martyr payments via the Taylor Force Act, the PSJVTA would only restore the jurisdictional landscape of 1992-2014 for terrorism cases only, which the PA and PLO and their counsel are very familiar with.

A thread common to the PA and PLO's arguments that the PSJVTA cannot meet Due Process requirements because the predicate conduct—sending martyr payments or conducting non-U.N. business in the United States—"does not support an inference that Defendants intended to submit to jurisdiction." PA Mem. at 20 n.10, 24, 26, 28-32. Or as the PA and PLO repeatedly argue, "Defendants' limited U.S. activities do not support a 'meaningful inference … that Defendants intended to submit to the laws of the United States or to the jurisdiction of an American court . . . .'" PA Mem. at 29 (quoting *Fuld v. PLO*, 578 F. Supp. 3d 577, 587 (S.D.N.Y. 2022)).

But as discussed below, the Supreme Court has often approved constructive consent to the waiver of fundamental constitutional rights. *Infra*, 23-24. More importantly, Congress has written constructive consent into the very fabric of the Federal Rules of Civil Procedure. In a case similar to this one, "[b]etween 2002 and 2011, [the PA and PLO] Defendants contested the Court's personal jurisdiction on multiple occasions despite the fact that they never moved for dismissal on that basis." *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 8 F. Supp. 3d 9, 13 (D.D.C. 2014). Despite these challenges, the PA and PLO failed to meet the technical requirements of Fed. R. Civ. P. 12(b), and thus waived the defense of personal jurisdiction. *Id.* at 14. The PA and PLO, by words and action, indicated a refusal to submit to the jurisdiction of the *Gilmore* court, nonetheless the court imposed personal jurisdiction over them because other

conduct signaled a knowing and voluntary submission according to the Rule 12 passed by Congress. Here, the PA and PLO's words and actions related to the case once reject the personal jurisdiction of the court, however, as the PA and PLO knew, the PSJVTA construes their relevant conduct as consent.

Next, the PA further argues that under *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, a state's waiver of its Eleventh Amendment immunity against suit must be "express" and "unequivocal," and could not be based merely on taking certain actions that Congress had "deemed" to be a waiver. 527 U.S. 666, 680-81 (1999). *College Savings Bank* does not apply to this case because the particularly "stringent" test imposed by the Court in that case for waivers of Eleventh Amendment rights does not apply here. *Id.* at 675. The Court imposed the "stringent" standard because of the importance of the competing sovereign interests involved, finding "there is 'no place' for the doctrine of constructive waiver in our sovereign-immunity jurisprudence . . . ." *Id.* at 675, 678 (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)). The PA and PLO further boil *College Savings* down to "the defendant's knowing and voluntary acceptance of a government benefit or privilege conditioned upon consent" creates "valid" consent. PA Mem. at 21, 22-25. The PA and PLO, "by accepting the benefit provided by the forum, the defendant enters into a 'bargain with the state' whereby it consents to personal jurisdiction in exchange for permission to engage in conduct the state could otherwise prohibit." PA Mem. at 24 (quoting *Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993)). The United States has the clear right to exclude the PA and PLO from its sovereign territory, but the PSJVTA recognizes their ability to conduct activity outside the U.N. context.

Further, *College Savings* is undercut by Supreme Court precedent which made clear that different waiver standards apply to different constitutional rights. *Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973) ("There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment."). The Court has construed a constructive consent to waiver of constitutional defenses such as warrantless searches,[5] the right to a jury trial,[6] and non-Article III adjudications.[7] The PA and PLO cannot explain why a court cannot construe a constructive consent to the personal jurisdiction defense, a personal defense "both forfeitable and waivable." *Shatsky v. PLO*, 955 F.3d 1016, 1032 (D.C. Cir. 2020).

The PA and PLO also argue that constructive consent cannot be imposed where the defendant is not the beneficiary of some privilege or benefits in exchange for submission to the jurisdiction of forum. PA Mem. at 21-25. But as found in *Fuld*, the PA and PLO cannot "cite, and the Court has not found, any case holding that such receipt of a benefit is a necessary condition." 578 F. Supp. 3d at 595 n.10 (citing *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 380 (S.D.N.Y. 2001) (Lynch, J.) ("[V]oluntary consent to jurisdiction need not be supported by consideration."). "[A] defendant's receipt of benefits is relevant to the issue of specific

---

[5] *Birchfield v. North Dakota*, 579 U.S. 438, 476 (2016) ("consent to a search need not be express but may be fairly inferred from context"); *South Dakota v. Neville*, 459 U.S. 553, 55-60 (1983) ("any person operating a vehicle in South Dakota is deemed to have consented" to a blood test and to have waived their right to protection under the "Fifth Amendment right against self-incrimination").

[6] *Bank of Columbia v. Okely*, 17 U.S. (4 Wheat.) 235, 235-36, 243 (1819); *see also Baltimore & Carolina Line v. Redman*, 295 U.S. 654, 657 (1935) ("in the absence of express or implied consent to the contrary, issues of law are to be resolved by the court and issues of fact are to be determined by the jury").

[7] *Wellness Int'l Network*, 575 U.S. at 674-78; *Roell v. Withrow*, 538 U.S. 580, 590 (2003).

jurisdiction, not jurisdiction by consent." *Sokolow v. PLO*, 607 F. Supp. 3d 323, 327 (S.D.N.Y. 2022).

Nor could the classic case of consent to personal jurisdiction—via a forum selection clause be deemed unconstitutional. In *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), the Supreme Court considered a forum-selection clause in a contract that a cruise-line customer was "deemed to have had knowledge of." *Id.* at 590. The Court upheld the clause under standards of "fundamental fairness." *Id.* at 595. It was undisputed that, "only the most meticulous passenger [was] likely to [have] become aware of the forum-selection provision" at all, and most likely only after "they ha[d] actually purchased their tickets." *Id.* at 597 (Stevens, J., dissenting). But the Court did not find this to be fundamentally unfair, even when there were unsophisticated individuals being held to the assertion of personal jurisdiction via forum selection clauses. *Id.* at 598.

The Supreme Court has upheld personal jurisdiction many times over artificial entities on the basis of deemed consent based on those entities' activities within the territory of a sovereign. *See Washington v. Superior Ct. of Wash.*, 289 U.S. 361, 364-65 (1933); *Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 95 (1917); *St. Clair v. Cox*, 106 U.S. 350, 356 (1882); *Baltimore & Ohio R.R. Co. v. Harris*, 79 U.S. (12 Wall.) 65, 81 (1870).

In *Baltimore & Ohio Railroad Co. v. Harris*, a District of Columbia court properly exercised personal jurisdiction over a Maryland corporation as Congress had determined that such a corporation "may exercise its authority in a foreign territory [*i.e.*, in the District of Columbia] upon such conditions as may be prescribed by the law of the place. One of these

conditions may be that it shall consent to be sued there. If it does business there, it will be presumed to have assented, and will be bound accordingly." 79 U.S. (12 Wall.) 65, 81 (1870). The Supreme Court continued to approve such statutes: "[a] corporation of one State cannot do business in another State without the latter's consent, express or implied, and that consent may be accompanied with such conditions as it may think proper to impose." *St. Clair v. Cox*, 106 U.S. 350, 356 (1882). Such conditions may include consent to jurisdiction as long as notice is given and jurisdiction is "reasonable." *Id.* ("And such condition and stipulation may be implied as well as expressed."). A later consent-to-jurisdiction statute permitting general jurisdiction upon the appointment of an agent to receive process "did not deprive the defendant of due process of law, even if it took the defendant by surprise." *Pennsylvania Fire Insurance Co. v. Gold Issue Mining Co.*, 243 U.S. 93, 95 (1917).

The legitimate power of the State to exclude a foreign entity forms the basis of the power to impose "reasonable conditions" as the price to operate intra-state. *See Hess v. Pawloski*, 274 U.S. 352, 356-57 (1927) ("having the power so to exclude, the State may declare that the use of the highway by the non-resident is the equivalent of the appointment of the registrar as agent on whom process may be served."); *Wash. ex rel. Bond & Goodwin & Tucker, Inc. v. Superior Court of Wash.*, 289 U.S. 361, 365 (1933) ("State may not exact arbitrary and unreasonable terms respecting suits against foreign corporations as the price of admission . . . .").

The Supreme Court acknowledged the continuing vitality of this line of cases in *Int'l Shoe Co. v. Washington*. 326 U.S. 310, 318 (1945) ("some of the decisions holding the corporation amenable to suit have been supported by resort to the legal fiction that it has given its consent to service and suit, consent being implied from its presence in the state through the

acts of its authorized agents."). *See Miss. Publ'g Corp. v. Murphree*, 326 U.S. 438, 442 (1946) ("By designating an agent to receive service of process and consenting to be sued in the courts of the state, the corporation had consented to suit in the district court. . . ."). While one of the courts to weigh in on the constitutionality of the PSJVTA found that the "*pre-International Shoe* case law from the nineteenth century [] is now obsolete", *Sokolow v. PLO*, 607 F. Supp. 3d 323, 327 (S.D.N.Y. 2022), the Supreme Court itself has not overruled this line of cases.[8] Indeed, the Court continued to approve consent-to-general jurisdiction statutes long after *Int'l Shoe Co*. *See Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 892 (1988) (stating that a corporation could appoint "a resident agent for service of process in Ohio and subject itself to the general jurisdiction of the Ohio court").[9]

Finding consent is even more meaningful here. Defendants, represented by sophisticated counsel since 2004, were well aware of the statute's terms before it took effect. *See Shatsky*, 955 F.3d at 1038. If driving on a public road or serving as a corporate officer can validly signify consent to personal jurisdiction, how can the same not be said of engaging in conduct—i.e., making incentive payments to those who intentionally and successfully attack innocent American citizens—expressly violative of applicable U.S. law and set out in a statute actually known to sophisticated parties advised by elite counsel.

---

[8] The Supreme Court may rule on the ongoing relevance of these decisions in an upcoming decision in *Mallory v. Norfolk Southern Ry. Co.*, 142 S. Ct. 2646 (2022), but until then, as the Supreme Court has repeatedly reaffirmed: "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

[9] *Daimler* and *Goodyear* created a rule regarding general jurisdiction over corporations that had "not consented to suit in the forum." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 928 (2011) (quoting *Donahue v. Far E. Air Transp. Corp.*, 652 F.2d 1032, 1037 (D.C. Cir. 1981)). But the PSJVTA is not a general jurisdiction statute. *See infra*, at 35-36.

The long history of Congress's active supervision of the presence of the PA and PLO in the United States illustrates the bargain that Congress imposed on them—they could maintain a presence and conduct business in the United States as long as they renounced terrorism and ceased attacking Americans. *See supra* at 3; Pub. L. 101-246 § 803(a), 104 Stat. 76-80 (Feb. 16, 1990) (reiterating "long-standing United States policy" that "any dialogue with the PLO be contingent upon the PLO's…renunciation of all acts of terrorism.").

Congress's latest expression of this bargain took the form of the PSJVTA, which noticed the PA and PLO that they would be deemed to have consented to jurisdiction if they engaged in certain activities, specifically included the continued payment of monies to "martyrs", or convicted terrorists, already specifically barred by applicable U.S. law[10] 120 days after the passage of the statute. "The principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign." *J. McIntyre Mach., Ltd. V. Nicastro*, 564 U.S. 873, 882 (2011) (plurality). Inspection of the PA and PLO's course of conduct reveals that they have long accepted the bargain: license from the United States government to operate in the U.S. in exchange for exposure to jurisdiction over lawsuits for their attacks on American citizens. Indeed, the bargain is implicit in the activities prong of the PSJVTA, the continuing presence of the PA and PLO in the United States for non-UN business will be tolerated, but only if they submit to the jurisdiction of U.S. courts for acts of terrorism against Americans.

The PSJVTA has returned the parties to the status quo, which had been disrupted by *Goodyear*/*Daimler*—the PA and PLO may engage in non-U.N. activities in the United States as

---

[10] Taylor Force Act, Pub. L. No. 115-141, 132 Stat. 348, 1143 (22 U.S.C. § 2378c-1 note) (Mar. 23, 2018).

long as they cease their support of terrorism against Americans and agree to compensate their past victims.

## 2. The PSJVTA is Reasonable in the Context of our Federal System

The U.S. government interest in preventing PA and PLO terrorism from killing Americans justifies the exercise of jurisdiction under the PSJVTA. The exercise of personal jurisdiction must also be "reasonable, in the context of our federal system of government." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1024 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316-17 (1945)). Consent to jurisdiction should be enforced unless the defendant can "clearly show that enforcement would be unreasonable and unjust." *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).

In the state-court context, the exercise of jurisdiction is reasonable by forum States that have "significant interests at stake," such as "'providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors,' as well as enforcing their own safety regulations," *Ford Motor Co.*, 141 S. Ct. at 1030 (quoting *Burger King*, 471 U.S. at 473). In this case, the interests of the federal government must be weighed. *J. McIntyre*, 564 U.S. at 884 ("Because the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State."); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976) ("there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State").

The significant interests at stake for the Federal Government—protecting Americans from PA and PLO terrorism and promoting the Israeli-Palestinian peace process—renders the exercise of jurisdiction in this case just and reasonable as the statute advances the national

security interests of the United States. Here, the PSJVTA seeks to deter terrorism, which is "an urgent objective of the highest order." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 4 (2010). The statute advances the protection of U.S. citizens abroad, which is also a national interest. *See Gamble v. United States*, 139 S. Ct. 1960, 1967 (2019).  Thus, the PSJVTA concerns legitimate U.S. government interests—foreign affairs and national security. "The political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403 (2018) (citing *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 116 (2013)). The PSJVTA advances legitimate governmental purposes, to halt, deter, and disrupt PA and PLO terrorism against Americans, a goal which Congress has continually and consistently labored to advance and enforce since the 1980s. *See* H.R. Rep. 115-858 at 7-8 (2018). These national security and foreign affairs interests are plainly "significant." *Ford*, 141 S. Ct. at 1030.

There can be no doubt that Congress has the power to fashion rules which regulate and condition the PA and PLO's privilege of conducting business in the United States. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605-06 (2013); *see also In re Sealed Case*, 932 F.3d 915, 922 (D.C. Cir. 2019) ("Congress requires any 'foreign bank' to acquire 'prior approval of the' Federal Reserve before it 'may establish a branch or an agency' in the United States", including its consent to the jurisdiction of U.S. courts). Indeed, Congress can exclude the PA and PLO entirely from the United States, *Kleindienst v. Mandel*, 408 U.S. 753, 765–67 (1972) ("plenary congressional power to make policies and rules for exclusion of aliens has long been firmly established."); *see also Palestine Info. Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988) (rejecting constitutional Due Process challenges to U.S. government's closure of the PLO office in the U.S. due to "concerns over terrorism committed and supported by organizations affiliated

30

with the PLO."). However, Congress continued to allow the PA and PLO to operate in the United States. From 1988 to 1993, the PLO closed its Washington, D.C. office and halted its non-U.N. activities in New York. In 1993, Congress enacted the Middle East Peace Facilitation Act, which authorized the President to suspend the 1987 statute upon certification that the PLO was abiding by its anti-terrorism commitments. Pub. L. 103-125, 107 Stat. 1309. The President made the certification in 1994, permitting the PLO to return to the United States, 59 Fed. Reg. 4777 (1994), and the PA and PLO resumed their public relations offensive, among other activities.

In 2017, the President did not renew the statutory waiver which would allow the PLO to operate in the United States because of Defendants' failure to meet the statutory criteria; however, the President exercised his constitutional (*i.e.*, non-statutory) plenary foreign affairs powers to permit the PLO to continue to engage in certain activities, including "outreach to Palestinian-Americans, Palestinians in the United States, or interested Americans on matters relevant to the Palestinian community" to "enlist 'public sympathy' for their cause"—activities that the State Department described as "public diplomacy. U.S. Dep't of Justice, Off. of Legal Counsel, *Statutory Restrictions on the PLO's Washington Office* at 22 (Sept. 11, 2018).

This exchange of "reciprocal obligations" is exactly what makes the exercise of personal jurisdiction "fair" to the PA and PLO under the Due Process Clause. *Ford*, 141 S. Ct. at 1029-30 (explaining that "allowing jurisdiction in these cases treats Ford fairly" because Ford enjoyed "the benefits and protection" of state law when doing business in the forum).

The PA and PLO argue that the PSJVTA, "does not confer any benefit for Defendants to 'accept' in exchange for their purported 'consent' . . . . Accordingly, 'there is no bargain—no

social compact' between the parties that could evince Defendants' implied agreement to submit to jurisdiction in the United States." PA Mem. at 30-31 (quoting *Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993)). But the PSJVTA implicitly allows the PA (i) "to maintain any office, headquarters, premises, or other facilities or establishments in the United States;" (ii) establishing or procuring "any office, headquarters, premises, or other facilities or establishments in the United States;" or (iii) conducting "any activity while physically present in the United States" so long as they submit to personal jurisdiction in the United States for a very narrow scope of cases.

The circumstance of a statute like the PSJVTA, which recognizes the PA and PLO's ability to operate in the United States and also gives notice to the PA and PLO that the condition for this favorable treatment is submission to the personal jurisdiction of US courts in a very narrow subset of cases, is addressed by the *Brown v. Lockheed Martin Corp.* decision by the Second Circuit:

> it could be concluded that a carefully drawn state statute that expressly required consent to general jurisdiction as a condition on a foreign corporation's doing business in the state, at least in cases brought by state residents, might well be constitutional.

814 F.3d 619, 641 (2d Cir. 2016).

The PA and PLO believe they denigrate the PSJVTA by calling it "a disguised form of legislatively-imposed jurisdiction", PA Mem. At 24, but jurisdiction is always created by Congress as it passes laws in the national interest, to further congressional purposes. Congress has never attempted to disguise its opposition to the PA's payment of incentives and rewards to convicted terrorists and its intent to force the PA and PLO to submit to the jurisdiction of US courts for cases involving attacks on Americans. The PA and PLO have been aware of this fact

for decades and the PSJVTA is simply Congress's latest attempt to bring about this equitable result—and a direct response to the *Goodyear*/*Daimler* modification of the pre-existing status quo where the PA and PLO had to answer in U.S. court for terrorist attacks on Americans.

### 3.   Ties between PSJVTA Jurisdictional Predicates and this Case

The PA and PLO claim that their conduct, which triggers the Martyr Payments prong of the PSJVTA in this case, "has 'no direct connection to the United States, let alone to litigation in a United States court.'" PA Mem. at 26 (quoting *Fuld*, 578 F. Supp. 3d at 587).

*See* Exhibit 1.[11] Rimawi, convicted of Esther's murder and imprisoned by Israel, admitted to shooting Esther Klieman deposition was previously taken during an earlier discovery phase. Thus, there is a direct connection between the PA and PLO's conduct, occurring before, during, and after the passage of the PSJVTA and this case.

Furthermore, the PA and PLO's refusal to engage in good faith during the jurisdictional discovery phase have both made it impossible to discern the scale of their activities in the United States, as well as blocked Plaintiffs from learning whether the martyr payments transited the United States, as they did during the entire Second Intifada:

> Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS, finalizes the lists, maintains a database of persons eligible to receive benefits under the death and dismemberment plan, and *opens a dollar account for each beneficiary. Families who choose to collect the benefit must present to the*

[11]

> *Bank an official certification from the Palestinian Authority that includes the individualized identification number of the martyr . . .* Plaintiffs allege that these payments create an incentive to engage in terrorist acts by rewarding all Palestinian terrorists, regardless of their affiliation with a particular group . . . . Plaintiffs also allege that *funds raised by the Saudi Committee in Saudi currency, and deposited in the Committee's Arab Bank accounts, are then routed through the Bank's New York branch office, where they are converted to U.S. dollars, since Saudi currency cannot easily be converted into Israeli currency;* the funds are then transferred to Arab Bank branches located in the West Bank in Israel and used to fund terrorist activities.

*Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 577-78 (E.D.N.Y. 2005) (emphasis added). The Arab Bank case explains why it is likely that PA funds to support their martyrs program continue to transit through the United States, specifically New York. Plaintiffs have served Defendants with Requests for Production of Documents, *see* Plaintiffs' Reply re: Motion to Compel, *Klieman v. PA*, 1:04-cv-01173, DE 325, at 3-4 (D.D.C. filed October 21, 2021), which would examine any financial transfers through the United States connected to PA programs, including the martyr payments to Esther's killers.

The PA and PLO also incorrectly cite the recent D.C. Circuit decision in *Shatsky v. PLO* to argue the martyr payments cannot support jurisdiction in these cases. PA Mem. at 28. But *Shatsky v. PLO* merely stated that the plaintiffs in that case had not provided any proof that the martyr payments had occurred yet:

> The Palestinian Defendants are correct. *Perhaps the Justice for Victims Act will at some point create personal jurisdiction over the Palestinian Authority or the PLO.* But neither one of them can possibly have made any statutorily relevant payments before the jurisdictional trigger even takes effect. The mere prospect that they *might* do so in the future does not create personal jurisdiction now.

955 F.3d 1016, 1038 (D.C. Cir. 2020) (emphasis added). In this case, Plaintiffs have proof that the PA and PLO have been paying and continue to pay Esther's murderers.

The PA and PLO also argue that their conduct which satisfies the activities prong of the PSJVTA is not "'of such nature as to justify the fiction' that the party actually consented to submit itself to the jurisdiction of the court." PA Mem. at 28 (quoting *Fuld*, 578 F. Supp. 3d at 586-87).[12] However, the *Fuld* district court decision is not persuasive for several reasons. *Fuld* is largely driven by the reasoning of *College Savings Bank*, finding that it "all but compels the conclusion that personal jurisdiction is lacking here." 578 F. Supp. 3d 577, 588 (S.D.N.Y. 2022). As discussed above, *supra* at 22-23, *College Savings Bank* is not applicable.

The *Fuld* court also characterized the personal jurisdiction issue as a "fundamental constitutional right." *Id.* at 580, 588, 591. But not even the PA or PLO describe the issue this way, and research does not turn up a case in support.[13] Most importantly, *Fuld* leans heavily on the following *dicta* from *College Savings Bank*:

> To the contrary, the Court explicitly noted that constructive — i.e., "deemed" — consents were "simply unheard of in the context of *other* constitutionally protected privileges. . . . *Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights*."

---

[12] Considering the PA and PLO refused to produce any information in jurisdictional discovery beyond a very select and narrow category of documents, their attacks on the quantity of information disclosed during jurisdictional discovery should be ignored—jurisdictional discovery is not complete. Plaintiffs' have moved to compel the jurisdictional discovery that was sought, which included documents and information that the PA did not produce in *Shatsky* or *Fuld*, and has not yet been provided. *See* Plaintiffs' Motion to Compel, *Klieman v. PA*, 1:04-cv-01173, DE 315-1, at 6-8, 16-17 (D.D.C. filed Sept. 30, 2021). As the PA and PLO admitted in their Opposition to Plaintiffs' Motion to Compel jurisdictional discovery: "Plaintiffs failed to explain why the jurisdictional discovery already produced—which was sufficient to litigate the PSJVTA issues in *Shatsky*—was not equally sufficient to litigate the identical issues in this case." DE 321, at 2 (D.D.C. filed Oct. 14, 2021).

[13] One leading treatise has catalogued "fundamental rights" as: (1) freedom of association; (2) the right to vote; (3) interstate travel; (4) fair procedures in the criminal process; (5) fair procedures (*i.e.*, notice and an opportunity to be heard) in claims against governmental deprivations of life, liberty, or property; and (6) privacy in matters relating to an individual's personal life. 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Const. L.* § 15.7 (5th ed. 2012 & Supp. 2022).

*Fuld*, 578 F. Supp. 3d at 588. But this conclusion is clearly wrong, as discussed above, s*upra* at 23-24, as the Supreme Court has repeatedly upheld constructive consent in relation to fundamental constitutional rights.

**B.  "Deemed Consent" does not violate the Due Process Clause in the Limited Circumstances addressed by the PSJVTA**

While the PSJVTA rests on multiple, fundamental bases for its constitutionality, some of the courts that have recently reviewed it have recoiled at a seeming invasion of their prerogative to decide the case based upon what-had-been the current law. *See Fuld*, 578 F. Supp. 3d at 587 ("To be blunt: The PSJVTA is too cute by half to satisfy the requirements of due process here."). A review of each of the uncontroversial bases and their intersection in support of the PSJVTA should put these objections to rest.

Through a constructive consent provision, the PSJVTA requires the PA and PLO to submit to the personal jurisdiction of U.S. courts for a narrow range of very specific cases; it is not a general jurisdiction statute. Congress has the power to assert personal jurisdiction on the basis of overseas conduct. As the Supreme Court has explained: "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).

The PA and PLO argue that "Congress 'simply took conduct in which the PLO and PA had previously engaged—conduct that the Second and D.C. Circuits had held was insufficient to support personal jurisdiction in *Waldman I*, *Livnat*, *Shatsky*, and *Klieman*—and declared that such conduct 'shall be deemed' to be consent.'" PA Mem, at 25-26 (quoting *Fuld*, 578 F. Supp. 3d at 587). This observation is of no moment as Congress also has the power to apply new rules to

pending cases as long as it explicitly "'congressional power to make valid statutes retroactively applicable to pending cases has often been recognized.'" *Bank Markazi v. Peterson*, 578 U.S. 212, 228 (2016) (citing *United States* v. *Schooner Peggy*, 5 U.S. 103, 1 Cranch 103 (1801)); *cf. Landgraf v. USI Film Products*, 511 U.S. 244, 269–70 (1994). The only live issue therefore is whether deeming consent on either of the two predicates is reasonable under the circumstances and comports with notions of fair play and substantial justice.

Moreover, there should be no concern that the PSJVTA somehow confers general personal jurisdiction over the Defendants and conflicts with the *Goodyear/Daimler* cases. The PSJVTA expressly links the decision to engage in specified conduct to submission to personal jurisdiction rather than relying on a judicial gloss on the effect of certain activities (creating effective fair warning); and rather than providing all-purpose general jurisdiction for any case of any kind, it provides jurisdiction in a narrow class of cases of particular interest to the national security of the United States (legitimate governmental interest). "[B]ecause of its nature as a personal right, a defendant may consent to personal jurisdiction without regard to what a due process analysis of its [minimum] contacts would yield." *Brown v. Lockheed Martin, Corp.*, 814 F.3d 619, 641 (2d Cir. 2016).

*Brown's* concern was that *Daimler* itself had specifically "rejected the idea that a corporation was subject to general jurisdiction in every state in which it conducted substantial business." *Id*. at 640. That concern does not apply to the PSJVTA, which creates limited jurisdiction in a narrow class of cases arising under federal law based on Defendants' U.S. presence and terrorism-supporting conduct. Here, the PSJVTA is carefully drawn in precisely the manner that *Brown* suggests. The conditions that trigger consent to jurisdiction are express and

unmistakably clear; the law serves legitimate governmental interests; it concerns a limited class of cases—ATA suits brought by U.S. nationals or their families; and it implicates no federalism concerns, because the adjudication of this case by the United States does not encroach on the sovereignty of another sovereign body in our constitutional system. The Constitution does not forbid Congress from enacting a statute providing for implied consent jurisdiction in connection with a specific federal claim based on the defendant's relevant conduct directed at the citizens or territory of the United States.

## II.      THERE IS NO SEPARATION OF POWERS ISSUE IN THIS CASE

The PA and PLO's separation of powers argument quickly collapses after a cursory review of their primary support, *Bank Markazi v. Peterson*, 578 U.S. 212 (2016). PA Mem. at 43-44. The statute at issue in *Bank Markazi* left far fewer determinations to the district court than the PSJVTA leaves to the courts here.[14] The defendant in *Bank Markazi* challenged the statute by arguing that "Congress effectively dictated specific factual findings in connection with a specific litigation — invading the province of the courts." *Id.* at 224. "[T]he statute "effectively" directed certain fact-findings and specified the outcome under the amended law." *Id.* at 229. The Supreme

---

[14] As the Court in *Bank Markazi v. Peterson* detailed, the law at issue determined liability based upon a small set of questions posed for the district court to adjudicate: "Before allowing execution against an asset described in §8772(b), a court must determine that the asset is:

'(A) held in the United States for a foreign securities intermediary doing business in the United States;
'(B) a blocked asset (whether or not subsequently unblocked) . . . ; and
'(C) equal in value to a financial asset of Iran, including an asset of the central bank or monetary authority of the Government of Iran . . . .' §8772(a)(1).

In addition, the court in which execution is sought must determine "whether Iran holds equitable title to, or the beneficial interest in, the assets . . . and that no other person possesses a constitutionally protected interest in the assets . . . under the Fifth Amendment to the Constitution of the United States." 578 U.S. 212, 219 (2016).

Court brushes aside this challenge, finding "a statute does not impinge on judicial power when it directs courts to apply a new legal standard to undisputed facts." *Id.* at 230. The new statute did not usurp the judicial power because it "provides a new standard clarifying that, if Iran owns certain assets, the victims of Iran-sponsored terrorist attacks will be permitted to execute against those assets." *Id.* at 231-32. The same result occurs in this case, the PSJVTA describes different categories of conduct which trigger the deemed consent provisions, a court must find both whether such conduct has occurred and whether the exercise of jurisdiction is reasonable.

Also, the PA and PLO are incorrect in their argument that, "[t]he PSJVTA usurps the judicial function by directing courts to always find consent if its factual predicates are met . . . ." PA Mem. at 43. As Plaintiffs demonstrate above, *supra* at 28, even if the factual predicates are met and a court finds consent to the power of the court, then the exercise of jurisdiction must still reasonably advance legitimate government interests in the context of our federal system.

The PA and PLO then argue that "[a] statute like the PSJVTA, which singles out disfavored groups for disparate treatment, is therefore more—not less—constitutionally suspect." PA Mem. at 44. But the statute at issue in *Bank Markazi* singled out a single entity in the context of a single case and survived constitutional review. *Bank Markazi v. Peterson*, 578 U.S. 212, 232-33 (2016) ("The Bank's argument is further flawed, for it rests on the assumption that legislation must be generally applicable, that "there is something wrong with particularized legislative action. We have found that assumption suspect . . . .").

## CONCLUSION

For the foregoing reasons, the Court should find the PSJVTA meets the requirements of the Due Process Clause and does not raise any separation of powers concerns; and therefore is constitutional.

Dated:  June 6, 2023                     Respectfully Submitted,

                                         HEIDEMAN NUDELMAN & KALIK P.C.


By:      */s/ Richard D. Heideman*_____
*/s/ Noel. J. Nudelman*_____
Richard D. Heideman (No. 377462)
Noel J. Nudelman (No. 449969)
Tracy Reichman Kalik (No. 462055)
Joseph H. Tipograph (No.997533)
HEIDEMAN NUDELMAN & KALIK, PC
5335 Wisconsin Avenue, NW; Suite 440
Washington, DC  20015
Telephone: 202.463.1818
Facsimile: 202.463.2999

PERLES LAW FIRM, P.C
Steven R. Perles (No. 326975)
Edward MacAllister (No. 494558)
816 Connecticut Ave., NW
12th Floor
Washington, DC 20006
Telephone: 202-955-9055
Telefax: 202-955-3806
*Counsel to the Plaintiffs*